**E-Filed 3/31/2010**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| RENEE TIETSWORTH, SUZANNE REBRO, and SONDRA SIMPSON, on Behalf of Themselves and All Others Similarly Situated, | Case Number 5:09-CV-00288 JF (HRL) |
| Plaintiffs, | **ORDER[1] GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS AND GRANTING DEFENDANTS' MOTION TO STRIKE CLASS ALLEGATIONS** |
| v. | |
| SEARS, ROEBUCK AND CO., and WHIRLPOOL CORPORATION, | Re: Docket Nos. 67, 69 |
| Defendants. | |

Defendants Whirlpool Corporation ("Whirlpool") and Sears, Roebuck and Co. ("Sears") move to dismiss and strike class allegations from the Second Amended Complaint ("SAC") filed by Plaintiffs Renee Tietsworth ("Tietsworth"), Suzanne Rebro ("Rebro"), Sondra Simpson ("Simpson"), John Carey ("Carey"), and John Engelke ("Engelke"), on behalf of themselves and a putative class of similarly situated consumers.  For the reasons discussed below, the motion to dismiss will be granted in part and dismissed in part and the motion to strike will be granted, with leave to amend.

## I. BACKGROUND

On December 22, 2008, Tietsworth filed suit in state court on behalf of herself and all

---

[1]      This disposition is not designated for publication and may not be cited.

others similarly situated, alleging that Defendants engaged in fraudulent concealment and nondisclosure, breached express and implied warranties, violated the California Consumers Legal Remedies Act ("CLRA") and California Unfair Competition Law ("UCL"), and unjustly enriched themselves at the expense of Tietsworth and the putative class.  On January 22, 2009, Defendants removed the action to this Court.  One week later, Defendants moved to dismiss the action pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6).  On May 14, 2009, this Court dismissed the action with leave to amend.  On June 15, 2009, Plaintiffs filed their first amended complaint ("FAC"), adding two individual plaintiffs, Rebro and Simpson, re-alleging Tietsworth's original claims and adding a new claim under the Magnuson-Moss Warranty Act ("MMWA").  15 U.S.C. 2301 et seq.  Defendants again moved to dismiss the action pursuant to Rule 12(b)(6) and on October 13, 2009 the Court granted the motion, again with leave to amend.

On November 12, 2009, Plaintiffs filed a second amended complaint ("SAC")[2], adding two individual plaintiffs, John Carey and John Engelke, and re-asserting the same claims for relief pled in the FAC.  On December 14, 2009, Defendants filed the instant motions to dismiss and strike class allegations.  On February 12, 2010, Plaintiff John Engelke voluntarily dismissed his complaint against all Defendants without prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A).  Accordingly, the Court's analysis of Defendants' motions will be limited to the allegations of Plaintiffs Tietsworth, Rebro, Simpson, and Carey.

Plaintiffs allege that at all relevant times, Whirlpool manufactured top-loading Kenmore Elite Oasis automatic washing machines ("the Machines"), and Sears marketed, advertised, distributed, warranted, and offered repair services for the Machines.  SAC ¶ 12.  Each individual plaintiff claims to have bought a new Oasis washer from Sears between May 2006 and June 2007; Plaintiffs allege that thousands of the Machines contain a defect that causes them to "stop

---

[2]  On February 12, 2010, Plaintiffs filed a "Corrected Second Amended Complaint."  The Court considers the corrected SAC in this order.

2

in mid-cycle and display a variety of 'F' error codes." SAC ¶¶ 30, 51, 56, 67. 74.[3]  Rebro,
Simpson and Carey claim that these electrical problems began within the first year after they
purchased their washers.  *Id.* ¶¶ 60, 70, 76.  Plaintiffs also allege that the "F" error codes are the
result of defective Electronic Control Boards and that the defect forces users to restart the
Machines, sometimes repeatedly, to complete a single load of laundry.  *Id.* ¶¶ 32, 52, 61, 70, 76.[4]

Plaintiffs claim that the alleged defects in the Electronic Control Boards belie Sears'
representation that "the Machines were and are the highest quality, top-of-the-line washers that
allow consumers to do laundry in a more convenient, faster and efficient manner and enable
consumers to save water, energy and time."  *Id.* ¶ 13.  They allege a series of misrepresentations
by Defendants, including:  statements on the Sears website and contained in stickers and
informational placards on floor models of the Machines in Sears' showrooms that the Machines
would use 47% less water and 53% less energy and would lower water and energy bills, *id.* ¶¶ 13,
15; statements made by Sears' salespeople that the Machines were "top-of-the-line" and "would
save them energy and water and would allow them to wash even large loads in a single cycle
without becoming unbalanced, *id.* ¶ 14; statements in the owner's manual that "[y]our new
Kenmore product is designed and manufactured for years of dependable operation" and that the
Machine has features that "increase the ease of use and improve wash performance," including
but not limited to, an electronic panel that is "easy to use,'" *id.* ¶16; and statements made in an
extensive advertising and promotional campaign that repeated Defendants' representations with
respect to the greater efficiency and durability of the Machines.  *Id.* ¶ 26.

---

[3] Plaintiffs claim that thousands of other Machine owners have experienced similar
problems with the Electronic Control Boards and refer to selected complaints from on-line
consumer forums.  SAC ¶ 96.

[4] Plaintiffs assert that "Machines equipped with the Electronic Control Boards pose a
serious personal safety risk, as the defective boards have led to the Machines spinning out of
control and literally exploding on a number of occasions...causing the heavy metal lid to detach
and fly across the laundry room. . .causing severe property damage and threatening very serious
bodily injury."  SAC ¶¶ 18, 31, 34.  It is not alleged that any named Plaintiffs have witnessed this
or have been harmed by such an occurrence.

Plaintiffs allege that Defendants' statements "relate directly to the functioning and performance of the Machine's Electronic Control Board because the Electronic Control Board controls the laundry cycles, the water levels and spin speed." *Id.* ¶ 17.  They claim that a functioning Electronic Control Board is necessary to operate the Machine in a manner that saves energy and water and finishes loads of laundry as advertised.  *Id.*

Plaintiffs also claim that Defendants had a duty to disclose the defect in the Electronic Control Board based on their alleged exclusive knowledge of the defect. *Id.* ¶ 19.  Plaintiffs allege that Defendants knew about the defect by May 2006 at the latest.  *Id.*  The SAC alleges specifically that:  "the Machines already had the highest rate of return by customers due to complaints about the electronic controls"; "the F51 error code was the leading number of service calls"; "the Electronic Control Boards were the most frequently replaced part on the Machines in 2006"; and "Defendants concluded [internally] that software remodification was required to solve the problem and began 'reprogramming boards to correct severe and destabilizing of balance problems."  *Id.*  In addition, Plaintiffs claim that in 2007 Defendants acknowledged the connection between the Electronic Control Board defect and the Machines spinning out of control in a "Service Flash entitled 'Wash Basket Loses Stability during Some Spin Conditions.'" *Id.*  Moreover, they allege that Defendants "mutually acknowledged that units equipped with the defective Electronic Control Boards, '*required* repair/replacement.'" *Id.*

The SAC also asserts that Defendants, even after issuing the Service Flash, continued to sell the Machines and Plaintiffs and Class members continued to be denied replacements for their defective parts, told that neither the Machines nor the Electronic Control Board were defective and charged for repairing defective parts.  *Id.*  Defendants also allegedly limited the Service Flash to Machines with serial codes between CS48-CT35 "even though all of the Machines suffered from the same defect."  *Id.*  Moreover, Whirlpool and Sears allegedly shared information concerning the Machines' defects and adopted "joint process initiatives" to "track and develop ways to address customer complaints with respect to machines manufactured by Whirlpool and sold by Sears since 2005."  *Id.* ¶ 20.  Plaintiffs claim that Sears and Whirlpool "collaborated

about potential redesigns" to address the defective Machines and agreed that Whirlpool would pay for a portion of the defective Electronic Control Boards that were replaced. *Id.* The SAC states that Sears Product Engineer David Chowanec indicated that the defective Electronic Control Boards in particular negatively impacted Machines purchased in 2006 and 2007 and that Sears is "currently trying to seek compensation [from Defendant Whirlpool] for a 'catastrophic failure.'" *Id.* ¶ 21.

Then, in December 2007, Defendants allegedly issued a Service Flash recognizing the defect and directing the Electronic Control Board be replaced in floor models of certain types of the Machines. *Id.* ¶ 22. The Service Flash did not apply to Machines already sold to consumers. *Id.*

Plaintiffs claim that Defendants' failure to disclose the defect is material in that they would not have purchased or would have paid significantly less for their Machines had the defect been disclosed. *Id.* ¶¶ 24, 28, 37, 55, 59, 66, 69, 83. Simpson alleges that she specifically asked a Sears agent about any potential problems with the Electronic Control Board and that the agent failed to disclose the alleged defect. *Id.* ¶ 68.

Tietsworth alleges she first experienced an error code problem approximately eighteen months after the purchase of her machine and that she contacted Sears in June 2008. *Id.* ¶¶ 51, 52. She claims that Sears informed her that "she could either purchase an extended warranty for approximately $218 or have someone come out to repair the Machine" at a cost of $70, a technician fee that did not include the cost of repair. *Id.* ¶ 53. She does not allege that she incurred any actual expenses*, id.* ¶¶ 51-55, nor does she allege that she asked Sears to repair or replace her washer at no cost. *Id.*

Rebro alleges that she purchased her washer in May 2006 and that she began experiencing Electronic Control Board problems "within the first months of purchasing the Machine." *Id.* ¶¶ 56, 60. She claims that when she purchased the Machine the Sears salesperson assured her that it would save water, could handle very large loads, and was the best in its class. *Id.* ¶ 57. She alleges that she contacted Sears during the first month or two of ownership

regarding the error code problems, and that a Sears representative told her that the Machine did not need service and instructed her to lower the spin speed, which did not solve the problem. *Id.* ¶ 60. Rebro also claims that she contacted Sears a second time "during the one-year warranty period" and that Sears again refused to acknowledge that the Machine was defective or needed to be serviced. *Id.* Rebro does not claim explicitly to have asked for a replacement or repair at that time.

According to the SAC , a Sears representative, "[o]nly after Plaintiff Rebro's one-year warranty had expired...acknowledge[d] that these problems were caused by the Electronic Control Board." *Id.* ¶ 62. Rebro claims that she had her washer serviced on November 21, 2008 and that at that time a Sears repair person admitted that the Board was defective and that "Sears had been well-aware of the problem." *Id.* The SAC also alleges that the repair person told Rebro that it would cost $383.94 to replace the defective Board and that she thereafter attempted to find the part at a lower price on the Internet. *Id.* Later, when she could not find the part, she called Sears. One representative allegedly told Rebro that the part was on recall, but another said that this information was incorrect and that the cost of repair would be approximately $400, plus another $200 for an additional one-year warranty. Rebro alleges that after she complained about the expense, Sears offered her a "special" for $214, which would include parts, labor and a one-year limited "Service Smart Protection Agreement." *Id.* Plaintiff purchased the Agreement for $214. *Id.* Finally, Rebro claims that she continued to experience similar problems with her new Electronic Control Board. *Id.* ¶ 63.

Simpson alleges that she purchased her Machine in January 2007 and that she began experiencing error code problems in July 2007. *Id.* ¶¶ 67, 70. She claims that at the time of the purchase she asked about potential problems with the Electronic Control Boards and that a "Sears agent specifically told her she could reasonably expect the Machine equipped with the Electronic Control Board to last for at least eight years." *Id.* ¶ 68. She does not allege that the salesperson promised that the Electronic Control Board itself would function properly for that period of time. She states that a service technician came to her home on three separate occasions

during the first year of ownership to service her Machine and that the technician did not correct the problem and refused to replace the defective Board. *Id.* ¶ 71.  It was only when her Machine failed shortly after expiration of the warranty period that Sears admitted that the Electronic Control Board was defective and charged her $320 for an out-of-warranty repair. *Id.* ¶ 72.

Carey alleges that he purchased his Machine in June 2007 and that the Machine began to stop in mid-cycle and display an F1 error code within six months of ownership. *Id.* ¶¶ 74, 76. Carey contacted Sears in "early 2008" and was told to unplug the Machine and then plug it back in. *Id.* ¶ 76.  Carey alleges that the defect caused him to drain the Machine and restart it repeatedly.  The problem became worse over time, and sometimes the Machine would stop three or four times during one cycle. *Id.*  In addition, Carey claims that the "fabric softener dispenser became detached from [his Machine] during an unbalanced load episode" within the one-year warranty period. *Id.* ¶ 77.  Carey alleges that he called to report the problem and that Sears sent a replacement part in response. *Id.*  Within the first year of ownership, Carey scheduled a service call and a Sears representative came to repair his Machine. *Id.* ¶ 78.  The representative allegedly admitted that the Machines had "intermittent problems, but did not replace the Electronic Control Board." *Id.*  Within a few days of the repair, the defect manifested itself again and the Machine began to fail more frequently. *Id.* ¶ 79. Carey contacted Sears again to complain in July or August 2008, and Sears informed him that replacing the Electronic Control Board would cost $450 and an extended warranty would cost $100. *Id.*  Because his Machine failed so consistently, Carey declined to purchase the replacement or extended warranty and sold the Machine for $25. *Id.* ¶ 80.

Plaintiffs claim that "Sears represented that the Machines' control boards would perform free of defects for a period of years in its written materials, including the owner's manual." *Id.* ¶¶ 35, 130, 150.  However, the actual terms of the one-year limited warranty, which properly may be considered under the incorporation by reference doctrine, *see Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *cert. denied*, overruled on other grounds by *Galbraith v. City of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002), provide that if the "appliance fails due to a defect in material or

workmanship within one year from the date of purchase" the purchaser is entitled to "arrange for free repair," *see* Affidavit of William Griego, Ex. A at 3, or have the Machine "replaced if repair proves impossible." *See id.*, Ex. B at 3.

Finally, Plaintiffs allege that, in April 2009, Defendants attempted to engage in a purported "secret warranty program" by sending letters to some, but not all, affected consumers, offering a free "upgraded control board' that [would] 'improve spin performance...and improve the detection of and adjust for potential out of balance situations'...but only if a response is received 'within 90 days of receipt...'" SAC ¶¶ 47. The letter makes no admission of any defect in the Electronic Control Boards. Rebro alleges that she demanded a reimbursement under the "upgrade program," but that Defendants said she was ineligible because of her purchase of the "Service Smart Protection Agreement." Rebro has received no reimbursement. *Id.* ¶ 64. Plaintiffs allege that Defendants' "remedial actions, including its [sic] secret warranty program and the April 2009 letter, came about as a direct result of this litigation...[and that] Plaintiffs are entitled to attorneys' fees and costs for the benefit conferred on the thousands of Class members who received free Electronic Control Boards pursuant to the April 2009 letter." *Id.* ¶ 50; *see also* SAC, Ex. A (Correspondence from Plaintiffs' counsel to Defendants) (notifying Defendants of the facts upon which the instant action is based).

## II. MOTION TO DISMISS

### A. Legal Standard

A complaint may be dismissed for failure to state a claim upon which relief may be granted if a plaintiff fails to proffer "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Allegations of material fact must be taken as true and construed in the light most favorable to the nonmoving party. *Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir. 1998), *see also Cahill v. Liberty Mut. Ins. Co.,* 80 F.3d 336, 337-38 (9th Cir. 1997). However, the Court need not accept as true allegations that are conclusory, unwarranted deductions of fact, or unreasonable inferences. *See Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir. 2001); *see also Twombly*, 550 U.S. at 561 ("a wholly

Case No. 5:09-CV-00288 JF (HRL)
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS AND GRANTING DEFENDANTS' MOTION TO STRIKE CLASS ALLEGATIONS
(JFLC1)

conclusory statement of [a] claim" will not survive a motion to dismiss).  Leave to amend should be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment. *Lucas v. Dep't of Corr.*, 66 F. 3d 245, 248 (9th Cir. 1995).

**B.  Discussion**

Although their claims arise under state law, Plaintiffs' allegations are subject to the pleading requirements of the Federal Rules.  Accordingly, claims alleging fraud are subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b).  *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-04 (9th Cir. 2003) (if "the claim is said to be 'grounded in fraud' or to 'sound in fraud,' [then] the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b)."); *Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir.1994) (claims based in fraud "must state precisely the time, place, and nature of the misleading statements, misrepresentations, and specific acts of fraud.").

**1. Fraudulent Concealment and Nondisclosure**

To establish a claim for fraudulent concealment, a plaintiff must allege that: (1) the defendant concealed or suppressed a material fact, (2) the defendant was under a duty to disclose the fact to the plaintiff, (3) the defendant intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff was unaware of the fact and would not have acted as she did if she had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff sustained damage.  *Hahn v. Mirda,* 54 Cal. Rptr. 3d 527, 532 (Cal. Ct. App. 2007) (citation omitted).

As was the case with the FAC, the principal element of fraudulent concealment at issue here is whether Plaintiffs have pled with sufficient particularity that Defendants had a duty of disclosure with respect to the allegedly defective Electronic Control Boards.  Plaintiffs argue that Defendants had such a duty because Defendants allegedly "made partial disclosures and representations" about the Machines, were in a "superior position to know the truth about the Machines," and "actively concealed" the claimed defect in the Electronic Control Boards.  SAC ¶ 142.  Plaintiffs also allege that Defendants had a duty to disclose because the machines "pose a

serious safety hazard." *Id.* ¶ 141.

In *LiMandri v. Judkins*, 52 Cal.App.4th 326 (1997), the court identified four circumstances in which a duty to disclose arises:

> (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts.

*Id.* at 336, quoting *Heliotis v. Schuman* 181 Cal.App.3d 646, 651, 226 Cal.Rptr. 509 (1986).

As they did in the FAC, Plaintiffs again allege that Defendants made partial representations regarding the quality of the Machines.  Plaintiffs point to numerous factual statements in the owner's manual, including statements that the Machines were "designed and manufactured for years of dependable operation," and that they would "conserve[] resources and also lower[] your water and energy bills."  SAC ¶ 16.  However, the Court again concludes that there is no allegation at all, let alone an allegation with Rule 9 specificity, that Defendants made any representations about the allegedly defective Electronic Control Boards.[5]

Plaintiffs also allege that they have pled adequately the existence of a safety defect that gives rise to a duty to disclose.  The SAC, like the FAC, alleges that:

> [T]he Machines equipped with the Electronic Control Boards pose a serious personal safety risk, as the defective boards have led to the Machines spinning out of control and literally exploding on a number of occasions...causing the heavy metal lid to detach and fly across the room. . .causing severe property damage and threatening very serious bodily injury.

SAC ¶ 34.  There are no factual allegations that any named Plaintiff or any identifiable member

---

[5]  As they did in the FAC, Plaintiffs again allege that Simpson asked a Sears sales representative about potential problems with the Electronic Control Board and that the representative "specifically told her she could reasonably expect the Machine equipped with the Electronic Control Board to last for at least eight years." SAC ¶ 68.  This specific inquiry related to the Electronic Control Boards only is alleged to have been made by Simpson.  Moreover, by its own terms, the salesman's assurance was given with respect to the long-lasting quality of the "Machine equipped with the Electronic Control Board," not the Electronic Control Board itself.  A representation made by a single salesman employed by Sears is not the equivalent of a misrepresentation by Whirlpool and Sears sufficient to create an affirmative duty to disclose as to all potential purchasers.

of the putative class actually experienced a malfunction involving the machine "spinning out of control" risking personal injury.[6]  Under these circumstances, Plaintiffs lack standing to pursue a claim based on the nondisclosure of the alleged safety defect.  *In re Apple & AT & TM Antitrust Litig.*, 596 F.Supp.2d 1288, 1309 (N.D. Cal. 2008), quoting *Lewis v. Casey*, 518 U.S. 343, 347 (1996) (concluding that "named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.")

Finally, a plaintiff cannot establish a duty by pleading, in a purely conclusory fashion, that a defendant was in a superior position to know the truth about a product and actively concealed the defect.  *Oestreicher v. Alienware Corp.*, 544 F.Supp.2d 964, 974 (N.D. Cal. 2008) (holding that a determination in plaintiffs' favor, given plaintiffs' general allegations of "exclusive knowledge as the manufacturer" and active concealment of a defect, would mean that any unsatisfied customer could make a similar claim every time a product malfunctioned).  However, a plaintiff can establish that a duty exists if she alleges facts showing that the defendant knew of the alleged defect and did nothing to fix it or alert customers to its existence.  *Falk v. General Motors Corp.*, 496 F.Supp.2d 1088, 1099 (N.D. Cal. 2007).

The SAC alleges new facts with respect to Defendants' exclusive knowledge of the defective Electronic Control Boards.  SAC ¶ 19.  Plaintiffs claim that: (1) "[b]y May of 2006 at the latest, Defendants knew about the defect and the problems it was causing consumers" based upon the fact that the "Machines already had the highest rate of return by customers due to complaints about the electronic controls and that the Machines would stop working", *id.* (2) "the F51 error code was the leading number of service calls and the Electronic Control Boards were the most frequently replaced part on the Machines in 2006, due to the defect," *id.*; (3) "Defendants concluded that software modification was required to solve the problem and began 'reprogramming boards to correct severe and destabilizing off balance problems,'" *id.*; (4)

---

[6]  Plaintiffs do allege that Carey's Machine became unbalanced during a cycle and that his fabric softener dispenser became detached.  SAC ¶ 77. However, Carey does not allege that his Machine spun out of control in such a way that his personal safety was at risk.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

"Defendants mutually acknowledge[d] that units equipped with the defective Electronic Control Boards, 'required repair/replacement,'" *id*; (5) Sears and Whirlpool "developed 'joint process initiatives,' and the two companies worked together to track and develop ways to address customer complaints with respect to machines manufactured by Whirlpool and sold by Sears since 2005," *id.* ¶ 20; Defendants "negotiated a deal where Whirlpool paid for a portion of the defective Electronic Control Boards that were replaced," *id.*; and Sears "Product Engineer David Chowanec indicated that the defective Electronic Control Boards particularly impacted Machines purchased in 2006 and 2007" and that Sears sought compensation from Whirlpool for the "catastrophic failure." *Id.* ¶ 21.

Plaintiffs also allege that Defendants actively concealed this information when "Plaintiffs and Class members contacted Sears for service of their defective Machines and were either told the Machines were not defective or denied free service or replacement of the defective parts." *Id.* ¶ 23.  Finally, Plaintiffs allege that if Defendants had informed them of this information they would not have purchased the Machines or would have paid less for them.  These additional facts are sufficient to state a claim that Defendants had exclusive knowledge of the alleged defect in their Electronic Control Boards and that Plaintiffs relied upon Defendants' alleged material omission in purchasing the Machines.  Together with Defendants' alleged denial of a defect when Plaintiffs called to request free servicing or replacements, these facts also are sufficient to state a claim for active concealment.  Accordingly, the Court concludes that Plaintiffs successfully have alleged the existence of a duty and have stated a claim for fraudulent concealment.[7]

---

[7]  Plaintiffs claim that Defendants maintain a "secret warranty program." SAC ¶ 50.  The Court addressed nearly identical allegations in the FAC and was presented with similar allegations in *Stearns v. Comfort Retail Corp.,* No. 08-2746 JF, 2009 WL 1635931, at *9-10 (N.D. Cal. June 5, 2009).  In *Stearns*, the plaintiffs claimed that the defendants actively sought to conceal the fact that their "Sleep Number" beds grew mold, and that they did so by providing refunds of the purchase price to any purchaser who complained about a "Sleep Number" bed.  The Court concluded that "the fact that Select Comfort offered a full refund does not support the theory that it had a plan to deceive Plaintiffs by somehow placating Plaintiffs and other potential litigants," and noting that return of a defective product "has been recognized by courts as a

Case No. 5:09-CV-00288 JF (HRL)
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS AND
GRANTING DEFENDANTS' MOTION TO STRIKE CLASS ALLEGATIONS
(JFLC1)

## 2.  Unfair Competition Law (UCL)

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."  Cal. Bus. & Prof. Code § 17200.  Accordingly, "[a]n act can be alleged to violate any or all of the three prongs of the UCL—unlawful, unfair, or fraudulent."  *Berryman v. Merit Prop. Mgmt., Inc.*, 152 Cal.App.4th 1544, 1554 (2007).  For an action based upon an allegedly unlawful business practice, the UCL "borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable."  *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) (quotations omitted).  A UCL claim predicated on unfair business practices may be grounded upon a violation of a statute, *see Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995), or be a "standalone" claim based on an alleged act that "violates established public policy or if it is immoral, unethical, oppressive or unscrupulous and causes injury to consumers which outweighs its benefits."  *McKell v. Wash. Mut., Inc.*, 142 Cal. App. 4th 1457, 1473 (2006).  *See also Cel-Tech*, 20 Cal. 4th at 180 ("[A] practice may be deemed unfair even if not specifically proscribed by some other law.")  Plaintiffs allege that Defendants violated the UCL by failing to comply with California Civil Code §§ 1572, 1668, 1709, 1710, 1770(a)(2), 1770(a)(5), 1770(a)(7), 1770(a)(9), 1770(a)(19), § 17500 of the Business and Professions Code, the Song-Beverly Warranty Act and the Magnuson-Moss Warranty Act.  SAC ¶ 116.

### A.  Unlawful Business Practices

Plaintiffs claim that Defendants' conduct violates California Civil Code Section § 1668,

---

standard business practice, serving many legitimate business purposes." *Id.* at 9.  The Court held further that allegations with respect to implementation of a new design or other remedial action were immaterial for the purpose of establishing the elements of a fraudulent concealment claim. *Id.* at 9, citing Fed. R. Evid. 407.  As was the case with the FAC, Defendants' offer of free upgrades of the Electronic Control Boards alone does not support a permissible inference that Defendants actively concealed the alleged defect.  As in *Stearns*, Defendants' alleged replacement policy properly is characterized as a standard business practice serving "many legitimate business purposes." *Id.* at 9.  As Rule 407 suggests, to hold otherwise would create a perverse incentive for manufacturers not to provide consumers with refunds or upgrades when defects exist.

which prohibits a party from contracting away liability "for his own fraud, or willful injury to the person or property of another."  Cal. Civ. Code. § 1668.  As they did in opposition to Defendant's prior motion to dismiss, Plaintiffs point specifically to Defendants' disclaimer of implied warranties, which purports to limit any implied warranty to one year or the shortest period allowed by law, with the sole remedy under the express warranty being repair or replacement.  Opp. Mot. at 10-11.  Plaintiffs cite no authority holding that a disclaimer limiting an implied warranty to the same time period as an express warranty or limiting the consumer's remedy to repair or replacement amounts to contracting away liability for "fraud or willful injury."  The cases that Plaintiffs do cite are inapposite.  *See Baker Pacific Corp. v. Suttles,* 220 Cal. App. 3d 1148, 1151, 1154 (1990) (invalidating release covering "all risks in connection with potential exposure of asbestos" because the release concerned would release Defendants from "fraud and intentional acts"); *Klein v. Asgrow See Co.*, 246 Cal.App.2d 87, 100 (1966) (invalidating disclaimer of warranty where fraud existed).   Plaintiffs thus cannot rely on Section 1668 to establish a violation of the UCL's "unlawful" prong.

In addition, Plaintiffs claim that Defendants have violated Section 17500 of California's Business and Professions Code by making misleading representations in informational placards on the floor models of the Machines and in owners' manuals.  SAC ¶¶ 13-16.  As they did in opposition to Defendants' prior motion to dismiss, Plaintiffs argue that statements that the Machines are "designed and manufactured for years of dependable operation" and that the Machines "save you time by allowing you to do fewer, larger loads" amount to "misdescriptions of specific or absolute characteristics of a product."  *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1145 (9th Cir. 1997) (claiming that turfgrass requires "50% less mowing" is a specific and measurable claim.")  However, these alleged "misdescriptions" are not statements about "specific or absolute characteristics of a product," such as the Electronic Control Panel, but properly are considered non-actionable puffery.  *See Anunziato v. eMachines Inc.*, 402 F.Supp.2d 1133, 1139 (C.D. Cal. 2005) (holding that the representations concerning the "outstanding quality, reliability, and performance" of a product were non-actionable puffery."); *see also*

*Tietsworth v. Sears, Roebuck & Co.,* No. C 09-00288 JF, 2009 WL 3320486, at *7 n. 5 (N.D. Cal. Oct 13, 2009) (providing a more in depth analysis of the identical allegations).

Next, Plaintiffs seek to base their UCL unlawful claim on California Civil Code Sections 1572, 1709, and 1710, arguing that Defendants "fraudulently concealed material information" or suppressed the truth. Opp. Mot. at 10-11. As discussed above, Plaintiffs successfully have alleged a claim of fraudulent concealment. *See supra* II.B.1 (explaining that Plaintiffs state a viable claim for fraudulent omission based upon the SAC's allegations of exclusive possession and control of all facts necessary to know that the Machines' Electronic Boards were defective and active concealment). For the same reasons, the Court concludes that Plaintiffs have stated a UCL claim based on California Civil Code Sections 1572, 1709, and 1710.

Finally, the Court concludes that Plaintiffs have stated a claim for violation of the unlawful prong of the UCL pursuant to the following predicate provisions: (1) the CLRA, *see infra* II.B.3B; (2) Rebro, Simpson, and Carey under the Song-Beverly Act against Sears, *see infra* II.B.4; and (3) Rebro, Simpson, and Carey under the MMWA again only as to Sears, *see infra* II.B.6. However, as addressed more fully below, *see infra* III.B, Plaintiffs' UCL unlawful claims predicated upon violations of their warranty agreements with Sears cannot extend to the purported class.

### B.  Unfair Business Practice

"An act or practice is unfair if the consumer injury is substantial, is not outweighed by any countervailing benefit to consumers or to competition, and is not an injury the consumers themselves could reasonably have avoided." *Daugherty v. Am. Honda Motor Co.*, 51 Cal.Rptr.3d 118, 129 (Cal. Ct. App. 2006). Plaintiffs must allege facts to support all three elements of a UCL unfair business practice claim. *Id.* Plaintiffs do allege with specificity that the Machines are substantially certain to fail within the useful life of the product - and often within the first year of use - despite the fact that the retail price of the Machines is $1,000. Plaintiffs also allege that as a result of known but undisclosed defects in the Machines, consumers have incurred costly service expenses. SAC ¶¶ 40, 42, 62, 73, 82. In addition, Plaintiffs now plead that they reasonably

could not have avoided their claimed injuries because Defendants knowingly and fraudulently concealed material information.  Defendants' argument that Plaintiffs could have avoided their claimed injuries, for example by purchasing an extended warranty, no longer is persuasive given that the SAC alleges that Defendants fraudulently concealed the defect at the time of sale and when Plaintiffs called Defendants to complain about the Electronic Control Boards.   However, Plaintiffs still have not pled adequately the second element of their claim.  Instead, they allege simply that there cannot be a benefit to consumers when a manufacturer is permitted knowingly to market and sell a defective product.  This argument is circular and conclusory.

### C.  Fraudulent Business Practices

"Unlike a common law fraud claim, a UCL fraud claim requires no proof that the plaintiff was actually deceived."  *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1025-26 (9th Cir. 2008), citing *Daugherty*, 144 Cal.App.4th at 838.  "Instead, the plaintiff must produce evidence showing 'a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care.'"  *Id.* at 1026, citing  *Brockey v. Moore,* 107 Cal.App.4th 86, 99 (2003). Accordingly, Plaintiffs must allege with specificity that Defendants' alleged misrepresentations: 1) were relied upon by the named plaintiffs; 2) were material; 3) influenced the named plaintiffs' decisions to purchase the defective Machines; and 4) were likely to deceive members of the public.  *See In re Tobacco II Cases*, 46 Cal.4th 298, 326-28 (2009).

To the extent that Plaintiffs base their claim on the representations that Defendants did make, for example that the Machines were "designed, manufactured and tested for years of dependable operations," such representations are mere puffery, *see supra* II.B.2.A, and they as a matter of law could not deceive a reasonable consumer.  Moreover, the alleged misrepresentations are not related directly to the Electronic Control Boards.

As to their claim of omission based on Defendants' failure to disclose a known defect in the Machines, for the reasons discussed above, *see supra* II.B.1, the Court concludes that Plaintiffs have stated a claim under the fraudulent business practices prong of the UCL.

### 3.  California Consumers Legal Remedies Act ("CLRA")

Plaintiffs allege that Defendants violated Civil Code Sections 1770(a)(2), (5), (7), (9) and (19) by misrepresenting information related to the Machines and omitting material information about existing defects within Defendants' knowledge.

### A. CLRA Claim for Misrepresentation

The CLRA proscribes active misrepresentations about the standard, quality, or grade of goods.  *Morgan v. Harmonix Music Sys., Inc.,* No. C08-5211 BZ, 2009 WL 2031765, at *3 (N.D. Cal. July 07, 2009), citing *Outboard Marine Corp. v. Superior Court,* 52 Cal.App.3d 30, 36 (1972).  Plaintiffs fail to allege sufficient facts to support a CLRA claim for misrepresentation because, as discussed above, the alleged affirmative representations pled in the SAC are either "puffery" or do not relate to the Machine's allegedly defective Electronic Control Boards.  *See* II.B.2.A (providing a more detailed analysis of why Plaintiffs' claims of misrepresentation are mere puffery or unrelated to the alleged defective Electronic Control Board); *see also Berenblat v. Apple, Inc.*, No. 09-CV-01649-JF, 2009 WL 2591366, at *6 (N.D. Cal. Aug. 21, 2009) (dismissing CLRA claim where the "complaint does not allege that Apple made any specific representation with respect to" the alleged defect).

### B. CLRA Claim for Omissions

As with their fraudulent concealment claim, the primary element at issue here is whether Plaintiffs have pled adequately that Defendants had a duty to disclose the allegedly defective Electronic Control Boards.  A plaintiff may "successfully pursue a CLRA claim [based on a fraudulent omission], despite *Daugherty and Bardin,* if [the manufacturer] was 'obliged to disclose' the potential for problems." *Falk v. Gen. Motors Corp.,* 496 F.Supp.2d 1088, 1094 (N.D. Cal. 2007).  As discussed above, *see supra* II.B.1, the SAC alleges new facts that support a conclusion that Defendants had knowledge of the defective Electronic Control Boards at the time the Machines were sold and when Defendants refused to replace or repair Plaintiffs' Machines. *LiMandri*, 52 Cal.App.4th at 337 (holding that a duty to disclose exists if the defendant has exclusive knowledge of material facts not known to the plaintiff or actively conceals a material

fact from the plaintiff).

To establish that Defendants owed a duty to Plaintiffs based upon exclusive knowledge of the defect, Plaintiffs also must demonstrate that the defect was material. *Falk,* 496 F.Supp.2d at 1095. Materiality exists if the omitted information would cause a reasonable consumer to behave differently if he or she were aware of the information. *See Oestreicher v. Alienware Corp.*, 544 F.Supp.2d 964, 971 (N.D. Cal. 2008). *See also Falk*, 496 F.Supp.2d at 1095 ("Materiality, for CLRA claims, is judged by the effect on a 'reasonable consumer.' ") (citation omitted). The Court finds that Plaintiffs sufficiently allege the materiality of the defect. *See e.g.* SAC ¶ 37 ("That the defective Electronic Control Boards cause the Machines to exhibit 'F' errors, requiring users to restart the Machines and initiate multiple wash cycles to complete a load of laundry or pay costly repair bills are...material facts that Plaintiffs and Class Members would consider important when deciding whether to purchase and how much to pay for their Machines"). Accordingly, the Court concludes that the alleged defect is "an omission of a fact the defendant was obliged to disclose" within the meaning of the CLRA.

## C. Unconscionable warranty provision

""Unconscionability has both a procedural and a substantive element." *Aron v. U-Haul Co. of California,* 143 Cal.App.4th 796, 808, 49 Cal.Rptr.3d 555 (2006), citing *Armendariz v. Foundation Health Psychcare Services, Inc.* 24 Cal.4th 83, 114, 99 Cal.Rptr.2d 745, 6 P.3d 669 (2000). "The procedural element of unconscionability focuses on two factors: oppression and surprise." *Id.* (internal citation omitted). "Oppression arises from an inequality of bargaining power which results in no real negotiation and an absence of meaningful choice." *Id.* (internal quotation and citation omitted). "Surprise involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the disputed terms." *Id.* (internal quotation and citation omitted). "The substantive element of unconscionability focuses on the actual terms of the agreement and evaluates whether they create overly harsh or one-sided results as to shock the conscience." *Id.* (internal quotation and citation omitted).

18

Plaintiffs contend that Defendants' warranties are procedurally and substantively unconscionable. Opp. Mot. at 16-17. However, "any claim of 'oppression' may be defeated if the complaining party had reasonably available alternative sources of supply from which to obtain the desired goods or services free of the terms claimed to be unconscionable." *Dean Witter Reynolds, Inc. v. Superior Court*, 211 Cal.App.3d 758, 768 (1989). Plaintiffs have not amended their pleadings meaningfully on this point and again fail to allege facts demonstrating that there were no alternative manufacturers of washers or that they were surprised by the terms of the warranty.

As was the case with Tietsworth's original complaint and FAC, the SAC fails to state a claim of oppression because it fails to allege the absence of "available alternative sources of supply from which to obtain the desired goods or services free of the terms claimed to be unconscionable." *Id.* Plaintiffs argue that the availability of any material alternative product or choice was curtailed or eliminated by the suggestions of Sears' sales representatives that Defendants' Machines were "the best" and were superior to other washers. Opp. Mot. At 17, citing SAC ¶ 57. However, the Court reaches the same conclusion it did in its prior order – instead of showing the absence of alternatives, these alleged statements highlight the fact that other machines were available to Plaintiffs when they selected Defendants' product. *Aron,* 49 Cal. Rptr. 3d at 564 (quotations and citations omitted) (concluding that "any claim of oppression may be defeated if the complaining party has reasonably available sources of supply from which to obtain desired goods or services free of the terms claimed to be unconscionable.").

Plaintiffs also re-allege that Defendants' warranties are procedurally unconscionable because the terms of the warranties were disclosed not at the time of purchase but rather at the time of delivery. SAC ¶ 25. Plaintiffs claim that this distinguishes their case from *Aron,* 143 Cal. App. 4th at 809 and *Dean Witter Reynolds*, 211 Cal. App.3d at 762. While Plaintiffs do allege that they were not informed of the language of the warranty until the Machines were delivered, they also admit that they were provided with a ninety day period in which to return the Machines "for any reason." There is no allegation that the terms of the warranty were hidden or

unclear to Plaintiffs when the Machines were delivered.  The SAC alleges for the first time that the ninety-day return window was "illusory" because the defect would not manifest itself within that period.  However, this argument does nothing to support Plaintiff's underlying argument that the warranty was procedurally unconscionable because it was not offered at the time of sale.  The alleged latent defect would not have presented itself at the time of sale either.

### D. CLRA claim against Whirlpool

Defendants contend that the CLRA requires each plaintiff to plead and prove that he or she entered into an agreement or transaction with the defendants that resulted in a sale or lease of goods or services, Cal. Civ. Code §§ 1761(e), 1700(a), 1780(a), 1780(c), 1782(a)(2), and that because Whirlpool did not engage directly in a "transaction" with Plaintiffs, it cannot be liable to Plaintiffs under CLRA.   However, when a plaintiff can demonstrate that the manufacturer had exclusive knowledge of a defect and the consumer relied upon that defect, the CLRA's protection extends to the manufacturer as well, regardless of whether the consumer dealt directly with the manufacturer.  *Chamberlan v. Ford*, 369 F.Supp.2d 1138, 1144 (N.D. Cal. 2005) (holding that plaintiffs had standing to bring CLRA claims against the manufacturer, "despite the fact that they never entered into a transaction directly with Defendant").  Plaintiffs allege that Whirlpool and Sears "shared information regarding the problems with the Machines and were both aware of its defects at the time Plaintiffs purchased the Machines." Opp. Mot. at 18, citing SAC ¶ 20. Moreover, Plaintiffs claim that Sears and Whirlpool engaged in joint meetings where they addressed the defects, collaborated about potential redesigns of the Electronic Control Boards, and negotiated a deal whereby Whirlpool paid for a portion of the Electronic Control Boards that were replaced.  *Id.*  Accordingly, because Plaintiffs allege successfully that Whirlpool had knowledge of the defect and engaged with Sears in responding to the defect, Whirlpool's alleged liability under the CLRA is coextensive with that of Sears.

### 4.  Claims by Rebro, Simpson, and Carey under the Song-Beverly Act

To state a claim for breach of express warranty under California law, a plaintiff must allege:  (1) the exact terms of the warranty; (2) reasonable reliance thereon; and (3) a breach of

warranty that proximately caused plaintiff's injury.  *Williams v. Beechnut Nutrition Corp.*, 185 Cal.App.3d 135, 142 (1986).  A plaintiff also must plead that she provided the defendant with pre-suit notice of the breach.  Cal. Com. Code § 2607.

### A.  Rebro provided Defendants with a reasonable opportunity to cure

Although the reasonableness of the number of repair attempts is ordinarily a question of fact, "at a minimum there must be more than one opportunity to fix the nonconformity." *Robertson v. Fleetwood Travel Trailers of Cal., Inc.*, 50 Cal.Rptr.3d 731, 741 (Cal. Ct. App. 2006).  Defendants argue again that Rebro fails to allege that she provided Defendants with two such opportunities.  However, Rebro now claims that: (1) she "contacted the Sears store to complain within the first month or two of ownership" and that "[a] Sears representative told her that the Machine was not in need of service and instructed her to lower the spin speed, which did not solve the problem," SAC ¶ 60; and (2) "she contacted Sears a second time and still within the one-year warranty period.  Again, Sears refused to acknowledge that the Machine was in need of servicing and defective.  Indeed, Sears failed to replace the board or offer any remedy, in breach of its express limited warranty."  *Id.*  Defendants point out that the SAC does not allege explicitly that Rebro requested a repair or indicated that there was a problem with her washer during the second conversation.  While Rebro's allegation of a second contact with Sears may not be artful with respect to the nature of her expressed complaint at the time, her allegations as a whole imply that she complained specifically about the malfunction of the Electronic Control Board.  Accordingly, Rebro has stated a claim for breach of warranty.  Defendants do not make the same challenge to the sufficiency of the pleadings with respect to Simpson and Carey; the Court concludes that they too have stated a claim.  SAC ¶¶ 71, 76, 78.

### B.  Defendants' express warranty and the alleged latent defects

Defendants contend that a latent defect cannot underlie a claim for express warranty.  Plaintiffs argue that their express warranty claim may be based on the presence of an alleged latent defect in the Electronic Control Board that existed at the time the Machines were sold.  According to Plaintiffs, the holdings in *Hicks v. Kaufmann & Broad Home Corp.*, 89

21

Cal.App.4th 908 (2001) and *Hewlett-Packard v. Superior Court*, 83 Cal.Rptr.3d 836 (2008) support their argument that California law permits express-warranty claims based on latent product defects even when the applicable express warranty excludes any coverage for such defects.  However, neither of these cases holds that a plaintiff may assert express-warranty claims for latent defects under a warranty that by its express terms covers only defects that result in product failure during the warranty period.  *See Hewlett-Packard*, 83 Cal. Rptr. 3d at 836-43 (distinguishing itself from *Daugherty* and explaining that it need not determine the validity of the claim for the purposes of determining the procedural issue of certifying a class); *Hicks*, 89 Cal. App. 4th at 908-26.  As this Court has held in a different context, if such a claim based upon "latent defects" in products that are governed by an express warranty contract was recognized, it would "eviscerate any limitations put in place by an express warranty."  *Hovsepian v. Apple, Inc,* Nos. 08-5788, 2009 WL 2591445, *7 (N.D. Cal. Aug. 21, 2009), citing *Daugherty,* 144 Cal.App. 4th at 832; *see also Hoey v. Sony Elecs. Inc.,* 515 F.Supp.2d 1099, 1105 (N.D. Cal. 2007).[8]

### C. Whirlpool's liability

Defendants contend that Plaintiffs have failed to state an express warranty claim against Whirlpool because Whirlpool did not make any warranties directly to Plaintiffs. MTD at 19. However, an "exception to the general rule is found in a few cases where the purchaser of a product relied on representations made by the manufacturer in labels or advertising material, and recovery from the manufacturer was allowed on the theory of express warranty without a showing of privity."  *Burr v. Sherwin Williams Co.*, 42 Cal.2d 682, 696 (1954).  While Plaintiffs contend that "the informational floor model placards, presumably supplied by or created in collaboration with Whirlpool, included misrepresentation upon which Plaintiffs relied," Opp. Mot. at 21, citing SAC ¶¶ 13, 24, as the Court concluded above, *see supra* II.B.2, these alleged misrepresentations are not statements about "specific or absolute characteristics of a product," but properly are considered non-actionable puffery.  Accordingly, they do not fall within the

---

[8] The parties' argument concerning latent defects is irrelevant to the determination of this aspect of the motion as it relates to Carey, Simpson, and Rebro, as all claim that the defect manifested itself within the one-year warranty period.

1

2

exception articulated in *Burr* and cannot give rise to liability against Whirlpool under an express

warranty theory.

### 5. Implied Warranty under the Song-Beverly Act

#### A. Vertical Privity

Vertical privity is a necessary element of an implied warranty claim.  It is undisputed that

Rebro, Simpson, and Carey lack vertical privity with Whirlpool.  Plaintiffs contend that an

exception to the privity argument applies in this case because Plaintiffs relied on manufacturer

advertisements in purchasing their Machines.  SAC ¶¶ 13, 24.  However, for the reasons

discussed, above, *see supra* II.B.4.C, the manufacturer advertisements alleged in the SAC do not

fall within this exception.  In addition, the exception applies only in the context of express

warranties.  *Blennis v. Hewlett-Packard Co.*, No. C 07-00333 JF, 2008 WL 818526, *4 (N.D.

Cal. Mar. 25, 2008), citing *Burr,* 42 Cal.2d at 695-96 and *Chandler v. Chandler*, No. 96-1047 SI,

1997 WL 464827 at *7 (N.D. Cal. July 28, 1997) ("vertical privity is a prerequisite in California

for recovery on a breach of implied warranty theory").  Accordingly, Plaintiffs cannot sustain an

implied warranty claim against Whirlpool.

#### B. Implied Warranty of Merchantability

"The mere manifestation of a defect by itself does not constitute a breach of the implied

warranty of merchantability.  Instead, there must be a fundamental defect that renders the product

unfit for its ordinary purpose." *Stearns v. Select Comfort Retail Corp.*, No. 08-2746 JF, 2009 WL

1635931, at *8 (N.D. Cal. June 5, 2009), citing *Am. Suzuki Motor Corp. v. Super. Ct.,* 37

Cal.App.4th 1291, 1295 (Cal.Ct.App. 1995).  The duration of an implied warranty of

merchantability is one year if the express warranty is one year or more.  Cal. Civ. Code. §

1791.1(c); *see also Atkinson v. Elk Corp. of Texas*, 142 Cal.App.4th 212, 231, 48 Cal.Rptr.3d

247 (2006) ("the duration of the implied warranty is the length of the express warranty").  The

express warranty at issue here extends for one year, thus the implied warranty of merchantability

is one year as well.

Rebro fails to plead that her Machine was unfit for its ordinary purpose of cleaning

clothes within the one-year warranty period.  While she claims that it displayed "F" error messages, that it stopped in mid-cycle, and that she had to restart it, sometimes more than once, she does not allege that she ever replaced it or resorted to other methods or means of washing clothes within one year of purchase.  Rather, Rebro alleges that the Machine "stopped working altogether" in or around October 2008, six months beyond the implied-warranty period.  *See* SAC ¶¶ 56, 62.

Simpson also fails to plead that her Machine failed to serve its ordinary purpose of cleaning clothes within the one-year warranty period.  Simpson alleges that she purchased the Machine on January 15, 2007 and that in or around July 2007 the "Machine would stop working in mid-cycle and she would receive an F51 error message," "at times, [she would] have to restart the Machine three or four times to get a single load through," and that "[o]ther times, [she] had to wring clothes out and carry them to the laundry mat to complete the washing."  *Id.* ¶ 67, 70.  However, her allegations of continued use of the Machine throughout the one-year warranty period belie her claim that it failed to serve its ordinary purpose.  In fact, Simpson alleges that "only after the Machine failed shortly outside the warranty period [did] Sears admit[] that the Electronic Control Board was defective."  *Id.* ¶ 72.  Simpson does not claim that she could not use her Machine at all, that she stopped using her Machine altogether, or that she replaced the Machine within the one-year warranty period.

Finally, Carey fails to plead facts demonstrating that the Machine failed to serve its ordinary purpose within one year of purchase.  Like Rebro and Simpson, Carey alleges that he had to stop and restart the Machine, sometimes repeatedly within the first year of ownership.  *Id.* ¶ 76.  He alleges that on some occasions it took three to four hours to complete a single load of laundry.  *Id.*  However, he never alleges that his Machine failed to serve its essential purpose – washing clothes – until after the one year warranty period ended.  Carey does allege that in July or August of 2008 he sold his Machine for $25 and replaced it.  *Id.* ¶ 80.  However, Carey purchased his Machine in or about June 2007, and thus his sale of the Machine occurred outside the one-year implied warranty period.  *Id.* ¶ 74.  For these reasons, no named Plaintiff

24

1   successfully alleges an implied warranty claim against Sears.

2       **6. Magnuson-Moss Warranty Act**

3           **A. Underlying state-law warranty claim**

4       The SAC alleges that Defendants' breach of the express warranty also constituted a

5   violation of the MMWA.  *Id.* ¶ 181.  The MMWA provides a federal cause of action for state

6   warranty claims.  *Monticello v. Winnebago Indus. Inc.,* 369 F.Supp.2d 1350, 1356 (N.D. Ga.

7   2005).  Rebro, Simpson, and Carey each have stated an express warranty claim against Sears.

8   *See supra* II.B.4.  Accordingly, each of them also has stated a claim against Sears pursuant to the

9   MMWA.

10          **B. Whirlpool's liability**

11      Defendants argue that Plaintiffs have failed to state an MMWA claim against Whirlpool

12  because Plaintiffs do not plead that they notified Whirlpool directly of the alleged breach of

13  warranty.  The MMWA requires that a plaintiff provide a defendant with an opportunity to cure

14  the alleged breach, and the defendant itself must have refused directly to provide a cure.  *Lewis v.*

15  *Mercedes-Benz. USA LLC, No. Civ. A.*, 1:03CV4000JOF, 2004 WL 3756384, at *3-4 (N.D. GA

16  Sept. 13, 2004).  Plaintiffs contend that *Lewis* is distinguishable, pointing out that in *Lewis* the

17  written warranty stated specifically that written notice of any defects had to be provided to

18  Mercedes Benz USA LLC (as distinct from the local dealership).  *See Id.*  Plaintiffs point out that

19  the warranty in this case contains no such provision, and that in fact the warranty directs the

20  consumer to contact Sears in case of a defect or problem.  SAC ¶ 44.  However, this distinction is

21  immaterial as the MMWA "itself" requires consumers to provide the manufacturer directly with

22  its own opportunity to cure "before they may seek any remedies for breach of warranty under [the

23  MMWA's] provisions."  See *Lewis,* 2004 WL 3756384 at *3, citing 15 U.S.C. § 2310(e).

24      Plaintiffs also contend that because Whirlpool "knew of the alleged defect at the time of

25  sale" it had an opportunity to cure the defect.  Opp. Mot. at 25, citing *Radford v. Daimler*

26  *Chrysler Corp.,* 168 F.Supp.2d 751, 754 (N.D. Ohio 2001) (finding MMWA's opportunity to

27  cure requirement was met where plaintiff sufficiently pled that defendant manufacturer knew of

28

the allegedly defective instrument panel at the time of sale); *see also Alberti v. General Motors Corp.*, 600 F.Supp. 1026, 1028 n. 2 (D.D.C. 1985).  However, neither *Radford* nor *Alberti* is binding authority, and the Court does not find either case persuasive.  In order for a manufacturer to respond to a problem with a consumer's product, it first must be notified of the occurrence of the problem.  Even if a product is defective at the time of sale, a manufacturer would be deprived of an opportunity to cure the defect if it remains unaware when that "latent" defect manifests itself.  Logically, notice that a defect has manifested and an opportunity to cure are required to state a claim under the MMWA, even if the manufacturer knows of an alleged defect at the time of sale.

## C. MMWA claim premised upon Federal Trade Commission regulations

Plaintiffs also allege that Defendants' failure to comply with Section 239.5 of the Code of Federal Regulations (16 C.F.R. § 239.5) gives rise to a claim under the MMWA.  *See* SAC ¶¶ 194-95.  The regulatory language at issue provides that "[a] seller or manufacturer should advertise that a product is warranted or guaranteed only if the seller or manufacturer, as the case may be, promptly and fully performs its obligations under the warranty or guarantee."  16 C.F.R. § 239.5.  Rebro, Casey, and Simpson allege that Sears breached the express warranty when it refused to repair or replace the defective Electronic Control Boards within a year of purchase.  Accordingly, Plaintiffs allege that Sears did not promptly and fully perform its obligations under the warranty in contravention of 16 C.F.R. § 239.5.

Defendants contend that the violation of Section 239.5 cannot serve as a predicate for an MMWA claim for three reasons: (1) it is not an obligation under the MMWA at all, but rather a guideline promulgated pursuant to the Federal Trade Commission Act, and the MMWA does not authorize private lawsuits based on other statutes, MTD at 21-22; (2) the FTC itself has recognized that the "MMWA has no corollary to Section 239.5, specifically stating in the Federal Register that the 'principle' recognized in Section 239.5 regarding product advertising 'is not expressly stated in the Magnuson-Moss Warranty Act or the rules adopted under it,'" MTD at 22, citing FTC Guides Against Deceptive Adveritising of Guarantees, 50 Fed. Reg. 18462, 18469

26

(May 1, 1985) (codified at 16 C.F.R. 239);[9] and (3) Section 239.5 is not a rule of substantive law, but rather a cautionary industry guide that cannot serve as a basis for a private lawsuit. *Id.*

Plaintiffs cite *Turunen v. Elite Auto Body & Collision Center*, No. 03-4862, 2005 WL 851024, at *1 (N.D. Cal. Apr. 13, 2005) for the proposition that violation of a federal regulation can serve as an independent basis for an MMWA claim.  The court in that case denied summary adjudication of a claim alleging that defendant's written warranty did not fully and conspicuously disclose all of the information required by 16 C.F. R. § 701.3(a).  *Id.*  However, *Turunen* and Section 701.3 are distinguishable from Section 239.5 for several reasons.  First, Section 701.3, the regulation at issue in *Turunen*, expressly finds its authority in the MMWA.  Second, Section 701.3 is a final regulation, while Section 239.5 is a cautionary industry guide.  Finally, *Turunen* does not address directly a plaintiff's ability to utilize an FTC regulation as the basis for an MMWA claim, let alone one promulgated pursuant to another statute.

### D. Substantive provisions of the MMWA

The MMWA requires that warrantors include certain disclosures "in simple and readily understood language," including "exceptions or exclusions from the terms of the warranty."  15 U.S.C. § 2302(a)(1)-(13); 15 U.S.C. § 2302(a)(6).  In addition, the MMWA requires that Defendants' warranties include "a brief, general description of the legal remedies available to the consumer."  15 U.S.C. § 2302(a)(9).

Plaintiffs argue that Defendants failed to disclose any "exceptions or exclusions from the terms of the warranty" in violation of 15 U.S.C. § 2302(a)(6) when they did not include the Electronic Control Boards among those exceptions and later refused to repair or replace them.  Opp. Mot. 23, citing SAC ¶ 192.  However, Plaintiffs plead that Defendants *breached* the

---

[9]  The Federal Register clarifies that Section 239.5 states "the principle...that a warrantor or guarantor should ensure performance on advertised warranties or guarantees.  This is an obvious point, but one which merits an express statement in Guides designed to simplify the task of advertisers attempting to comply with the law.  This is especially so in view of the fact that this principle, although implicit in the common law and the case law...is not expressly stated in the [MMWA] or the rules adopted under it."  50 Fed. Reg. 18462, 18469.

warranty by not repairing or replacing the defective Electronic Control Boards as well.  The

Court concludes that: (1) the warranty expressly discloses exceptions or exclusions from the

terms of the warranty; (2) these exceptions or exclusions do not include the Electronic Control

Boards; and (3) that Plaintiffs have stated a viable claim that Sears breached the warranty by

failing to repair or replace them.

In addition, while Plaintiffs argue that Defendants failed to include "a brief, general

description of legal remedies available to the consumer" in violation of 15 U.S.C. § 2302(a)(9),

the SAC still does not contain any factual allegations that would support this claimed violation.

"It is axiomatic that the complaint may not be amended by briefs in opposition to a motion to

dismiss." *Barbera v. WMC Mortgage Corp.,* No. C 04-3738 (SBA), 2006 WL 167632, at *2 n. 4

(N.D. Cal. Jan.19, 2006), quoting *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107

(7th Cir.1984).

### 7.  Unjust Enrichment

Plaintiffs' claim for unjust enrichment is premised on the same alleged course of conduct

that underlies their other claims.  *See* SAC ¶ 220 (incorporating by reference previous

allegations).  Defendants argue that Plaintiffs have not stated a claim for unjust enrichment

because Plaintiffs have failed to plead adequately their other claims for relief.  Because it

concludes that several of Plaintiffs' claims for relief in fact are viable, the Court also concludes

that their claim for unjust enrichment survives Defendants' motion to dismiss.

Defendants argue additionally that Plaintiffs have not stated an unjust enrichment claim

against Whirlpool because Plaintiffs do not allege that Whirlpool received a benefit at Plaintiffs'

expense and retained that benefit unjustly. *See First Nationwide Sav. v. Perry*, 15 Cal.Rptr.2d

173, 176 (Cal. Ct. App. 1992).  However, Plaintiffs allege that "Defendant Whirlpool was

unjustly enriched because they [sic] manufactured the Machines for Sears.  The Machines were

in demand because of Defendants' failure to disclose the defect.  Thus, the continued sale of the

Machines benefitted Whirlpool as they [sic] were able to sell more Machines to Sears as demand

increased."  SAC ¶ 222.  The Court concludes that paragraph 222 of the SAC sufficiently alleges

an unjust benefit received by Whirlpool as a result of fraudulently concealed material defects and resulting purchases.

### III. Motion to Strike

#### A. Legal Standard

Federal Rule of Civil Procedure 12(f) provides that the Court may strike from any pleading "any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. Pro. 12(f). "[T]he function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial [.]" *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993) (citations omitted), *overruled on other grounds,* 510 U.S. 517, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994).  As with motions to dismiss, when ruling on a motion to strike, the Court takes the plaintiff's allegations as true and must liberally construe the complaint in the light most favorable to the plaintiff.  *Farm Credit Bank of Spokane v. Parsons,* 758 F.Supp.1368, 1371 n. 4 (D. Mont. 1990) (citing 2A Moore's Federal Practice ¶ 12.21[3] ).[10]  Also as with motions to dismiss, leave to amend must be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment.  *See Lucas*, 66 F.3d at 248.

Under Rules 23(c)(1)(A) and 23(d)(1)(D), as well as pursuant to Rule 12(f), this Court has authority to strike class allegations prior to discovery if the complaint demonstrates that a class action cannot be maintained.  In order for a class to be certified, the class must be ascertainable. *Bishop v. Saab Auto. A.B.*, No. CV 95-0721 JGD(JRX), 1996 WL 33150020, at *4 (C.D. Cal. Feb. 16, 1996), citing *Debremaecker v. Short,* 433 F.2d 733 (5th Cir. 1970).  In addition, the requirements of Federal Rule of Civil Procedure 23(a) must be satisfied.  Finally, Plaintiff must satisfy one of the more stringent prerequisites set forth in Rule 23(b).[11]

---

[10]  Because the Court must accept the allegations of the complaint as true on a motion to strike, it did not rely upon the evidence (e.g. the declaration of a Sears' employee) submitted by the parties in support or opposition of the motion.

[11]  Defendants also argue that Plaintiffs' proposed injunctive-relief class, SAC ¶ 98, does not satisfy Rule 23(b)(2).  However, Plaintiffs point out that they do not allege "any such

**B. Discussion**

**1. Whether the class is ascertainable**

The proposed Class in this case is defined as follows:

> The California Class: All California residents and entities who purchased a top-loading Kenmore Elite Oasis automatic washing machine equipped with an Electronic Control Board, including, but not limited to model number 110.2703*, 110.2704*, 110.2705*, 110.2706*, 110.2707*, 110.2708, 10.2709* and 110.2715*, from January 1, 2004 to the present.
>
> The California Sub-Class: All Class members who are "consumers" as defined by California Civil Code § 1761(d).
>
> The Nationwide Class: All United States residents and entities who purchased a top-loading Kenmore Elite Oasis automatic washing machine equipped with an Electronic Control Board, including, but not limited to model numbers 110.2703*, 110.2704*, 110.2705*, 110.2706*, 110.2707*, 110.2708, 10.2709* and 110.2715*, from January 1, 2004 to the present.

SAC ¶ 98. Plaintiffs argue that their proposed classes are ascertainable because they allege that all of the Machines "contain defective Electronic Control Boards." *Id.* ¶¶ 18-21, 24-28. However, the putative classes alleged in paragraph 98 cannot be ascertained because they include members who have not experienced any problems with their Machines' Electronic Control Boards – or for that matter with any other part of the Machine. "Such members have no injury and no standing to sue." *Hovsepian v. Apple, Inc.,* No. 08-5788 JF (PVT), 2009 WL 5069144, at *6 (N.D. Cal. 2009); *see also Bishop,* 1996 WL 33150020, at *5 ("courts have refused to certify class actions based on similar 'tendency to fail' theories because the purported class includes members who have suffered no injury and therefore lack standing to sue.").[12] Accordingly, the Court concludes that the class as alleged in the SAC is not ascertainable. Defendants' motion to strike Plaintiffs' class allegations will be granted, with leave to amend.

---

proposed class." Opp. Mot. at 24-25.

[12] "Class actions, we believe, must be structured so as to conform in the essential respects to the judicial process. This is the principle by which we are guided. It dictates, inter alia, that the courts not be available to those who have suffered no harm at the hands of them against whom they complain. They have no standing to sue. It is necessary, therefore, to examine the standing of the plaintiffs to initiate the class action before us." *La Mar v. H & B Novelty & Loan Co.,* 489 F.2d 461, 464 (9th Cir. 1973).

Case No. 5:09-CV-00288 JF (HRL)
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS AND GRANTING DEFENDANTS' MOTION TO STRIKE CLASS ALLEGATIONS
(JFLC1)

## 2. Predominance of individual issues

Defendants contend that every claim pled in the SAC requires Plaintiffs and the putative class members to plead and prove that they experienced a product malfunction and incurred actual damages that were proximately caused by the alleged defect and Defendants' actions or inactions. For these reasons, Defendants argue that individual questions of fact are dominant with respect to all of Plaintiffs' class claims.

### a. Fraud-based claims

Defendants argue that Plaintiffs cannot sustain classwide claims on their fraud-based claims because they must demonstrate individual reliance on the alleged concealment. However, "courts have recognized that this element, which is often phrased in terms of reliance or causation, may be presumed in the case of a material fraudulent omission." *Plascencia v. Lending 1st Mortgage*, 259 F.R.D. 437, 447 (N.D. Cal. 2009). The Supreme Court has held, in cases "involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery." *Plascencia*, 259 F.R.D. at 447, quoting *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). "Rather, '[a]ll that is necessary is that the facts withheld be material,' in the sense that a reasonable person 'might have considered them important' in making his or her decision." *Plascencia*, 259 F.R.D. at 447, quoting *Affiliated Ute Citizens of Utah,* 406 U.S. at 153-54, 92 S.Ct. 1456. Accordingly, the Court concludes that Plaintiffs, assuming that they can plead an ascertainable class, may plead class-wide fraud-based claims.

### b. Unjust Enrichment

Defendants next argue that individual questions would predominate a classwide claim for unjust enrichment because Plaintiffs would need to show that each buyer conferred a benefit on Sears, Whirlpool or both companies, that Defendants knew of and retained the benefit, and that the retention of such benefit would be unjust. *Peterson v. Cellco P'ship*, 80 Cal.Rptr.3d 316, 323 (Cal. Ct. App. 2008). However, if they are able to redefine their classes to include only those Machine owners who have suffered an injury, it appears that Plaintiffs may be able to establish a

classwide claim "using generalized proof common to the class." *In re Abbott Labs Norvir Antritrust Litig.*, No. C 04-1511 CW and C 04-4203 CW, 2007 WL 1689899, at *9 (N.D. Cal. June 11, 2007) (finding that plaintiffs made a showing that common issues would predominate in a classwide unjust enrichment claim).

### c. Warranty Claims

Defendants contend that Plaintiffs' express warranty claims are improper for class treatment. The Court finds this argument persuasive, as Plaintiffs' express warranty claims involve elements that are individual to each purported class member, such as the provision of notice, an opportunity to cure, and reliance. *Stearns*, 2009 WL 4723366, at *15. In addition, the implied warranty claim would require an individual determination of whether the a plaintiff's Machine was fit for its ordinary purpose given that the defect could render certain Machines more inoperable than others. This is a significant concern for class certification, especially given the varying factual allegations made by the various named plaintiffs. Accordingly, the Court concludes that Plaintiffs may not allege a class-wide claim under either an express or implied warranty theory.

### 3. Choice of law

"[W]here the applicable law derives from the law of the 50 states, as opposed to a unitary federal cause of action, differences in state law will compound the [ ] disparities among class members from different states." *Zinser v. Accufix Research Inst.*, 253 F.3d 1180, 1189 (9th Cir. 2001) (citation and quotation omitted). Defendants argue that individual issues of law dominate Plaintiffs' putative nationwide class claims for fraudulent concealment and unjust enrichment. They contend that under applicable choice of law principles, multiple states' laws will apply to Plaintiffs' common law fraudulent concealment and unjust enrichment claims.

Plaintiffs point out that the elements of an unjust enrichment claim essentially are identical under the laws of every state. Opp. Mot at 20, citing *In re Terazosin Hydrochloride Antitrust Litig.,* 220 F.R.D. 672, 697, n. 40 (S.D. Fla. 2004); *see also In re Abbott Labs Norvir Antritrust Litig.*, 2007 WL 1689899, at *8-10 (certifying a forty-eight state unjust enrichment

class).  Plaintiffs also assert that there are multiple ways of addressing potential manageability issues in the context of a nationwide class action based upon fraudulent concealment or unjust enrichment. They argue that while a full analysis cannot be done until after certain discovery is completed, it is well settled that tools exist to manage an action such as the one now before the Court.  They suggest that a Court can bifurcate or sever issues or create subclasses to address divergent interests or conflicts.  Pending Plaintiff's identification of an ascertainable class, the Court will withhold judgment as to whether a nationwide class action with respect to their claims for unjust enrichment and fraudulent concealment is manageable.

### IV.  ORDER

Good cause therefor appearing, Defendants' motion to dismiss is DENIED as to Plaintiffs' claims of fraudulent omission, violation of the CLRA, violation of the unlawful and fraudulent prongs of the UCL, and unjust enrichment; and Simpson, Carey, and Rebro's individual claims for breach of express warranty and violation of the MMWA as to Sears.  The motion is GRANTED with respect to Plaintiffs' claims for violation of the implied warranty of merchantability, the unfair business prong of the UCL, and the express warranty and MMWA claims as to Whirlpool.  Leave to amend is limited only to Plaintiffs' claim under the unfair business prong of the UCL and their individual claims for breach of the implied warranty of merchantability against Sears.  Defendants' motion to strike also is GRANTED, with leave to amend.  Plaintiffs shall propose a new class definition consistent with this order.  Any amended complaint shall be filed within thirty (30) days of the date this order is filed.

**IT IS SO ORDERED.**

DATED: 3/31/2010

_____
JEREMY FOGEL
United States District Judge__

Case No. 5:09-CV-00288 JF (HRL)
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS AND
GRANTING DEFENDANTS' MOTION TO STRIKE CLASS ALLEGATIONS
(JFLC1)