1  Clement L. Glynn (CA Bar No. 057117)
   James M. Hanlon, Jr. (CA Bar No. 214096)
2  Glynn & Finley, LLP
   100 Pringle Avenue, Suite 500
3  Walnut Creek, California 94596
   Telephone: (925) 210-2800
4  Facsimile: (925) 945-1975
   Email:     cglynn@glynnfinley.com; jhanlon@glynnfinley.com
5
   Michael T. Williams (CO Bar No. 33172; admitted *pro hac vice*)
6  Galen D. Bellamy (CA Bar No. 231792)
   Joel S. Neckers (CO Bar No. 40886; admitted *pro hac vice*)
7  Edwin J. Kilpela, Jr. (CO Bar No. 42927; admitted *pro hac vice*)
   Theresa R. Wardon (CO Bar No. 41510; admitted *pro hac vice*)
8  Wheeler Trigg O'Donnell LLP
   1801 California Street, Suite 3600
9  Denver, Colorado 80202
   Telephone: (303) 244-1800
10 Facsimile: (303) 244-1879
   Email:     williams@wtotrial.com; bellamy@wtotrial.com; neckers@wtotrial.com;
11             kilpela@wtotrial.com; wardon@wtotrial.com

12 Attorneys for Defendants,
   Sears, Roebuck and Co. and Whirlpool Corporation
13

14              **UNITED STATES DISTRICT COURT**

15              **NORTHERN DISTRICT OF CALIFORNIA**

16                      **(SAN JOSE BRANCH)**

17 RENEE TIETSWORTH, SUZANNE          CASE NO. 5:09-CV-00288 JF (HRL)
   REBRO, SONDRA SIMPSON, and JOHN
18 CAREY, On Behalf of Themselves and All   **OPPOSITION TO PLAINTIFFS' MOTION TO**
   Others Similarly Situated,               **EXCLUDE CERTAIN TESTIMONY AND**
19                                           **OPINIONS OF DEFENDANTS' EXPERT**
                    Plaintiffs,              **NOSHIRWAN K. MEDORA**
20
           vs.                       Date:     March 19, 2012
21                                   Time:     9:00 a.m.
   SEARS, ROEBUCK AND CO., and       Dept:     3, 5th Floor
22 WHIRLPOOL CORPORATION,            Before:   Hon. Jeremy Fogel

23
                    Defendants.
24

25

26

27

28

1

# **<u>TABLE OF CONTENTS</u>**

2

*Page*

3

Table of Authorities ........................................................................................................ ii

4

INTRODUCTION .......................................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 2

5

A.    Dr. Pietila's Initial Expert Report Contained No Service Data Analysis .................... 2

6

7

B.    Mr. Medora Rebutted Dr. Pietila's Opinions Based, in Part, on an Analysis of Sears' Service Data Undertaken By Exponent's Staff at Mr. Medora's Direction ........................................................................................................... 2

8

9

C.    Dr. Pietila Submitted a Sur-Rebuttal Report that Included an Analysis of Sears' Service Data Performed by an Independent Database Analyst Who Dr. Pietila Does Not Know and Who Did Not Work at His Direction .............................. 4

10

11

D.    Mr. Medora Responded to the New Opinions in Dr. Pietila's Sur-Rebuttal Report in His Sur-Sur Rebuttal Report ........................................................................ 5

12

ARGUMENT .................................................................................................................. 6

13

I.    PLAINTIFFS' MOTION INCORRECTLY RELIES ON FEDERAL RULE OF EVIDENCE 702.................................................................................................. 6

14

15

II.    MR. MEDORA'S OPINIONS ARE ADMISSIBLE BECAUSE ENGINEERS AND ENGINEERING EXPERTS ROUTINELY RELY ON OTHERS TO ANALYZE SERVICE DATA.................................................................................. 7

16

17

III.    THE METHODOLOGY AND RATIONALE UNDERLYING MR. MEDORA'S OPINIONS WERE ADEQUATELY EXPLAINED IN HIS REPORTS AND DEPOSITION .................................................................................................... 10

18

19

IV.    PLAINTIFFS' CHALLENGES TO MR. MEDORA'S OPINIONS GO TO THE WEIGHT HIS TESTIMONY SHOULD BE AFFORDED, NOT ITS ADMISSIBILITY ................................................................................................. 12

20

CONCLUSION................................................................................................................ 14

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

*Page*

## Cases

*Am. Med. Sys., Inc. v. Laser Peripherals, LLC*,
712 F. Supp. 2d 885 (D. Minn. 2010) ................................................. 9

*Bauman v. Centex Corp.*,
611 F.2d 1115 (5th Cir. 1980) ........................................... 10

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) ............................................. 13

*Flebotte v. Dow Jones & Co., Inc.*,
No. Civ.A. 97-30117-FHF, 2000 WL 35539238 (D. Mass. Dec. 6, 2000) ...................... 13

*Gussack Realty Co. v. Xerox Corp.*,
224 F.3d 85 (2d Cir. 2000).............................................. 10

*Hangarter v. Provident Life and Acc. Ins. Co.*,
373 F.3d 998 (9th Cir. 2004) ............................................ 13

*Humetrix, Inc., v. Gemplus S.C.A.*,
268 F.3d 910 (9th Cir. 2001) ............................................ 13

*In re Sulfuric Acid Antitrust Lit.*,
235 F.R.D. 646 (N.D. Ill. 2006)........................................... 8

*McReynolds v. Sodexho Marriott Servs., Inc.*,
349 F. Supp. 2d 30 (D.C. Cir. 2004).......................................... 10

*Monsanto Co. v. David*,
516 F.3d 1009 (Fed. Cir. 2008)............................................ 9

*Snyder v. W. Am. Ins. Co.*,
CIV.A. 01-5033, 2003 WL 21497359 (E.D. Pa. June 9, 2003) ...................... 10

*Southland Sod Farms v. Stover Seed Co.*,
108 F.3d 1134 (9th Cir. 1997) ........................................... 7

*Stone v. Advance America*,
No. 08-CV-1549-AJB, 2011 WL 6151636 (S.D. Cal. Dec. 11, 2011) .................... 13

*Sugar Ass'n, Inc. v. McNeil-PPC, Inc.*,
CV 04-10077 DSF, 2007 WL 5674020 (C.D. Cal. Dec. 19, 2007)..................... 12

*Taylor, Bean & Whitaker Mortg. Corp. v. GMAC Mortg. Corp.*,
No. 5:05-cv-260-Oc-GRJ, 2008 WL 3819752 (M.D. Fla. Aug. 12, 2008) .................. 7

*United States v. McPhilomy,*
270 F.3d 1302 (10th Cir. 2001) ................................................................... 10

**<u>Rules</u>**

Fed. R. Civ. P. 23 .......................................................................................... 13

Fed. R. Evid. 702 .................................................................................. 6, 7, 12

Fed. R. Evid. 703 .................................................................................... *passim*

1

## **INTRODUCTION**

2        Plaintiffs move to strike certain of the opinions offered by Defendants' engineering expert,

3  Noshirwan K. Medora, arguing that Mr. Medora improperly relied on an analysis of Sears, Roebuck

4  and Co.'s ("Sears") service data that was performed by database analysts and verified by PhD-level

5  statisticians at Mr. Medora's request. Plaintiffs' Motion provides no factual or legal basis for striking

6  Mr. Medora's opinions and should be denied.

7        First, an expert witness may base an opinion on facts or data that are "of a type reasonably

8  relied on by experts in the particular field." Fed. R. Evid. 703. Here, several Sears and Whirlpool

9  Corporation ("Whirlpool") engineers have testified that they routinely rely in the ordinary course of

10 business on analyses of Sears' and Whirlpool's service data performed by database analysts. Further,

11 Plaintiffs' own engineering expert, Dr. Raymond Pietila, also relied on a database analyst to query

12 Sears' service data. Unlike Mr. Medora, however, Dr. Pietila admitted that he did not direct the

13 analysis on which he relied (instead it was spoon-fed to him by the Plaintiffs' attorneys), that he

14 knew nothing about the qualifications or background of the individuals who conducted that analysis,

15 and that he knew nothing about how that analysis was conducted.

16        Further, Plaintiffs' suggestion that Mr. Medora failed to adequately explain the data analyzed

17 and methodology employed is likewise incorrect. Mr. Medora's reports and deposition testimony

18 contain detailed descriptions of the data reviewed and methodologies employed and those

19 descriptions were augmented through interrogatory responses and correspondence between counsel

20 for the parties. Plaintiffs' selective quotations from Mr. Medora's reports and deposition do nothing

21 to alter this conclusion.

22        Finally, Plaintiffs' challenges to Mr. Medora's opinions go to the weight this Court should

23 accord those opinions, not their admissibility. As discussed in the Opposition to Class Certification

24 and herein, Mr. Medora's opinions are sound. Accordingly, in conducting the rigorous analysis of

25 Plaintiffs' motion for class certification, the Court may consider and rely on Mr. Medora's opinions,

26 including that Sears' service data shows that the Kenmore Elite[®] Oasis top-loading washing

27 machines ("Kenmore Oasis Washers" or "Washers") do not share a common design defect and that

28

---

1  the "F1" and "F51" error codes that are at issue in this case are rare, not common to the class, and

2  are unlikely to manifest in any putative class member's machine.

3  **STATEMENT OF FACTS**

4      **A.**    **Dr. Pietila's Initial Expert Report Contained No Service Data Analysis**

5          On May 16, 2011, Plaintiffs disclosed Dr. Pietila's initial expert report ("Report"). In that

6  Report, Dr. Pietila opined that all Washers in the putative class contain a "uniform design flaw - a

7  defectively programmed" electronic control board ("ECB") that allegedly causes the Washers to

8  cease operating and to display F1 and F51 error codes. (*See* Dkt. # 127, Decl. of Lori Andrus in

9  Supp. of Pls.' Mot. for Class Certification ("Andrus Decl.") Ex. GG. at 4.) Dr. Pietila's Report

10  contained no analysis of Sears' service data, and Dr. Pietila did not attempt to determine the service

11  incident rate ("SIR") associated with either F1 or F51 error codes, or any component on the Washer

12  that can cause F1 or F51 error codes. (*Id.* at 1-13.)

13      **B.**    **Mr. Medora Rebutted Dr. Pietila's Opinions Based, in Part, on an Analysis of**

14                 **Sears' Service Data Undertaken By Exponent's Staff at Mr. Medora's Direction**

15          On June 13, 2011, Defendants disclosed the expert rebuttal report of Mr. Medora ("Rebuttal

16  Report"), a Senior Managing Engineer with Exponent®, an engineering and scientific consulting

17  firm.[1] Mr. Medora has over 30 years of experience in failure analysis of electronic components and

18  systems. (Weaver Decl. Ex. D (Rebuttal Report), Ex. A.) In his Rebuttal Report, Mr. Medora

19  responded to Dr. Pietila's opinion that all Washers contain a "uniform design flaw" that allegedly

20  causes F1 and F51 error codes by analyzing the failure rates attributable to those codes. (*Id.* at ¶¶ 24-

21  25.) Specifically, Mr. Medora directed database analysts at Exponent to query the customer and

22  service data collected and maintained by Sears in the ordinary course of Sears' business operations,

23  to identify customers who potentially experienced either F1 or F51 error codes. (*Id.* ¶¶ 15, 25.)

24  Exponent's statistical group (including three individuals with PhDs) analyzed Sears' service data, in

25  the form of flat text files. (*See* Tr. of Dep. of Noshirwan K. Medora, Dec. 1, 2011 ("Medora Dep."),

26

27  [1] Mr. Medora's Rebuttal Report ("Rebuttal Report") is attached as Exhibit D to Dkt. # 130, Declaration of Lesley E. Weaver ("Weaver Decl.") in Support of Plaintiffs' Motion to Exclude Certain Testimony and Opinions of Defendants' Expert Noshirwan K. Medora.

28

DEFS.' OPP. TO PLS.' MOT TO EXCLUDE CERTAIN TESTIMONY & OPINIONS OF DEFS.' EXPERT
CASE NO. 5:09-CV-00288 JF (HRL)

1    at 55:1-17, 56:17-22, attached as Ex. 17 to the Decl. of Galen Bellamy Submitting Defs.' Evidence

2    in Opp'n to Class Cert. (hereafter "Defs.' Evid. Subm.").)

3         The Rebuttal Report detailed the steps Exponent's statistical group took in analyzing Sears'

4    customer and service databases (Weaver Decl. Ex. D (Rebuttal Report) ¶¶ 15-21 (explaining the

5    methodology behind how Sears' database was searched)) and attached a description of the database

6    program used to conduct the queries (*id.*, Ex. E), a list of the search terms used (*id.,* Ex. F), as well

7    as the specific part numbers for which his staff searched (*id.*, Ex. G).[2] Contrary to Plaintiffs'

8    suggestion, Mr. Medora explained during his deposition the type of data he and his team reviewed

9    and the way in which his team queried the databases and analyzed the data. (Defs.' Evid. Subm. 17

10   (Medora Dep.) at 55:18-59:11 (explaining which model numbers and parts were searched as well as

11   the methodology by which Mr. Medora determined the failure rate for the Washers).) Mr. Medora

12   also explained that the data analyzed at his request was reviewed and approved by a PhD-level

13   statistician as part of Exponent's quality control process. (*Id.* at 69:15-70:22, 130:7-10.)

14        The analysis of Sears' customer and service data revealed that F1 and F51 error codes

15   affected only a small fraction of the Washers included in Plaintiffs' proposed class. For example,

16   only 0.5% and 3.2% of all Washers sold in 2006 have any reported problem that could have been

17   related to the washer stopping in mid-cycle and displaying an F1 or F51 error code, respectively,

18   during the first year of use. (Weaver Decl. Ex. D (Rebuttal Report) at Table 1, Figures 1a, 1b.) Mr.

19   Medora's analysis also demonstrated that the incidence of each of these error codes, and the

20   corresponding repairs, significantly diminished each year after 2006 as Whirlpool implemented

21

22

23   _____

[2] Prior to the submission of Mr. Medora's Rebuttal Report, Defendants answered interrogatories
24   regarding a number of Sears' databases, including its National Product Services database, NPJ
database (which is a database that stores consumer information for all serviceable appliances),
25   Customer Complaint Management System, Strategic Performance Reporting System, Sears
Technical Assistance Center, Home Service Teradata Data Warehouse, Leveraging Customer
26   Information Teradata Warehouse 2.0, Broadvision, and Library Imaging System. (*See* Sears,
Roebuck and Co.'s Responses to Plaintiffs' Second Set of Interrogatories ("Interrogatory
27   Responses"), Responses 4 and 6, attached as Ex. A to the Declaration of Edwin J. Kilpela ("Kilpela
Decl.").) Defendants also explained how Sears stores its service records (*id.*, Response 7) and how it
28   queried and linked various database tables to derive requested information (*id.*, Response 11).

1    various design changes and improvements to the Washers. (*Id.* ¶ 29, 40-43 Table 1 & Figures 3 & 4,

2    49-50 Figures 7 & 8.)

3         Based on his review of the relevant engineering documents and inspection of exemplar

4    machines, coupled with the data analysis performed by his colleagues at Exponent, Mr. Medora

5    concluded that "[t]he vastly different rates for Washers produced at different times from 2006 to

6    2009 clearly demonstrate the inhomogeneous nature of the proposed class as outlined in the

7    complaint." (*Id.* ¶ 29.) Mr. Medora also opined that if Dr. Pietila's theory that the Washers suffered

8    from a uniform design flaw were correct, one would expect to see consistent repair rates for F1 and

9    F51 codes throughout the relevant period, not the substantially reduced rate of F1 and F51 error

10   codes reflected in the service data. (*Id.* ¶ 30.)

11        **C.    Dr. Pietila Submitted a Sur-Rebuttal Report that Included an Analysis of Sears'
               Service Data Performed by an Independent Database Analyst Who Dr. Pietila
12             Does Not Know and Who Did Not Work at His Direction**

13        On July 7, 2011, Dr. Pietila submitted a sur-rebuttal report ("Sur-Rebuttal Report") that

14   purported to respond to Mr. Medora's opinions, but that actually set forth new opinions and analyses

15   for the first time. (*See* Andrus Decl. Ex. A.)[3] Relying on the work of an unidentified database

16   analyst, Dr. Pietila opined that the failure rate due to allegedly defective ECBs was 21.55%. (*Id.* at

17   ¶¶ 12-13.) In contrast to the statistical analysis performed at Mr. Medora's direction, however, Dr.

18   Pietila admitted that he did not even know who performed the statistical analysis included in his Sur-

19   Rebuttal Report, and could testify only that the analysis "came through" Plaintiffs' counsel. (*See* Tr.

20   of Dep. of Dr. Raymond Pietila, Dec. 2, 2011 ("Pietila Dep."), at 88:25-89:9, Defs.' Evid. Subm. 6).)

21   Dr. Pietila admitted that he had never met the analysts, does not "really know what their background

22   is," and did not direct their review or analysis. (*Id.* at 89:10-90:16.) Dr. Pietila further admitted that

23   even though he relied on the work performed by Plaintiffs' data analysts, he does not know where

24   the instructions to search the data came from, does not know if the unidentified individuals who

25   were conducting the searches had any experience working with Sears' databases, and does not know

26

27   [3] The Sur-Rebuttal Report included a considerably revised definition of the "Proposed Class" and
     offered several new opinions regarding, among other things, the likelihood that the Washers would
28   experience error codes in the future. (E.g., *id.* at 4-5, 29.)

-4-

1   anything about them "other than their name." (*Id.* at 90:17-92:1.) Dr. Pietila also conceded that he is

2   not capable of querying Sears' or Whirlpool's databases himself. (*Id.* at 194:21-24.)

3       **D.    Mr. Medora Responded to the New Opinions in Dr. Pietila's Sur-Rebuttal
            Report in His Sur-Sur Rebuttal Report**

4

5           To respond to the new opinions improperly disclosed for the first time in Dr. Pietila's Sur-

6   Rebuttal Report,[4] Defendants disclosed Mr. Medora's Sur-Sur-Rebuttal Report on August 11, 2011.

7   (*See* Weaver Decl. Ex. E, Sur-Sur Rebuttal Report at ¶¶ 3, 4.) In order to evaluate Dr. Pietila's

8   unsubstantiated new opinions regarding the likelihood that Washers might experience F1 and F51

9   errors in the future, Mr. Medora directed the statistical group at Exponent to analyze Sears' customer

10  and service data to identify "the trend of reported rates of F1 and F51 error codes among the revised

11  Proposed Class of Washers for the last year for which data was available." (*Id.* ¶ 41.) This analysis

12  confirmed that the relevant failure rates peak approximately 1.5 to 2.5 years into the Washers' lives,

13  and then begin declining. (*Id.* ¶¶ 41-44, Figures 1, 2, 3.) Mr. Medora also explained that the searches

14  Dr. Pietila utilized were over-inclusive because, among other things, his searches captured service

15  records for ECBs that were replaced for <u>any</u> reason and were not limited to repairs or replacements

16  related to F1 or F51 error codes. (*Id.* ¶¶ 45-52.)

17          After Mr. Medora submitted his Sur-Sur Rebuttal Report, but before his deposition,

18  Defendants produced additional information regarding the field names in the Sears service databases

19  relating to Dr. Medora's analysis. (*See* October 18, 2011 Letter from Galen Bellamy to Lesley

20  Weaver, Kilpela Decl. Ex. B.)

21          Sears employees David Chowanec and Steven Namnick read and analyzed both of Mr.

22  Medora's expert reports, including the data queries that his team at Exponent wrote for purposes of

23  determining the service rates attributable to F1 and F51 error codes. (*See* Declaration of David

24  Chowanec ¶ 12, Defs.' Evid. Subm. Ex. 5.) They determined that the F1 and F51 key-word search

25  terms that were used by Mr. Medora's data analysts were thorough and exhaustive. Further, Mr.

26

27  [4] By rule, Dr. Pietila's Sur-Rebuttal Report should have been limited to "evidence [] intended solely
    to contradict or rebut" the opinions expressed in Mr. Medora's Rebuttal Report. *See* Fed. R. Civ. P.
28  26(a)(2)(D)(ii).

1   Namnick, who is a who is an SAS Warranty Analyst and whose job responsibilities include querying

2   and analyzing Sears' customer, merchandise, service, and other databases (*id.* at ¶ 9), concluded that

3   Exponent's search methodologies were consistent with the analysis that he would have undertaken to

4   determine the rates of reported F1 and F51 error codes among owners of different model years of

5   Oasis washers (*id.* at ¶ 12).

## ARGUMENT

7          No doubt anticipating that Defendants would move to exclude Dr. Pietila's opinions to the

8   extent they were based on the flawed service data analyses performed by his unknown database

9   analyst, Plaintiffs seek to create a false equivalency by moving to exclude certain paragraphs, tables,

10  and figures contained in Mr. Medora's expert reports. (*See* Pls.' Mot. to Exclude Certain Test. and

11  Op. of Defs.' Expert Noshirwan K. Medora ("Pls.' Mot.").) Plaintiffs only half-heartedly criticize

12  the data and methodologies on which Mr. Medora's opinions are based. Instead, they claim that

13  certain of Mr. Medora's opinions are flawed because he is not a statistician, and because he did not

14  personally conduct the service data and statistical analyses. (Pls.' Mot. at 8-14.) Plaintiffs' Motion

15  provides no legitimate factual or legal basis for striking Mr. Medora's opinions, and should be

16  denied.

17  **I.   PLAINTIFFS' MOTION INCORRECTLY RELIES ON FEDERAL RULE OF
           EVIDENCE 702**

18

19         Plaintiffs contend that Mr. Medora's opinions should be excluded pursuant to Federal Rule of

20  Evidence 702 to the extent that his opinions are based on analyses of Sears' customer and service

21  data that Mr. Medora did not conduct personally. (Pls.' Mot. at 6-7.) The relevant inquiry, however,

22  is whether Mr. Medora's opinions are consistent with Rule 703, which governs the types of

23  information on which an expert witness is entitled to rely in forming his opinions. Rule 703 provides

24  in relevant part:

25         An expert may base an opinion on facts or data in the case that the expert has been
           made aware of or personally observed. If experts in the particular field would
26         reasonably rely on those kinds of facts or data in forming an opinion on the subject,
           they need not be admissible for the opinion to be admitted.

27

28  Fed. R. Evid. 703. *See also Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1142 (9th Cir.

-6-

1    1997) ("The fact that Engelke's opinions are based on data collected by others is immaterial; Federal

2    Rule of Evidence 703 expressly allows such opinion testimony."). "In determining whether an expert

3    based his opinion upon relevant and reliable data, deference ought to be accorded to the expert's

4    view that experts in his field reasonably rely on such sources of information." *Taylor, Bean &*

5    *Whitaker Mortg. Corp. v. GMAC Mortg. Corp.*, No. 5:05-cv-260-Oc-GRJ, 2008 WL 3819752, at *2

6    (M.D. Fla. Aug. 12, 2008) (citations and internal quotation marks omitted).

7         Here, Plaintiffs claim (without citing any pertinent authority) that because Mr. Medora is not

8    a statistician, he may not rely on the statistical analyses his staff performed.[5] (Pls.' Mot. at 6, 9.)

9    Notably, Plaintiffs do not contend that any of Mr. Medora's opinions—*e.g.*, that the fluctuations in

10   SIR data show that the Washers contain relevant design differences and that decreasing repair rate

11   demonstrates that the Washers are unlikely to fail—fall short of Rule 702's requirements.

12   Regardless, the relevant inquiry under Rule 703 is whether Mr. Medora properly relied on the work

13   Exponent's database analysts and statisticians performed at his direction. As discussed more fully

14   below, Mr. Medora's reliance on that work is plainly permitted by Rule 703.

15   **II.    MR. MEDORA'S OPINIONS ARE ADMISSIBLE BECAUSE ENGINEERS AND
             ENGINEERING EXPERTS ROUTINELY RELY ON OTHERS TO ANALYZE**
16   **      SERVICE DATA**

17         Rule 703 allows an expert to rely on any facts or data "[i]f experts in the particular field

18   would reasonably rely on those kinds of facts or data in forming an opinion." Fed. R. Evid. 703.

19   Here, the fact and expert testimony in this matter demonstrate that the database analyses performed

20   at Mr. Medora's direction are precisely the sort of information utilized by engineers.

21         Like Mr. Medora, Dr. Pietila relied on database analysts to query Sears' customer and service

22   databases in support of his opinions regarding the Washers' purported failure rate (*see* Andrus Decl.

23   Ex. A (Sur-Rebuttal Report) at 12-13), because, as he acknowledged, Dr. Pietila does not "have the

24   data-processing skills to set up the software, to search the data fields and do all that." (Defs.' Evid.

25   _____

26   [5] Plaintiffs misleadingly quote Mr. Medora's Rebuttal Report to suggest that Mr. Medora was not
     candid when he stated he conducted an "independent analysis" of Sears' database. (Pls.' Mot. at 8-
27   9.) The very next sentence of Mr. Medora's Rebuttal Report discloses that the analysis of Sears'
     database contained in his report "was performed by our data analysis personnel at my request."
28   (Rebuttal Report ¶ 15.)

1   Subm. 6 (Pietila Dep.) at 193:24-194:20, 196:13-18.) The fact that Plaintiffs' engineering expert

2   followed the same methodology as Mr. Medora—albeit in an uninformed and unreliable manner—

3   demonstrates that Plaintiffs' argument is unfounded. *See In re Sulfuric Acid Antitrust Litig.*, 235

4   F.R.D. 646, 653 (N.D. Ill. 2006) (rejecting defendants' claims that they did not understand plaintiffs'

5   expert's methodology because their own work belied their contention: "we have it on the highest

6   authority-the defendants themselves-that the price data are at least reasonably reliable").

7        The testimony of several Sears and Whirlpool engineers confirms that engineers routinely

8   rely on analyses of service data to identify, evaluate, and address field quality issues. For example,

9   David Chowanec, a Sears engineer, testified that he regularly analyzes and evaluates Sears' service

10  records for the purposes of evaluating and improving field quality in the products Sears sells, and

11  that he relies on database analysts to conduct the relevant searches and provide him with the results.

12  (*See* Tr. of Dep. of David Chowanec, Sept. 9, 2009 ("Chowanec Dep."), at 51:21-57:21, Defs.' Evid.

13  Subm. 4.) Mr. Chowanec also testified that in connection with his work on this case, he relied on the

14  expertise of Mr. Steve Namnick (an employee in Sears' IT department) to search Sears' database

15  (called the Terradata system) and provided Mr. Namnick with only high-level instructions regarding

16  the information he sought:

17       Q.    And then what did you do with respect to – You mentioned also that you gathered
18             information with respect to consumer complaints?

19       A.    Yes, ma'am.

20       Q.    How did you go about doing that?

21       A.    That would have been through the queries that Mr. [Namnick] ran.

22                              * * *

23       Q.    Do you know which tables were included in the query?

24       A.    The way – I know Terradata was used.  Mr. [Namnick] is the expert when it comes to
             the tables.  Therefore, I do not want to restrict him in any way, so I give him a high
25           level of this is the information I'm looking for and he determines how to get all of the
             data.

26  (*Id.* at 52:12-18, 54:19-55:2.) Mr. Chowanec further explained in an affidavit he submitted in this

27  case that he relies on Mr. Namnick to analyze databases for him:

28       *I do not usually search Sears' databases myself, however, as there is another*

                                      -8-

*member of my department, Steven Namnick, who is an SAS Warranty Analyst and whose job responsibilities include querying and analyzing Sears' customer, merchandise, service, and other databases, primarily on an ad hoc basis, to assist Sears Home Services personnel in their various job responsibilities, such as monitoring and reporting the field performance and quality of Sears' laundry appliances. Mr. Namnick wrote and executed the queries summarized below to assist me in analyzing Sears' customer, merchandise, and service data for Oasis washers owners.*

(*See* Sept. 17, 2009 Affidavit of David Chowanec in Supp. of Mot. to Strike at 3, Defs.' Evid. Subm. 18.)

Whirlpool engineer Eric Farrington also testified that Whirlpool engineers routinely rely on analyses of Whirlpool's service data to evaluate the performance of their products, identify potential areas of design improvement, and monitor the impact of design changes once implemented. Although Mr. Farrington did not know how the data was collected or analyzed, he was unequivocal in stating that service data was an important part of Whirlpool's efforts to analyze and improve field quality:

> Q.    Returning to the definition of quality issues, how does Whirlpool determine whether an issue is common enough across all machines such that it deserves investigation or correction?
>
> A.    I don't know.  There is data that comes back from the field, service tickets, comments from trade partners, comments from dealers that's made aware to the team, and we organize projects around those to improve quality wherever – wherever we see a need.

(*See* Tr. of Dep. of Eric Farrington June 2, 2011 ("Farrington Dep.") at 77:8-20, Defs.' Evid. Subm. 7.)[6]

In circumstances like these, courts routinely find that the challenged expert's reliance on database analysts or information prepared by others was proper. *See, e.g.*, *Monsanto Co. v. David*, 516 F.3d 1009, 1015 (Fed. Cir. 2008) (collecting cases and observing that "numerous courts have held that reliance on scientific test results prepared by others may constitute the type of evidence that is reasonably relied upon by experts for purposes of Rule of Evidence 703"); *Am Med. Sys., Inc. v. Laser Peripherals, LLC*, 712 F. Supp. 2d 885, 896 (D. Minn. 2010) ("An expert witness may rely on

---

[6] *See also* Defs.' Evid. Subm. 1 (Decl. of Eric Farrington at ¶¶ 45-47), 3 (Decl. of Marvin Fox at ¶ 8).

1  factors or data not based on personal perception if the facts or data are of a type reasonably relied

2  upon by experts in the particular field in forming opinions or inferences upon the subject." (internal

3  quotation marks and citations omitted)); *McReynolds v. Sodexho Marriott Servs., Inc.*, 349 F. Supp.

4  2d 30, 36 (D.C. Cir. 2004) (statistician's reliance on others to create and run computer programs to

5  analyze data provided by employer did not support exclusion of his expert testimony where he was

6  familiar with techniques used in structuring analysis for programs, and programs' results were

7  reviewed for errors); *United States v. McPhilomy*, 270 F.3d 1302, 1313-14 (10th Cir. 2001) (holding

8  expert testimony was properly admitted where expert relied on retail prices charged by area retailers

9  for expert's analysis and noting that evidence was reasonably relied upon by experts in the field);

10 *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94-95 (2d Cir. 2000) (explaining that an expert

11 need not have conducted her own tests and may rely on data she did not personally collect); *Snyder*

12 *v. W. Am. Ins. Co.*, CIV.A. 01-5033, 2003 WL 21497359, at *1 (E.D. Pa. June 9, 2003) (denying

13 motion to strike expert opinions and noting that "[t]he fact that Mr. Kufta is not in the field of

14 laboratory analysis is inapposite, provided that experts within Mr. Kufta's field, *i.e.*, the cause and

15 origin of fires, reasonably rely on such reports"); *Bauman v. Centex Corp.*, 611 F.2d 1115, 1120 (5th

16 Cir. 1980) (expert management consultant permitted to base opinion on, among other things, "stock

17 analyst people that are analyzing companies for a living").

18    Accordingly, because Plaintiffs do not contend that the processes used to aggregate and

19 analyze the data in this case are atypical in the engineering community or that Mr. Medora's

20 opinions are otherwise improper, this Court should find that Mr. Medora's reliance on his staff's

21 analysis was proper and deny Plaintiffs' motion.

22 **III.    THE METHODOLOGY AND RATIONALE UNDERLYING MR. MEDORA'S
       OPINIONS WERE ADEQUATELY EXPLAINED IN HIS REPORTS AND
23     DEPOSITION**

24    Plaintiffs' also argue that Mr. Medora failed to explain adequately the methodology and

25 rationale underlying the opinions in his reports and that he did not understand how the data analysis

26 was conducted. (*See, e.g.*, Pls.' Mot. at 14.) Specifically, Plaintiffs' contend that Mr. Medora could

27 not explain how the total universe of Washers was derived, how the repair records were de-

28 duplicated, whether the search methodology was tested for error, or how the error code rates were

-10-

calculated. (Pls.' Mot. at 4, 5, 10.) Plaintiffs' argument is demonstrably false, and contradicted both by Plaintiffs' legal authority as well as Dr. Pietila's Sur-Rebuttal Report.

First, contrary to Plaintiffs' argument, Mr. Medora's opinions are well supported. For example, Mr. Medora attached to his Rebuttal Report lists of the search terms his staff used to query Defendants' database and the part numbers for which his staff searched to identify relevant service records. (*See* Weaver Decl. Ex. D (Rebuttal Report), Exs. F and G.) Mr. Medora's Rebuttal Report and Sur-Sur Rebuttal report detail the database queries that were performed (*id.* at ¶¶15-20; Weaver Decl. Ex. E (Sur-Sur Rebuttal Report) at ¶¶ 41-44) and provide charts, tables, and graphs depicting the resulting data (*see* Weaver Decl. Ex. D at Table 1, Figures 1a, 1b, 3, 4, 5, 6a, 6b, 7, 8; Weaver Decl. Ex. E at Figure 1, 2, 3). Moreover, Defendants supplemented the information in Dr. Medora's reports via interrogatory responses and correspondence from counsel. (*See* Kilpela Decl., Exs. A and B.) It is difficult to imagine how Mr. Medora could have been any more transparent in describing how the databases analysts who supported his work conducted their analysis.

Second, Plaintiffs misleadingly cite select portions of Mr. Medora's deposition testimony to suggest that he knows nothing about the work his analysts performed. (Pls.' Mot. at 8, 13.) Taken in proper context, however, Mr. Medora's deposition testimony reveals that he plainly understood the nature of the data that his team searched and how his team conducted their database searches. (*See* Defs.' Evid. Subm. 17 ("Medora Dep.") at 73:20-76:16 (explaining how queries were conducted and complaint rates were analyzed including why his analysis includes the population of Washers it does), and 83:18-89:24 (explaining that he created the search used to search the database, which search terms were used, and why those search terms were used).) By way of another example, although Plaintiffs assert that Mr. Medora's opinions are based on the wrong set of data, Mr. Medora explained in great detail why his analysis included the Washers it did. (*Id.* at 57:14-59:11.) Further, Mr. Medora's Rebuttal Report discusses the way in which the database searches were conducted and the methodology used in identify the machines that may have manifested F1 or F51 error codes. (Weaver Decl. Ex. D (Rebuttal Report) at ¶¶ 15-35.)

Third, Plaintiffs' suggestion that Mr. Medora's analysis and methodology is flawed is belied by the testimony of their own expert. Mr. Medora's analysis is based on calculating the Washers'

1  SIR at various points in time, and Dr. Pietila admitted repeatedly that SIR is a legitimate method of

2  tracking field quality. (Defs.' Evid. Subm. 6, ("Pietila Dep.") at 80:14-23 (admitting SIR is a way to

3  measure quality and failure rates in the field); *id.* at 81:19-82:22 (admitting that SIR can be used to

4  track field failures on a specific platform or component and for a specific time period); *id.* at 155:17-

5  24 (admitting that SIR is "a measure of manifestation of the errors").)

6          Fourth, although Plaintiffs cite *Sugar Ass'n, Inc. v. McNeil-PPC, Inc.*, CV 04-10077 DSF,

7  2007 WL 5674020, at *2 (C.D. Cal. Dec. 19, 2007), that case actually demonstrates that the

8  disclosures and opinions Mr. Medora provided satisfy the requirements of Rules 702 and 703. In

9  *Sugar Ass'n*, the court rejected the defendants' claim that plaintiff's and plaintiff-intervenors' failure

10 to produce substantial amounts of data underlying their expert's report warranted the exclusion of

11 the experts' testimony. *Id.* The court also rejected defendants' argument that plaintiffs' experts'

12 opinions were unreliable because the experts failed to supervise the researchers who performed the

13 foundational work because Rule 703 "expressly allow such opinion testimony." *Id.* at *3 ("The

14 Experts' reliance on others in conducting experiments is not an abdication of oversight sufficient to

15 warrant exclusion of the proffered testimony pursuant to Rule 702") (citations omitted).

16         Finally, Plaintiffs' suggestion that they were denied essential information on which Mr.

17 Medora's opinions are based is undermined by the fact that Dr. Pietila drafted an extensive Sur-

18 Rebuttal Report responding to Mr. Medora's opinions after Plaintiffs hired their own database

19 analysts. In fact, Dr. Pietila dedicated almost 20 pages of his Sur-Rebuttal report to challenging Mr.

20 Medora's opinions regarding failure rates and the significance of such rates. (Andrus Decl. Ex. A

21 (Sur-Rebuttal Report) at 12-31.) Thus, any suggestion that Plaintiffs do not understand the genesis of

22 Mr. Medora's opinions (Pls.' Mot. at 9-11), cannot be squared with the realities of the work their

23 expert performed.

24 **IV.    PLAINTIFFS' CHALLENGES TO MR. MEDORA'S OPINIONS GO TO THE
            WEIGHT HIS TESTIMONY SHOULD BE AFFORDED, NOT ITS ADMISSIBILITY**

25

26         In addition to being predicated on the wrong Rule of Evidence and erroneous factual

27 assumptions, it is well established that challenges like the one Plaintiffs bring go to the <u>weight</u> of

28 Mr. Medora's opinions, not their admissibility. *See Stone v. Advance Am.*, No. 08-CV-1549-AJB,

-12-

1   2011 WL 6151636, at *3-*4 (S.D. Cal. Dec. 11, 2011) (holding that challenge brought against expert

2   on grounds that said expert relied on foundational work of others did not render opinions

3   inadmissible, but rather was basis to challenge weight of those opinions); *see also Flebotte v. Dow*

4   *Jones & Co., Inc.*, No. Civ.A. 97-30117-FHF, 2000 WL 35539238, at *3 (D. Mass. Dec. 6, 2000)

5   ("Although the disputed statistical analyses may be subject to the various flaws indicated by the

6   defendant, such imperfections affect their probative value rather than their admissibility.").

7   Moreover, when a party challenges the weight that should be afforded an expert's testimony, the

8   vehicle for such challenge is cross-examination and not exclusion of the testimony. *See Humetrix,*

9   *Inc., v. Gemplus S.C.A.*, 268 F.3d 910, 919 (9th Cir. 2001) ("To the extent Gemplus sought to

10  challenge the correctness of *Humetrix*'s experts' testimony, its recourse is not exclusion of the

11  testimony, but, rather, refutation of it by cross-examination and by the testimony of its own expert

12  witnesses. . . . Authority to determine the victor in [] a 'battle of expert witnesses' is properly

13  reposed in the [trier of fact]" (citation omitted)); *Hangarter v. Provident Life and Acc. Ins. Co.*, 373

14  F.3d 998, 1017 (9th Cir. 2004) ("[T]he factual basis of an expert opinion goes to the credibility of

15  the testimony, not the admissibility and it is up to the opposing party to examine the factual basis for

16  the opinion in cross-examination") (citation and internal quotation marks omitted).

17       Here, Plaintiffs' Motion reveals that they want to exclude Mr. Medora's opinions because

18  they disagree with the results of the data analyses included in his reports. For example, they assert

19  that Mr. Medora's staff (a) "parsed the numbers" to generate a low failure rate, (b) used narrow

20  definitions of "failure," (c) used a large number of machines to change the denominator so a lower

21  overall percentage was calculated, and (d) that Mr. Medora limited his analysis to Washers that were

22  covered under ESPs, rather than all Washers. (Pls.' Mot. at 3.) Although Plaintiffs may believe that

23  Mr. Medora's staff did not properly analyze the data, they fail to provide the Court with anything

24  demonstrating that the methodology used was either incorrect or unreliable. Accordingly, the proper

25  remedy is to allow Plaintiffs to engage their own analysts (which they did) and cross-examine Mr.

26  Medora (which they did), not to exclude Mr. Medora's opinions. *Cf. Ellis v. Costco Wholesale*

27  *Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (when conducting the required "rigorous analysis" of Rule

28  23's requirements, a district court must resolve disputed facts relevant to Rule 23's criteria,

-13-

1   including conflicting expert testimony, by "judging the persuasiveness of the evidence presented,"

2   not just its admissibility.)[7]

3   **CONCLUSION**

4        For all the foregoing reasons, Plaintiffs' Motion to Exclude Certain Testimony & Opinions of

5   Defendants' Expert, Noshirwan K. Medora, should be denied.

6   Dated: February 1, 2012              WHEELER TRIGG O'DONNELL LLP

7

8                          By:*s/ Edwin J. Kilpela*_____
                             Edwin J. Kilpela

9

10                         Attorneys for Defendants,
                           Sears, Roebuck and Co.
                           and Whirlpool Corporation

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

26  [7] In contrast, Defendants' Motion to Exclude Certain Testimony and Opinions of Plaintiffs' Expert
    Raymond Pietila, is not based simply on criticisms of Dr. Pietila's analyses, but on the facts that

27  certain of his opinions: (i) are based solely on speculation, and are not derived from any reliable
    scientific methodology; (ii) are based on information that is not of the sort reasonably relied on by

28  electrical engineers; and (iii) were disclosed for the first time in his deposition.

-14-

## CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that on February 1, 2012, I electronically filed the foregoing **Opposition to Plaintiffs' Motion to Exclude Certain Testimony and Opinions of Defendants' Expert Noshirwan K. Medora** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following email addresses:

Lori E. Andrus
Jennie Lee Anderson
Andrus Anderson LLP
155 Montgomery Street, Suite 900
San Francisco, CA  94104
Telephone: (415) 986-1400
Facsimile:  (415) 986-1474
lori@andrusanderson.com
jennie@andrusanderson.com

James C. Shah
Shepherd, Finkelman, Miller & Shah, LLP
35 East State Street
Media, PA 19063
Telephone: (610) 891-9880
Facsimile: (610) 891-9883
jshaw@sfmslaw.com

James E. Miller
Shepherd, Finkelman, Miller & Shah, LLP
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (860) 526-1120
jmiller@sfmslaw.com

Karen M. Leser-Grenon
Shepherd, Finkelman, Miller & Shah, LLP
401 West A Street, Suite 2350
San Diego, CA 92101
Telephone: (619) 235-2416
Facsimile: (619) 234-7334
kleser@sfmslaw.com

*Attorneys for Plaintiffs and the Class*

_s/ Edwin J. Kilpela_
Edwin J. Kilpela