1  Lori E. Andrus (SBN 205816)
2  Jennie Lee Anderson (SBN 203586)
   Jessica Moy (SBN 272941)
3  **ANDRUS ANDERSON LLP**
   155 Montgomery St, Suite 900
4  San Francisco, CA  94104
   Telephone: (415) 986-1400
5  Facsimile:  (415) 986-1474
   lori@andrusanderson.com
6  jennie@andrusanderson.com
   jessica@andrusanderson.com
7
8  [Additional counsel identified on signature page]

9  *Attorneys for Plaintiffs and the Proposed Classes*

10
                    UNITED STATES DISTRICT COURT
11
                  NORTHERN DISTRICT OF CALIFORNIA
12
                        SAN JOSE DIVISION
13

14 RENEE TIETSWORTH, SUZANNE          CASE NO. C09-00288-JF
   REBRO, SONDRA SIMPSON, and JOHN
15 CAREY, On Behalf of Themselves and All   **PLAINTIFFS' BRIEF IN OPPOSITION
   Others Similarly Situated,            TO DEFENDANTS' MOTION TO
16                                        EXCLUDE CERTAIN TESTIMONY AND
               Plaintiffs,               OPINIONS OF PLAINTIFFS' EXPERT
17                                        DR. RAYMOND PIETILA**

18         vs.
                                         Judge:      Hon. Jeremy Fogel
19 SEARS, ROEBUCK AND CO., and           Date:       March 19, 2012
   WHIRLPOOL CORPORATION,                Time:       9:00 a.m.
20                                        Courtroom:  3, 5th Floor
               Defendants.
21

22

23

24

25               **PUBLICLY FILED REDACTED VERSION**

26

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... ii

I.      INTRODUCTION ............................................................................................................ 1

II.     ARGUMENT ................................................................................................................... 1

        A.      The Legal Standard For Adjudicating *Daubert* Motions At The Class
                Certification Stage ................................................................................................ 1

        B.      Dr. Pietila's Opinions, As Articulated In His Expert Reports And During His
                Deposition, Support Plaintiffs' Argument That This Case Presents
                Predominantly Common Questions For The Fact Finder. ..................................... 3

        C.      Viewed In Light Of The Requirements For Class Certification, Dr. Pietila's
                Opinions Satisfy *Daubert* Standards And Are Admissible.................................. 6

                1.      Dr. Pietila Is Qualified To Testify To The Opinions He Offers In This
                        Matter. ...................................................................................................... 7

                2.      Dr. Pietila's Opinions Have More Than Adequate Support, Are Reliable,
                        And Are Admissible. ................................................................................. 8

                3.      Dr. Pietila's Opinions Are Properly Grounded In Fact And Any Fact-
                        Based Challenge Goes To The Weight, And Not The Admissibility Of
                        Dr. Pietila's Testimony And Opinions.................................................... 13

        D.      Dr. Pietila's Opinions Were Timely Made And Defendants Are Not Prejudiced
                By His Disclosures................................................................................................ 17

III.    CONCLUSION............................................................................................................... 20

1

## TABLE OF AUTHORITIES

2

**Cases**

3  *Abarca v. Merck & Co., Inc.*
     No. 1:07-cv-0388 OWW, 2010 WL 4643642 (E.D. Cal. Nov. 9, 2010) ........................................ 16

4  *Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.*
5     47 Cal. App. 4th 464 (1996) ........................................................................................................ 17

6  *Behrend v. Comcast Corp.*
      655 F.3d 182 (3d. Cir. 2011) ...................................................................................................... 1, 2
7
   *Blades v. Monsanto Co.*
8     400 F.3d 562 (8th Cir. 2005) .......................................................................................................... 2

9  *Childress v. Darby Lumber, Inc.*
      357 F.3d 1000 (9th Cir. 2004) ...................................................................................................... 20
10
    *Clausen v. M/V New Carissa*
11     339 F.3d 1049 (9th Cir. 2003) ...................................................................................................... 12

12  *Clicks Billiards, Inc. v. Sixshooters, Inc.*
       251 F.3d 1252 (9th Cir. 2001) ...................................................................................................... 16
13
    *Comer v. Am. Elec. Power*
14     63 F. Supp. 2d 927 (N.D. Ind. 1999) ........................................................................................... 16

15  *Daubert v. Merrell Dow Pharms., Inc.*
       509 U.S. 579 (1993) ............................................................................................................... *passim*
16
    *Dominguez v. Schwarzenegger*
17     270 F.R.D. 477 (N.D. Cal. 2010) .................................................................................................... 1

18  *DSU Med. Corp. v. JMS Co., Ltd.*
       296 F. Supp. 2d 1140 (N.D. Cal. 2003) ..................................................................................... 2, 7
19
    *Gen. Elec. Co. v. Joiner*
20     522 U.S. 136 (1997) ...................................................................................................................... 12

21  *Greenwell v. Boatwright*
       184 F.3d 492 (6th Cir. 1999) ........................................................................................................ 15
22
    *Guidroz-Brault v. Mo. Pac. R. Co.*
23     254 F.3d 825 (9th Cir. 2001) ........................................................................................................ 12

24  *Guillory v. Domtar Indus. Inc.*
       95 F.3d 1320 (5th Cir. 1996) .................................................................................................. 15, 16
25
    *Hangarter v. Provident Life And Accident Ins. Co.*
26     373 F.3d 998 (9th Cir. 2004) ........................................................................................................ 10

27  *Heisler v. Maxtor Corp.*
       Case No. 5:06-cv-06634-JF (PSG), 2011 WL 1496114 (N.D. Cal. Apr. 20, 2011) ................. 11, 19

28

ii

*Hogan v. Robinson*
  No. 1:03-CV-06408-LJO, 2007 WL 1452790 (E.D. Cal. May 15, 2007) ........................................ 19

*Humetrix, Inc. v. Gemplus S.C.A.*
  268 F.3d 910 (9th Cir. 2001) ........................................ 17

*In re Aftermarket Automotive Lighting Prods. Antitrust Litig.*
  276 F.R.D. 364 (C.D. Cal. 2011) ........................................ 2

*In re Magnetic Audiotape Antitrust Litig.*
  No. 99 CIV 1580, 2001 WL 619305 (S.D.N.Y. June 1, 2001) ........................................ 2

*In re Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig.*
  711 F. Supp. 2d 1348 (M.D. Ga. 2004) ........................................ 17

*In re TFT-LCD (Flat Panel) Antitrust Litig.*
  No. M 07-1827 SI, MDL No. 1827, 2012 WL 555090 (N.D. Cal. Feb. 21, 2012) ........................................ 17

*In re Wal-Mart Stores, Inc. Wage and Hour Litig.*
  No. C 06-2069 SBA, 2008 WL 413749 (N.D. Cal. Feb. 13, 2008) ........................................ 17

*In re Zurn Pex Plumbing Prods. Liab. Litig.*
  644 F.3d 604 (8th Cir. 2011) ........................................ 1, 2, 3, 13

*Jinro Am. Inc. v. Secure Invs., Inc.*
  266 F.3d 993 (9th Cir. 2001) ........................................ 8

*Knotts v. Black & Decker, Inc.*
  204 F. Supp. 2d 1029 (N.D. Ohio 2002) ........................................ 16

*Kumho Tire Co. v. Carmichael*
  526 U.S. 137 (1999) ........................................ 6, 8, 9

*Lanard Toys, Ltd. v. Novelty, Inc.*
  375 Fed. App'x 705 (9th Cir. 2010) ........................................ 18

*Luke v. Family Care and Urgent Med. Clinics*
  323 F. App'x 496 (9th Cir. 2009) ........................................ 18

*Parkinson v. Hyundai Motor Am.*
  258 F.R.D. 580 (C.D. Cal. 2008) ........................................ 11

*PixArt Imaging, Inc. v. Avago Tech., Gen. IP (Singapore) PTE, Ltd.*
  No. C 10-00544 JW, 2011 WL 5417090  (N.D. Cal. Oct. 27, 2011) ........................................ 8, 9, 10

*Primiano v. Cook*
  598 F.3d 558 (9th Cir. 2010) ........................................ 7, 10

*Primrose Operating Co. v. Nat'l Am. Ins. Co.*
  382 F.3d 546 (3d. Cir. 2004) ........................................ 13

*Quevedo v. Trans-Pacific Shipping, Inc.*
  143 F.3d 1255 (9th Cir. 1998) ........................................ 18

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333 (11th Cir. 2003) ........................................ 13

*Richter v. Hickman*
578 F.3d 944 (9th Cir. 2009) ................................................................................ 12

*San Francisco Baykeeper v. West Bay Sanitary Dist.*
791 F. Supp. 2d 719 (N.D. Cal. 2011) .................................................................. 20

*Semtech v. Royal Ins. Co. of Am.*
No. CV 03-2460-GAF (PJWx), 2005 WL 6192906 (C.D. Cal. Sept. 8, 2005) ................................. 19

*Shalaby v. Irwin Indus. Toll Co.*
No. 07CV2107-MMA, 2009 WL 7452756 (S.D. Cal. Jul. 28, 2009) ............................... 17

*Silong v. United States*
No. CV F 06-0474 LJO, 2007 WL 2712100 (E.D. Cal. Sept. 14, 2007) ........................ 18

*Smith v. Ceva Logistics U.S., Inc.*
No. CV 09-4957, 2011 WL 3204682 (C.D. Cal. Jul. 25, 2011) ............................... 1, 2, 13

*Taser Int'l Inc. v. Bestex Co. Inc.*
No. CV 06-2636 PA, 2007 WL 2947564 (C.D. Cal. Feb. 9, 2007) ........................... 19

*Tietsworth v. Sears, Roebuck & Co.*
720 F. Supp. 2d 1123 (N.D. Cal. 2010) ................................................................ 14

*United Nat'l Maint. Inc. v. San Diego Convention Center Corp., Inc.*
No. 07-cv-2172 BEN (JMA), 2010 WL 3034025 (S.D. Cal. Aug. 3, 2010) ........................ 16

*United States v. Hankey*
203 F.3d 1160 (9th Cir. 2010) .............................................................................. 8

*United States v. Rapanos*
376 F.3d 692 (6th Cir. 2004) ................................................................................ 19

*United States v. Rushing*
388 F.3d 1153 (8th Cir. 2004) .............................................................................. 12

*United States v. Sandoval-Mendoza*
472 F.3d 645 (9th Cir. 2006) ............................................................................. 7, 8

*Wal-Mart Stores v. Dukes*
131 S. Ct. 2541 (2011) ......................................................................................... 12

*Wong v. Regents of Univ. of California*
410 F.3d 1052 (9th Cir. 2005) .............................................................................. 19

**Rules**

Fed. R. Civ. P. 23(b)(3) ......................................................................................... 3

Fed. R. Civ. Proc. 37(c)(1) ................................................................................... 18

Fed. R. Evid. 407 ................................................................................................. 14

Fed. R. Evid. 702 ............................................................................................... 6, 8

iv

1   I.      INTRODUCTION

2          Plaintiffs' Expert, Dr. Raymond Pietila, a highly-qualified electrical engineer with decades of

3   experience designing, testing and evaluating electrical and electronic systems, is unquestionably

4   qualified to testify on the subject matter of his opinions offered in this lawsuit.  Dr. Pietila's opinions

5   are relevant, reliable, and clearly support Plaintiffs' argument that the Kenmore Oasis washing

6   machines ("Machines") in the proposed Class share a common defect and a common engineering

7   solution.  Further, those opinions (and the facts they are based upon) support Plaintiffs' contention

8   that the Machines are defective and otherwise substantially certain to fail in their useful lives,

9   whether it be by F1, F51 or explosion failure mode.  Defendants have had ample opportunity to test

10  Dr. Pietila's opinions and to cross-examine him during deposition.  For all of these reasons, as fully

11  explained below, Defendants' Motion To Exclude Certain Testimony And Opinions Of Plaintiffs'

12  Expert Dr. Raymond Pietila ("Motion to Exclude") should be denied.

13  II.     ARGUMENT

14          A.      The Legal Standard For Adjudicating *Daubert* Motions At The Class
                    Certification Stage
15

16          Although it is appropriate for the Court to evaluate expert testimony offered at the class

17  certification stage, the central inquiry is whether the expert testimony is reliable "in light of the

18  criteria for class certification and the current state of the evidence"—***not*** whether it will ultimately

19  be admissible at the trial on the merits.  *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604,

20  613-14 (8th Cir. 2011) (rejecting defendant's "desire for an exhaustive and conclusive *Daubert*

21  inquiry before the completion of merits discovery" because of the "inherently preliminary nature of

22  pretrial evidentiary and class certification rulings"); *Behrend v. Comcast Corp.*, 655 F.3d 182, 204,

23  n.13 (3d. Cir. 2011) (holding *Daubert* "need not turn class certification into a mini-trial"); *Smith v.

24  Ceva Logistics U.S., Inc.*, No. CV 09-4957, 2011 WL 3204682, at **6-8 (C.D. Cal. Jul. 25, 2011)

25  (finding expert's testimony to be helpful for identifying a class-wide method of proof); *Dominguez

26  v. Schwarzenegger*, 270 F.R.D. 477, 483 n.5 (N.D. Cal. 2010) (holding "evidence presented in

27  support of class certification need not be admissible at trial").

28  //

                                                    1

As the Eighth Circuit in *Zurn* persuasively explained:

> Expert disputes "concerning the factual setting of the case" should be resolved at the class certification stage only to the extent "necessary to determine the nature of the evidence that would be sufficient, if the plaintiff's general allegations were true, to make out a prima facie case for the class." *Blades v. Monsanto Co.,* 400 F.3d 562, 567 (8th Cir. 2005). We have never required a district court to decide conclusively at the class certification stage what evidence will ultimately be admissible at trial.

*Zurn,* 644 F.3d at 611 (emphasis added); *see also Behrend*, 655 F.3d at 204, n.13 (requiring a district court to "evaluate whether an expert is presenting a model which could evolve to become admissible evidence, [but] not requiring a district court to determine if a model is perfect at the certification stage"); *In re Aftermarket Automotive Lighting Prods. Antitrust Litig.*, 276 F.R.D. 364, 374 (C.D. Cal. 2011) ("'To determine predominance, a court need not plunge into the weeds of an expert dispute about potential technical flaws in an expert methodology[,]'" and need only "evaluate[] whether the method by which plaintiffs propose to prove class-wide impact could prove such impact, not whether plaintiffs in fact can prove class-wide impact") (quoting *In re Magnetic Audiotape Antitrust Litig.*, No. 99 CIV 1580, 2001 WL 619305, at *4 (S.D.N.Y. Jun. 1, 2001)); *Smith*, 2011 WL 3204682 at *8 ("[T]he court should not 'transform a *Daubert* hearing into a trial on the merits.'") (quoting *DSU Med. Corp. v. JMS Co., Ltd*., 296 F. Supp. 2d 1140, 1147 (N.D. Cal. 2003)).

The rationale for this approach is compelling:

> Class certification "is inherently tentative," and may "require revisiting upon completion of full discovery[.]"

> * * *

> The main purpose of *Daubert* exclusion is to protect juries from being swayed by dubious scientific testimony. That interest is not implicated at the class certification stage where the judge is the decision maker. The district court's "gatekeeping function" under *Daubert* ensures that expert evidence "submitted to the jury" is sufficiently relevant and reliable, but "[t]here is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself[.]"

> * * *

> [A] court's inquiry on a motion for class certification is "tentative," "preliminary," and "limited." The court must determine only if "questions of law or fact common to class members predominate over any questions affecting only individual members [and if] a class action

is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). As class certification decisions are generally made before the close of merits discovery, the court's analysis is necessarily prospective and subject to change, and there is bound to be some evidentiary uncertainty. Because a decision to certify a class is far from a conclusive judgment on the merits of the case, it is "of necessity . . . not accompanied by the traditional rules and procedure applicable to civil trials."

*Zurn*, 644 F.3d at 613 (internal citations omitted). Particularly where merits discovery is not closed, as is the case here, a full *Daubert* inquiry is premature and impractical since "[e]xpert opinions may have to adapt as such gaps are filled by merits discovery, and the district court will be able to reexamine its evidentiary rulings." *Id.*

>   **B.  Dr. Pietila's Opinions, As Articulated In His Expert Reports And During His Deposition, Support Plaintiffs' Argument That This Case Presents Predominantly Common Questions For The Fact Finder.**

In Dr. Pietila's opinion, the Oasis washing Machines all suffer from a "uniform design flaw"—a defective ECB—which was functionally and physically the same across all models in the Oasis platform. *See* Pietila Expert Report, Exhibit[1] GG to the Declaration of Lori Andrus In Support of Class Certification ("Andrus Declaration" or "Andrus Decl.") (Dkt. No. 127-33), pp. 4, 9 ("Pietila Expert Report"); *see also* Pietila Sur-Rebuttal Report, Ex. A, p. 7 ("The physical differences between models based on the Oasis platform are limited and not material.") ("Pietila Sur-Rebuttal") (Dkt. No. 127-1).

Importantly, the engineering solutions for this design flaw are all "likewise uniform across all subject Machines—a redesigned ECB." Pietila Expert Report, p. 4. As Dr. Pietila explains, "[t]he Machines in the class were uniformly built in a production setting with controls to ensure that the units were built to be identical. The design defects that are causing the majority of problems…were [thus] … uniformly manufactured into each unit." Pietila Sur-Rebuttal, p. 5; *see also* Deposition of Raymond Pietila, Ph.D., P.E. ("Pietila Tr."), p. 27:20-22 ("For one thing, the goal is to make every system identical. You stamp out Oasis platforms like jelly beans."), attached as Exhibit A to the Declaration of Lori E. Andrus In Support Of Plaintiffs' Opposition to Defendants' Motion To Exclude Certain Testimony And Opinions Of Plaintiffs' Expert Dr. Raymond Pietila ("Andrus

---

[1] Unless otherwise noted, all references to "Exhibit" (or "Ex.") are exhibits to the Andrus Declaration.

*Daubert* Declaration"), submitted herewith; *id.*, p. 38:1-3 ("So we have uniformly built thousands of machines, very carefully built them to be exactly the same, all with the same flaws."); *id.*, p. 57:5-7 ("They're uniform, across the board.  Everyone that has this machine with that software has the problem.").  Because "washing machines are expected to last, without operational failure, at least 10 years," "the defective ECB resulted in a product that had an unacceptably high failure rate, and was defective."  Pietila Expert Report, p. 5.

Regarding the three symptoms of the defective ECB at issue in this lawsuit, Dr. Pietila offered the following opinions.  The F1 error code problems stem from a defective pressure sensor— a "key component" of the ECB that is physically attached to, and a part of, the ECB.  *See* Pietila Sur-Rebuttal, p. 7.  The "major F1 related contributors" include "software problems associated with algorithms that handle calibration of the pressure sensor" and "pressure sensor performance problems" ("drift") caused by heating and cooling the pressure sensors during manufacture and transport.  *Id.*, p. 8.  The F51 error code problems are a result of the ECB's inability to control the Machines' "motor speed and direction."  *Id.*, pp. 10-11.  And, finally, explosions occur when water is present in the tub during the spin cycle and the "control board thinks that the water's drained our and it hasn't.  The tub spins up and you have water remaining in the tub, which causes an instability."  Pietila Tr., Andrus *Daubert* Declaration, Ex. A, p. 32:7-11.  The remedy for explosions is for the updated ECB software "to sense the deceleration of the tub and make some decisions as to whether there's actually water still trapped in the tub or not."  *Id.*, p. 33:14-17.  Regarding the likelihood of explosions, Dr. Pietila opined "[i]f everybody in the customer community that owns an Oasis washing machine decided to wash raincoats and tablecloths next Monday morning, the SIR rate would probably be 90 percent."  *Id.*, p. 156:3-7.  Contrary to Defendants' characterization of their "product improvements" over time, Dr. Pietila expressed his opinion that "these fixes are not quality improvements but they're fixes that are required to get the machine to behave the way it should have behaved in the first place."  *Id.*, p. 61:1-4.

As Dr. Pietila explains, he bases these opinions on: his considerable experience developing and analyzing electrical and electronic systems; and on his extensive review of Sears' and Whirlpool's internal engineering and quality documents, customer service data provided by

Defendants, depositions taken in this matter, Defendants' written discovery responses and Defendants' corporate representative declarations, and Sears and Whirlpool's own internal analysis (which shows that more than 30% of the Machines failed within the first year they were sold, *see* Andrus Decl., Ex. NN, WT0164171, at p. WT0164178).[2]  Pietila Expert Report, pp. 4, 9; *see also* Pietila Expert Report, Appendix B (Materials Reviewed); Pietila Sur-Rebuttal, Appendix B (Materials Reviewed).

Contrary to Defendants' assertions, *see* Motion to Exclude pp. 4-5, Mr. Medora's Rebuttal Report does not undermine Dr. Pietila's findings that the Machines suffer from a uniform design flaw.  In his Sur-Rebuttal Report, Dr. Pietila took issue with Mr. Medora's data analysis on several grounds.  First, Mr. Medora misleadingly diluted his figures significantly by including later versions of the Oasis washing machines that did not contain a defective ECB.  *See* Pietila Sur-Rebuttal, p. 16. Next, Dr. Pietila explained that Mr. Medora's search terms were too narrow, and the fields searched too limited, thereby excluding service calls legitimately related to F-1 and F-51 problems.  *Id.*, pp. 17-20 ("the keyword search term list was expanded to include terms and jargon used by service technicians to describe the ECB" including, e.g., "main control," "CCU," or "Control Bd") and Appendix A.  Dr. Pietila also pointed out that the customer service data did not reflect ██████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████, Exhibit D to the Andrus *Daubert* Declaration.[3]

In addition, in response to Mr. Medora's statistical analysis of the incomplete customer

[2] ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

Mr. Medora's conclusions that the failure rates specific to the incidence of F1 and F51 error codes was supposedly miniscule is directly contradicted by the pre-litigation documents cited by Plaintiffs and by the testimony of Whirlpool's very own Principal Engineer, Eric Farrington, who testified that, within months of product launch, the incidence of F51 error codes was "greater than 10 percent."  *See* Deposition Transcript Of Eric Farrington ("Farrington Tr."), p. 160:15-24, Ex. E to the Andrus *Daubert* Declaration.  Mr. Medora's conclusions are simply not credible.

service records produced by Defendants, Dr. Pietila tallied the incidences of F1- and F51-related

service calls in the records with the assistance of a database analyst.  *See* Pietila Sur-Rebuttal, pp.

12-13.[4]  Dr. Pietila's key word and part number search of the database included a more

comprehensive list than Mr. Medora's original analysis, in order to be sure to capture all relevant F1

and F51 service calls in the database.  Dr. Pietila's analysis shows that more than 22% of Machines

in Defendants' data required service related to F1, F51 or an ECB replacement.[5]  *See*  Ex. B to the

Andrus *Daubert* Declaration (Pietila Deposition Exhibit No. 295), p. 6.

   For all of these reasons, Dr. Pietila's opinions regarding the Machine's uniform design flaw

are clearly articulated, well-supported, and grounded in fact.

## C.   Viewed In Light Of The Requirements For Class Certification, Dr. Pietila's Opinions Satisfy *Daubert* Standards And Are Admissible.

   The determination of whether expert testimony is admissible "entails a preliminary

assessment of whether the reasoning or methodology underlying the testimony is scientifically valid

and of whether that reasoning or methodology properly can be applied to the facts in issue."

*Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 592-93 (1993).  Federal Rule of Evidence 702

provides that opinions relating to "scientific, technical, or other specialized knowledge" may be

admitted if they will "assist the trier of fact to understand the evidence or to determine a fact in

issue."  Fed. R. Evid. 702.  Pursuant to Rule 702, experts must be qualified "by knowledge, skill,

experience, training or education."  *Id.*  Expert opinions are admissible if "(1) the testimony is based

upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and

---

[4] Review and analysis of post-sales service data is of the type of evidence normally relied upon by engineers in evaluating product performance to address design defects.  Here, Dr. Pietila properly relies on such evidence because he is an engineering expert offering purely engineering opinions. By contrast, as fully explained in Plaintiffs' Reply in Support of Motion to Exclude Certain Testimony and Opinions of Defendants' Expert Noshirwan K. Medora, submitted herewith, Mr. Medora is an engineering expert who improperly exceeds his qualifications by purporting to offer statistical opinions, despite his admitted lack of statistical expertise.

[5] Defendants' challenge to Dr. Pietila's opinion that the failure rate is underreported in Defendants' data (as expressed in the Pietila Sur-Rebuttal Report, at p. 15), Motion to Exclude, pp. 12-13, is immaterial, as Dr. Pietila's assessment that the Machines are substantially certain to fail in their useful life is factually well-supported, and reliable, as discussed herein and in Plaintiffs' Reply In Support Of Motion for Class Certification, submitted herewith.  Simply put, it is not unusual for parties to differ about what the evidence reflects.

1    (3) the witness has applied the principles and methods reliably to the facts of the case." *Id.*; *see also*

2    *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147 (1999) (citing *Daubert,* 509 U.S. at 589).

3         "[T]he district court [is] a gatekeeper, not a fact finder." *United States v. Sandoval-Mendoza*,

4    472 F.3d 645, 653-54 (9th Cir. 2006); *see also DSU Med. Corp.*, 296 F. Supp. 2d at 1147 ("[A]

5    district court's gatekeeper role under *Daubert* is not intended to supplant the adversary system or the

6    role of the jury.") (citations omitted).  When the threshold of reliability is met, "[v]igorous cross-

7    examination, presentation of contrary evidence [by the opposing party], and careful instruction on

8    burden of proof are the traditional and appropriate means" of challenging the accuracy of an expert's

9    testimony." *Daubert*, 509 U.S. at 596; *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (same).

**1.    Dr. Pietila Is Qualified To Testify To The Opinions He Offers In This Matter.**

12        Defendants do not challenge Dr. Pietila's qualifications.  To be sure, Dr. Pietila is well-

13   qualified to testify to the opinions he offers in this matter.  Dr. Pietila attended the University of

14   Santa Clara, California, where he earned a Ph.D. in Electrical Engineering in 1977 and a Master of

15   Science in Electrical Engineering in 1970.  *See* Pietila Expert Report, Appendix C (Curriculum

16   Vitae) ("Pietila C.V.").  In his decades-long career as an electrical engineer, Dr. Pietila has

17   developed electrical and electronic systems for the U.S. government and military and has

18   accumulated vast experience in conforming such systems to the military's stringent technology

19   protocols.  *See e.g.*, Pietila Tr., Ex. A to the Andrus *Daubert* Declaration, pp. 239:4-240:2; *see also*

20   p. 80:1-2.  He has also spent considerable time acting as a litigation expert (for both plaintiffs and

21   defendants) in determining product failure modes (including washing machines) and has never failed

22   to qualify as an expert.  *See* Pietila C.V.  He has drafted product specifications and overseen failure

23   mode effects analyses.  *Id.*  He has also conducted mathematical modeling and computer software

24   analysis.  *Id.*  As a consultant, he has modeled processing algorithms, and identified and corrected

25   design deficiencies.  *Id.*  As such, Dr. Pietila is qualified to opine upon the subject matter of his

26   opinions offered in this lawsuit.

27   ///

28   ///

### 2. Dr. Pietila's Opinions Have More Than Adequate Support, Are Reliable, And Are Admissible.

Defendants' argument that Dr. Pietila's opinion regarding the uniformity of the Machines' defect is not scientifically reliable is unpersuasive for several reasons.

First, given the fact that Sears and Whirlpool addressed the problems with the Machines in a uniform manner (pursuant to the Service Flashes and the voluntary recall program, *all* Machines in the Class require an updated ECB), their newly-minted litigation stance (that all Machines are unique) simply rings hollow. Additionally, given the nature of the issues presented here (retrospectively analyzing an engineering defect), the Court's inquiry regarding reliability should focus on Dr. Pietila's *technical expertise*. In *Daubert*, where the Supreme Court was focused on admissibility of scientific testimony, the Court recommended the evaluation of certain factors designed to test scientific reliability (*e.g.*, error rates). *See Daubert*, 509 U.S. at 582. However, the Supreme Court made clear that the optional analytical factors outlined in *Daubert* may not always be pertinent in assessing reliability, depending on the nature of the expert testimony offered. *See Kumho Tire*, 526 U.S. at 150. "When evaluating specialized or *technical* expert opinion testimony, 'the relevant reliability concerns may focus on personal knowledge or experience.'" *Sandoval-Mendoza*, 472 F.3d at 655 (emphasis added)). Thus, "[w]hen expert opinion testimony is based on specialized or *technical knowledge* … it is not necessary to rigidly adhere to the *Daubert* factors," *PixArt Imaging, Inc. v. Avago Tech., Gen. IP (Singapore) PTE, Ltd.*, No. C 10-00544 JW, 2011 WL 5417090, at *8 (N.D. Cal. Oct. 27, 2011) (emphasis added), particularly in light of the fact that the Court has "broad latitude" in deciding how to measure reliability, as well as in making the ultimate reliability determination. *Kumho Tire*, 526 U.S. at 142; *see also United States v. Hankey*, 203 F.3d 1160, 1168-69 (9th Cir. 2010) ("The Daubert factors (peer review, publication, potential error rate, etc.) simply are not applicable to this kind of testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it."). This notion is in keeping with the Ninth Circuit's admonishment that "Rule 702 is applied consistent with the 'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers or opinion testimony.'" *Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1004 (9th Cir. 2001).

*PixArt Imaging, Inc. v. Avago Tech., Gen. IP (Singapore) PTE, Ltd.*, No. C 10-00544 JW, 2011 WL 5417090 (N.D. Cal. Oct. 27, 2011) is highly instructive on this point.  In *PixArt*, a patent dispute, the Court examined the testimony of plaintiff's expert, Dr. Bobby Hunt, regarding the "similarity and interchangeability of technology used in optical mouse, optical trackball, and optical finger navigation devices" to determine whether that testimony was scientifically reliable.  *PixArt Imaging, Inc.,* 2011 WL 5417090 at **7-8.  Applying the principles articulated in *Kumho Tire*, the Court observed that Dr. Hunt had "reviewed the technical specifications underlying PixArt's mouse devices, reviewed Avago's patents and the technology underlying those patents, and made observations about an optical finger navigations device built by PixArt." *Id.* at *8.  Based upon his review of defendant's internal documents, Dr. Hunt formed the opinion that the devices were similar in all relevant respects.  *Id.*  Over the defendant's objections that Dr. Hunt's methodology was not scientifically reliable, the Court held that Dr. Hunt's opinion "derives from his personal knowledge and experience, as well as his personal review of patents and technologies at issue in this case.  It light of Hunt's extensive background in the area of optical science and computer engineering, the Court finds that his opinions have adequate support to be admissible." *Id.*

Similarly here, given Dr. Pietila's extensive background in electrical engineering and in the development of complex electrical and electronic systems, and his review of volumes of technical documents including, for example, the extraordinarily-detailed Machines' Engineering Specifications, *see e.g.*, WT0347654, Ex. F to the Andrus *Daubert* Declaration, the service technician's manual, *see* WT ST0002316, Ex. G to the Andrus *Daubert* Declaration, in addition to Defendants' Failure Mode Effects analyses, *see e.g.,* WT0100224, Ex. H to the Andrus *Daubert* Declaration, Pareto analyses,[6] *see e.g.*, WT0146727, Ex. I to the Andrus *Daubert* Declaration, Service Flashes, and numerous other engineering documents supplied by Defendants, Dr. Pietila's opinions have more than adequate support to be admissible.

Viewed in light of the standard articulated in *Kumho Tire* and *PixArt*, Defendants' arguments that Dr. Pietila's opinions are unreliable because they are not based on scientific principles, and

---

[6] A Pareto analysis is a chart listing, from highest to lowest, the factors contributing to the Service Incident Rate.  Farrington Tr., Ex. E to the Andrus *Daubert* Declaration, p. 82:23-25.

9

because Dr. Pietila did no scientific testing, are unsustainable.  Motion to Exclude, pp. 3, 7.  Just as in *PixArt*, here, the *Daubert* factors relating to the assessment of strictly scientific principles need not be rigidly applied to Dr. Pietila.  No scientific testing needs to be done here for Dr. Pietila to reasonably opine on the nature of the Machines' defect because Whirlpool and Sears' ***own pre-litigation documents*** provide ample basis—and ample engineering data—to support the conclusion that the ECBs are defective.  Dr. Pietila's role as an engineer is not to re-create in a laboratory setting all circumstances by which a Machine could fail.  Instead, his role in the litigation context is to interpret Whirlpool's and Sears' internal design documents, test results, and engineering changes to understand the mechanics and electronics of the Machines (including any defects).  That is sufficient, and Defendants cite no authority otherwise.[7]  The mere fact that Defendants take issue with Dr. Pietila's opinions does not render them unreliable.

In this respect, this case is akin to *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010), wherein the Ninth Circuit held that the opinions of plaintiff's expert (an orthopedic surgeon)—that plaintiff's prosthetic elbow "fail[ed] to perform in the manner reasonably to be expected in light of [its] nature and intended function"—satisfied *Daubert*.  *Primiano,* 598 F.3d at 567.  Dr. Weiss' opinion was admissible despite the fact that it was unsupported by peer-reviewed publications, because Dr. Weiss' methodology, "essentially [a] comparison of what happened with Ms. Primiano's artificial elbow with what surgeons who use artificial elbows ordinarily see" had an adequate basis in Dr. Weiss' education and experience.  *Id.*; *see also Hangarter v. Provident Life And Accident Ins. Co.*, 373 F.3d 998, 1018 (9th Cir. 2004) (finding expert's testimony reliable based on his knowledge and experience and overruling objections that expert's analysis lacked scientific basis.).

Defendants also argue that, as an engineer, Dr. Pietila is unaccustomed to giving opinions about whether a machine is substantially certain to fail.  Motion to Exclude, p. 3.  This statement ignores the entirety of Dr. Pietila's experience and his role as an engineer.  In fact, this type of

---

[7]  The present situation is contrary to one, for example, in which it is unknown whether a pharmaceutical product is responsible for a particular disease, and an original epidemiology study must be undertaken to determine the pharmacological implications of the drug in a previously untested aspect.  Here, the Defendants' own extensive analysis of the Machines tells the story.

1    analysis is ***exactly*** what engineers do when faced with a situation where there is a high incidence of

2    failure of a product.  In that circumstance, the engineer first analyzes production data and post-sales

3    service data.  He also considers any technical service bulletins (the equivalent of Service Flashes

4    here).[8]  Next, he determines whether the failures are random and insignificant or that the failures are

5    chronic (requiring design modification to the platform).

6        Here, Dr. Pietila has applied these analytic techniques—the same that he has applied in the

7    commercial and military settings—and has determined that the evidence indicates that the F1, F51

8    and explosion failures in the Machines are uniform and so prevalent that the Machines are

9    substantially certain to fail in their useful lives.  Consistent with Dr. Pietila's opinions, Defendants

10    (prior to generating litigation positions designed to persuade that individual issues purportedly exist),

11    redesigned the ECB and, after the filing of this lawsuit, began retrofitting the Machines in the Class

12    with an ECB containing updated (corrected) software.[9]

13        Although the ultimate determination of whether the machines are defective is a matter for the

14    fact finder (and not to be determined at the class certification stage), Dr. Pietila's opinion in this

15    regard is adequately supported by the evidence and by common sense.  As Dr. Pietila explains, if the

16    Machines do not have updated ECB software, the first time a consumer washes a waterproof item is

17    likely to result in explosion.  *See* Pietila Tr., Ex. A to the Andrus *Daubert* Declaration, p. 156: 1-7

18    (referring to explosions: "The thing that bothers me on this whole program is that there are errors

19    that just haven't happened yet that are ready to happen.  If – if everybody in the customer community

20    that owns an Oasis wash – washing machine decided to wash raincoats and tablecloths next Monday

21    ///

22    morning, the SIR rate would probably be 90 percent.").[10]

23

---

24    [8] Contrary to Defendants' claim, Motion to Exclude, p. 12 n.4, Service Flashes are the type of facts
25    or data that engineering experts reasonably rely upon and that can support a common defect theory.
   *See Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 594 (C.D. Cal. 2008).
26    [9] Defendants' own expert, Mr. Medora, even admits that the ECB software changes fixed the
   problems.  Ex. O, Medora Tr., p. 116:19-21.
27    [10] Defendants cite *Heisler v. Maxtor Corp.*, Case No. 5:06-cv-06634-JF (PSG), 2011 WL 1496114
   (N.D. Cal. Apr. 20, 2011) for the proposition that Dr. Pietila's opinions regarding the Machines'
28    propensity to explode suffers from an "absence of documentation."  Motion to Exclude, p. 15.
   Defendants' reliance on *Heisler* is perplexing, as Dr. Pietila's opinions regarding explosions are
   based on Defendants' ***own*** documents.  *See e.g.*, Ex. U, WT0100034.

Defendants' attempt to characterize Dr. Pietila's "substantially certain to fail" opinion as speculative, baseless, and contrary to "established" facts is also without basis.[11] Quite unlike Dr. Pietila's opinion here, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) and *Richter v. Hickman*, 578 F.3d 944 (9th Cir. 2009), Motion to Exclude, p. 9, concerned expert testimony so patently conjectural and lacking in factual relevance that exclusion was warranted. *See Joiner*, 522 U.S. at 143-46 (affirming the exclusion of expert testimony because the animal studies relied upon to prove the cause of plaintiff's lung cancer involved infant mice exposed to highly concentrated and massive doses of PCBs, whereas plaintiff was an adult human who was allegedly exposed at a much smaller scale, and because the four epidemiological studies also relied upon never suggested a link between increases in lung cancer and PCB exposure, involved exposure to a type of mineral oil not at issue in the case, and involved exposure to numerous other potential carcinogens than that alleged by plaintiff); *see also Richter*, 578 F.3d at 987 (finding that the expert lacked absolutely any scientific basis for his conclusions, he did not assert that his conclusions were based on specialized forensic pathology experience or knowledge, he based his opinions on wrong facts, and he relied on testimony offered at trial, which he did not even attend).

Further, Defendants' reliance on *Clausen v. M/V New Carissa*, 339 F.3d 1049 (9th Cir. 2003), *Guidroz-Brault v. Mo. Pac. R. Co.*, 254 F.3d 825 (9th Cir. 2001), and *United States v. Rushing*, 388 F.3d 1153, 1156 (8th Cir. 2004), Motion to Exclude, p. 9, as purported support for excluding expert opinions that contradict the clear facts of the case, is likewise unpersuasive. In the first place, the analysis of failure rates conducted by Defendants' expert, Mr. Medora, which he performed *in the litigation context*, as well as their self-serving interpretation of internal documents that purportedly shows a "downward trend in SIR," hardly constitute "established" facts in this

---

[11] Defendants assert that Dr. Pietila admitted that "he does not know" whether the Machines are substantially certain to fail. Motion to Exclude, pp. 9-10 (citing *Wal-Mart Stores v. Dukes*, 131 S. Ct. 2541, 2544 (2011) and referencing Dr. Pietila's deposition testimony at p. 275:4-277:1). Defendants grossly mischaracterize Dr. Pietila's testimony and conveniently omit a key follow up sentence ("You just know that it's going to fail and it's not a good deal.") Pietila Tr., Ex. A to the Andrus *Daubert* Declaration, p. 277:1-2. Defendants' position also overlooks the extensive record evidence that the failure rate of the Machines was exceptionally high and far surpassed Defendants' view of what was acceptable in the industry.

case.[12]   Here, Dr. Pietila's opinion is not a differential diagnosis opinion and it is grounded on facts

derived from the pre-litigation record.

### 3.   Dr. Pietila's Opinions Are Properly Grounded In Fact And Any Fact-Based Challenge Goes To The Weight, And Not The Admissibility Of Dr. Pietila's Testimony And Opinions.

As a general rule, "***the factual basis of an expert opinion goes to the credibility of the***

***testimony, not the admissibility***."   *Zurn*, 644 F.3d at 614 (citation omitted) (emphasis added);

*Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (3d. Cir. 2004) ("[A]s a general

rule, questions relating to the bases and sources of an expert's opinion affect the *weight* to be

assigned to that opinion rather than its *admissibility* and should be left for the jury's consideration.")

(emphasis in original).   "Such testimony should be excluded only if it 'is so fundamentally

unsupported that it can offer no assistance to the jury.'"   *Zurn*, 644 F.3d at 614 (citation omitted);

*Smith*, 2011 WL 3204682, at **6-8 (rejecting defendants' argument that the expert's analysis should

be excluded because he failed to account for alternative explanations for missed breaks).   Moreover,

"'when parties dispute 'the specific numbers' to be used in an otherwise reliable scientific analysis,

the 'alleged flaws...are of a character that impugn the accuracy of the [the expert's] results, not the

general scientific reliability of his methods.'"   *Zurn*, 644 F.3d at 614 (quoting *Quiet Tech. DC-8, Inc.

v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1345 (11th Cir. 2003)).

In their Motion to Exclude, Defendants make a number of fact-based arguments.   None of

them are persuasive and none of them defeat class certification.   Each will be addressed in turn.

***First,*** Defendants claim that Dr. Pietila does not refute the downward trend of F1 and F51

error codes reported by Mr. Medora.   Motion to Exclude, p. 8.   However, Mr. Medora's argument

that the implementation of numerous engineering fixes over time actually proves Dr. Pietila's point:

only due to the presence of corrected software and Panasonic pressure sensor do the F1 and F51

---

[12] What is more, none of these cases are even applicable.   *See Clausen*, 339 F.3d at 1057 (involving an expert's differential diagnosis opinion as to the cause of death of the farmers' oysters); *Guidroz-Brault*, 254 F.3d at 830-31 (excluding expert's assumptions and conclusions that "find[] no support in the physical facts as described by the reports and other evidence in the record"); *Rushing*, 388 F.3d at 1156 (affirming the exclusion of an expert's opinion that, based on the medical histories of two individuals, they did not engage in a sexual relationship with each other, because, *inter alia*, the expert failed to account for factors critical to the opinion, he did not hold his opinion with any degree of scientific certainty, and he assumed facts clearly contradicted by the factual record).

error codes abate.  ***Without the corrected software, the Machines will continue to exhibit false***

***error codes.***  As Dr. Pietila explained in his Sur-Rebuttal, "the evidence shows that redesigning the

software on the ECB and installing an updated version of the ECB was successful in significantly

reducing the unacceptably high Service Incident Rate ("SIR") associated with the Machines."  Pietila

Sur-Rebuttal, p. 4.  Additionally, the "drift" associated with the F1 error has an "incubation period"

(a fact Mr. Medora admits) and can occur at any point in time.  *See* Pietila Sur-Rebuttal, at pp. 7-8,

and p. 28 (incubation period creates a "hazard that all machines in the class …are prone to

malfunctioning at some point in time with an F1 error code."); *see also* Ex. D to the Declaration of

Lesley E. Weaver In Support Of Plaintiffs' Motion To Exclude Certain Testimony and Opinions Of

Defendants' Experts Noshirwan K. Medora ("Medora Rebuttal Report") (Docket No. 130-4), p. 37.

   ***Second,*** Defendants incorrectly claim that Dr. Pietila "identified only one evidentiary fact

that he contends supports his opinion" that the Machines are defective: the fact that Sears issued

Service Flashes regarding the F1, F51 and explosion problems.[13]  Motion to Exclude, p. 10.  In fact,

there are numerous additional bases for the conclusion that Defendants' actions in updating all of the

Machines' ECBs as evidence of the existence of a common defect: as Dr. Pietila explained,

Mr. Medora's claims that "'to a reasonable degree of engineering certainty, there is a real and

significant difference in the performance of these Washers that correspond to real and significant

differences in software and hardware designs between Washers manufactured at different times.'  In

effect, [Mr.] Medora is again conceding that design changes to the ECB achieved significant

differences in the performance of the Machines (and not manufacturing issues).  He is also

acknowledging that the original ECB design was defective."  Pietila Sur-Rebuttal, p. 25.

---

[13]  Contrary to Defendants' argument, Plaintiffs do not rely on the voluntary recall ***alone*** to establish the existence of a common defect.  Motion To Exclude, p. 11, n.3.  As such, Federal Rule of Evidence 407 is not applicable.  In fact, Plaintiffs have proffered evidence that shows Defendants were aware of the defective nature of the ECBs long before the voluntary recall letters went out in March and April of 2009.  *See e.g.*, Ex. T, ST00119003 (first explosion April 2006).  This Court's holding in *Tietsworth v. Sears, Roebuck & Co.*, 720 F. Supp. 2d 1123 (N.D. Cal. 2010) is procedurally inapposite as it concerned challenges at the pleading stage and is also *dicta*, since it had no bearing on the Court's conclusion that "Plaintiffs successfully have alleged the existence of a duty and have stated a claim for fraudulent concealment."  *Id.* at 1135.  The fact that Defendants' uniform treatment of the defect strongly supports Plaintiffs' position that certification is warranted is not a legitimate reason to exclude the evidence.

1    Whirlpool's Principal Engineer Eric Farrington's testimony also supports Dr. Pietila's

2    opinions that the ECBs are defective.  For example, Dr. Pietila explains that "[o]n page 80, lines 19-

3    23 of Mr. Farrington's deposition ... Mr. Farrington explains that there were two major causes for the

4    F1 problem within the Oasis Machines.  Changing the pressure switch (pressure sensor)

5    manufacturer was one of the major remedies for reducing F1 error codes.  Since the pressure sensor

6    is an integral part of the ECB, Mr. Farrington is implicitly admitting that one of the major causes for

7    the F1 problem within the Oasis Machines was the ECB and that the new ECBs with pressure sensor

8    components purchased from a different manufacturer are now being utilized by Whirlpool."  Pietila

9    Sur-Rebuttal, p. 27.  Dr. Pietila also bases his opinion on the voluntary recall instituted by

10   Defendants, in which they acknowledge that every ECB in the subject Machines should be replaced.

11   Pietila Sur-Rebuttal, p. 5; *see also* Ex. M, SREBRO000108.  Accordingly, there are multiple facts

12   and evidentiary sources supporting Dr. Pietila's opinions that the ECBs are defective.

13       ***Third,*** recognizing the damning nature of the Service Flashes, Defendants complain that

14   Dr. Pietila's "unilateral interpretation of those documents is factually incorrect."  Motion to Exclude,

15   p. 10.  As an initial matter, the "interpretation" of the meaning of the Service Flashes is

16   unquestionably a merits issue.  Defendants do not deny that the Service Flashes apply to all

17   Machines in the Class.  Whether the Service Flashes contained instructions to replace all ECBs is a

18   question of fact that can be decided ***once*** for all Class members (by the jury).  Avoiding that obvious

19   point, Defendants' legal advocacy mischaracterizes the nature of the Service Flashes and blatantly

20   contradicts Defendants' own 30(b)(6) witness testimony that Service Flashes are communications

21   "to the service technician to let them know what repairs to make on the machine."  Ex. D,

22   Deposition of Danielle Whah, at p. 62:13-19.  A review of the face of the documents shows that

23   technicians were explicitly instructed to replace all ECBs.  *See* Exhibits E, F, G, H, I, J, K, and L.

24   As Dr. Pietila pointed out, "Service Flash 26-784R1 states in bold and italicized font that it is

25   'important' the ECB be updated when addressing F51 error code failures."  Pietila Sur-Rebuttal, p.

26   27; *see also* Ex. I, WT0281846.[14]

27

28   ───────────────
[14] None of the cases Defendants reference support a finding that Dr. Pietila's opinion is based on a
false premise.  *Greenwell v. Boatwright*, 184 F.3d 492 (6th Cir. 1999), Motion to Exclude, pp. 10-

**Fourth,** Defendants complain that Dr. Pietila has not identified any connection between F1, F51 error codes and explosions, Motion to Exclude, p. 6, but this is a red herring.  Plaintiffs have never argued that the error codes and explosions are co-dependent, in fact, they can occur independently of each other.  That is of no consequence, however, as all three are directly connected to the defective ECB, which can exhibit three different manifestations of its defective programming and faulty pressure sensor.

**Fifth,** Defendants also incorrectly argue that Mr. Medora's analysis of the data shows that only a tiny fraction of the Machines have experienced F1 or F51 error codes.  Motion to Exclude, p. 4.  In addition to the fact that Mr. Medora's calculation are flatly contradicted by Defendants' own documents, corporate testimony and their own conduct, *see, e.g.*, Farrington Tr., at p. 160:15-24 (more than 10% of the failures were due to F51), Ex. E to the Andrus *Daubert* Declaration, any errors in Dr. Pietila's calculation go to the weight of the expert opinion, and not to its admissibility. *See United Nat'l Maint. Inc. v. San Diego Convention Center Corp., Inc.*, No. 07-cv-2172 BEN (JMA), 2010 WL 3034025, *4 (S.D. Cal. Aug. 3, 2010); *see also Clicks Billiards, Inc. v.*

___

11, is inapposite.  There, in upholding the district court's admission of expert testimony, the Sixth Circuit noted that the plaintiffs did not challenge the factual basis of the expert's testimony and did not identify any factual assumptions by the expert that contradict the evidence.  *Id.* at 497-98. *Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320 (5th Cir. 1996), Motion to Exclude, p. 11, is distinguishable.  There, the forklift manufacturer defendant's expert was prevented from admitting a video simulation that was based on facts that were indisputably wrong.  *Id.* at 1330-31.  The Fifth Circuit made clear that "expert evidence ***based on a fictitious set of facts*** is just as unreliable as evidence based upon no research at all."  *Id.* at 1331 (emphasis added).  Here, the facts are disputed and Defendants have not alleged (nor could they) that Dr. Pietila's opinions are based on a fictitious set of facts.  In *Abarca v. Merck & Co., Inc.*, No. 1:07-cv-0388 OWW, 2010 WL 4643642 (E.D. Cal. Nov. 9, 2010), Motion to Exclude, p. 11, the district court held that plaintiffs' expert reports raised numerous scientific questions which rendered the expert testimony (and model) "potentially confusing, misleading, not understandable to the jury, and/or unreliable," and, as such, the district court ordered several court-appointed experts to assist with the assessment of the scientific reliability of the air modeling testimony.  *Id.* at *5.  No such complexities exist here.  In *Comer v. Am. Elec. Power*, 63 F. Supp. 2d 927 (N.D. Ind. 1999), Motion to Exclude, p. 12, a case involving an electrical power surge and a house fire, plaintiffs' expert repeatedly gave "inexplicably contradictory" testimony, reversing course "based on nothing more than the mere suggestion of counsel."  *Id.* at 935-38.  No such egregious circumstances have been alleged here; nor could they be.  *Knotts v. Black & Decker, Inc.*, 204 F. Supp. 2d 1029 (N.D. Ohio 2002), Motion to Exclude, p. 12, another house fire case, is also distinguishable.  There, the plaintiffs' expert acknowledged that other than the statements of child witnesses (who were deemed incompetent to testify), "he could not opine upon the origin of the fire."  *Id.* at 1039.  As discussed herein, contrary to the cases cited, Dr. Pietila's opinions are properly based on documentary and testimonial evidence.

*Sixshooters, Inc.*, 251 F.3d 1252, 1262-63 (9th Cir. 2001) (noting that faults in methodology and calculations, and critiques of conclusions, go the weight and not the admissibility of expert opinions); *Humetrix, Inc. v. Gemplus S.C.A.*, 268 F.3d 910, 919 (9th Cir. 2001) (holding that "'criticisms of an expert's method of calculation [are] a matter for the jury's consideration in weighing that evidence.'") (quoting *Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.*, 47 Cal. App. 4th 464 (1996)).  Indeed, this Court has acknowledged that errors in an expert's report do not render an expert's analysis unreliable.  *See In re Wal-Mart Stores, Inc. Wage and Hour Litig.*, No. C 06-2069 SBA, 2008 WL 413749, at *7 (N.D. Cal. Feb. 13, 2008).[15]

Accordingly, none of these fact-based arguments defeat class certification.  *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, MDL No. 1827, 2012 WL 555090, at *8 (N.D. Cal. Feb. 21, 2012) (holding defendants' "disagreements" with the bases for expert's opinion "do not render that opinion so inherently suspect that it may not be admitted at trial.  These arguments are precisely the type of matter that is appropriate for cross-examination.").

### D.   Dr. Pietila's Opinions Were Timely Made And Defendants Are Not Prejudiced By His Disclosures.

Contrary to Defendants' claims, Dr. Pietila's opinion that machine explosion is a symptom of a defective ECB is not untimely.  Unlike the plaintiffs in cases Defendants reference, Motion to Exclude, pp. 13-15, Plaintiffs here have complied with all deadlines dictated by this Court and the

---

[15] Defendants also cite to *In re Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig.*, 711 F. Supp. 2d 1348 (M.D. Ga. 2004) and *Shalaby v. Irwin Indus. Toll Co.*, No. 07CV2107-MMA, 2009 WL 7452756 (S.D. Cal. Jul. 28, 2009), Motion to Exclude, p. 15, for the assertion that because Dr. Pietila did not conduct any scientific testing of his opinions regarding the Machine explosions, these opinions must be excluded.  However, both cases are factually distinct and inapplicable.  In *In Re Mentor*, the district court held that one of plaintiffs' experts, Dr. Samaras, was prevented from testifying regarding specific causation of the plaintiffs' physical injuries allegedly due to defendants' suburethral tape ("Ob-Tape") "since Plaintiffs had not adequately explained the basis for any opinion by Dr. Samaras that connected the biophysical characteristics of Ob-Tape specifically to any Plaintiffs' individual injuries." *Id.* at 1374.  *In re Mentor* does not support the same finding here, as there are no such complicated biophysical considerations.  *Shalaby v. Irwin Indus. Toll Co.*, No. 07CV2107-MMA, 2009 WL 7452756 (S.D. Cal. Jul. 28, 2009) is distinguishable as the plaintiff's expert in that case (involving an allegedly defective handheld torch attached to a gas cylinder) completely disregarded the testimony of two witnesses to the explosion and did not know if the cylinder the plaintiff was using at the time of the accident was the same as the exemplar cylinders that he examined.  *Id.* at **9-10.  Here, Dr. Pietila has not disregarded any relevant witness testimony and has examined a Machine and several of the ECBs that are a part of the Class.

Federal Rules Of Civil Procedure regarding expert disclosure.  *Cf  Luke v. Family Care and Urgent Med. Clinics*, 323 F. App'x 496, 500 (9th Cir. 2009) (excluding experts where plaintiffs disclosed the expert declarations more than three months after the district court's deadline for initial expert disclosures, more than two months after the deadline for rebuttal disclosures, only four days before the close of discovery and ten weeks before trial, where the expert declarations presented a new theory as to a key element of plaintiffs' medical negligence claim); *Silong v. United States,* No. CV F 06-0474 LJO, 2007 WL 2712100, at \*5 (E.D. Cal. Sept. 14, 2007) (excluding a lengthy expert declaration disclosed more than six months after deadline, three months after depositions were taken, two months after discovery closed and a month after pretrial motions were filed); *Quevedo v. Trans-Pacific Shipping, Inc.*, 143 F.3d 1255, 1258 (9th Cir. 1998) (excluding expert where plaintiff failed to comply with district court's deadline for naming his liability expert and filing reports and statements of expert witness).  By contrast, here, Plaintiffs disclosed Dr. Pietila's Expert Report and Sur-Rebuttal Expert Report in accordance with the deadlines for expert report disclosure set forth by the Court.  *See* Dkt. No. 107 (Stipulation and Order Revising Case Management Schedule).

Even if this Court finds disclosure of Dr. Pietila's opinion regarding machine explosions untimely, the disclosure is substantially justified and harmless, rendering any alleged untimeliness moot.  *See* Fed. R. Civ. Proc. 37(c)(1).  The Ninth Circuit has held that district courts have discretion to allow untimely expert testimony in appropriate circumstances.  *See Lanard Toys, Ltd. v. Novelty, Inc.*, 375 Fed. App'x 705, 713 (9th Cir. 2010) (holding that the district court did not abuse its discretion in allowing plaintiff's expert to testify, even though plaintiff did not serve a timely, complete expert report, since the violation was non-prejudicial).  The four factors for courts to consider in evaluating harmlessness and justification are: "(1) prejudice or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the likelihood of disruption of the trial; and (4) bad faith or willfulness involved in not timely disclosing the evidence." *Id.*

The disclosure of Dr. Pietila's opinion regarding the fact that machine explosion is a

///

///

1  symptom of a defective ECB has not prejudiced Defendants.[16]  In fact, this Court has specifically

2  recognized that late disclosures of expert opinions are not prejudicial where the defendant has

3  deposed the expert and incorporated the late opinions and analysis into their briefing, as Defendants

4  here have done in their Opposition to Plaintiffs' Motion For Class Certification.  *See Heisler v.*

5  *Maxtor Corp.,* No. 5:06-cv-06634-JF (PSG), 2011 WL 1496114, at *3 (N.D. Cal. Apr. 20, 2011);

6  *see also* Defendants' Opposition to Plaintiffs' Motion For Class Certification ("Opposition") (Dkt.

7  No. 138) at pp. 11-13.  Additionally, courts have declined to exclude an expert's late report or

8  analysis when it is based on raw data already in possession of that the other party, finding no unfair

9  surprise or prejudice to the opposing party in such circumstances.  *See Semtech v. Royal Ins. Co. of*

10  *Am.*, No. CV 03-2460-GAF (PJWx), 2005 WL 6192906, at **2-3 (C.D. Cal. Sept. 8, 2005); *see also*

11  *United States v. Rapanos,* 376 F.3d 692, 644-45 (6th Cir. 2004) ("In this case, the failure to disclose

12  seems harmless as the Defendants were aware of the data used in the supplemental reports.").

13  Defendants here cannot complain that they were unaware of the propensity for the Machines to

14  explode, as they themselves have been aware of that fact since 2006.  Nor can they complain that

15  they are unaware of the documents or data upon which Dr. Pietila relies, because the data and

16  documentation all came from Defendants' files.  Moreover, as in *Heisler*, Dr. Pietila's opinions

17  regarding Machine explosions are highly relevant to the analysis of Plaintiffs' claims and,

18  accordingly, should be admitted.  2011 WL 1496114, at *3.

---

20  [16] Defendants' citations to *Hogan v. Robinson*, No. 1:03-CV-06408-LJO, 2007 WL 1452790 (E.D.
21  Cal. May 15, 2007), *Taser Int'l Inc. v. Bestex Co. Inc*., No. CV 06-2636 PA, 2007 WL 2947564
   (C.D. Cal. Feb. 9, 2007), and *Wong v. Regents of Univ. of California*, 410 F.3d 1052 (9th Cir. 2005),
22  Motion to Exclude, p. 15, are unpersuasive, as all three cases are distinguishable and inapposite.  In
   *Hogan,* plaintiffs' initial expert reports were completely non-compliant with the Federal Rules
23  including, *inter alia*: the reports were not signed; the reports did not include any factual basis for the
   opinions and did not reveal the data or relied upon in forming the opinions; the reports did not reveal
24  the qualifications of the experts.  2007 WL 1452790, at **5-6.  Additionally, the case had been
   pending for nearly four years and trial was set for three months later.  *Id.* at *3.  In comparison to the
25  plaintiffs in *Taser* and *Wong*, Plaintiffs here have not violated any discovery disclosure deadline,
   discovery does not need to be re-opened, and the disclosure of Dr. Pietila's opinion about machine
26  explosions has not resulted in any disruption to the schedule of the court.  *Cf Taser*, 2007 WL
   2947564, at **6-7 (excluding plaintiffs' expert when plaintiffs failed to disclose their expert until the
27  **last day of discovery**, when plaintiffs submitted his declaration to the court along with its opposition
   to defendants' summary judgment motion, over two weeks late under the Federal Rules and eight
28  weeks late under the scheduling order); *Wong*, 410 F.3d at 1062 (excluding plaintiffs' expert when
   plaintiffs failed to disclose their expert pursuant to the schedule set forth by the court).

---

19

The three remaining factors of the test set forth by the Ninth Circuit also support inclusion of Dr. Pietila's opinions regarding explosions.  Defendants here have cured any alleged prejudice by deposing Dr. Pietila and incorporating opinions (and their criticisms of those opinions) into their Opposition and bringing a Motion To Exclude Pietila's Testimony And Opinions.  Dr. Pietila's disclosure has not disrupted any scheduled trial date in this case (or any other court deadline, for that matter).

And, finally, there is no basis to suggest that the disclosure of Dr. Pietila's opinion resulted from any bad faith or willfulness on Plaintiffs' part.  Instead, the timing of Dr. Pietila's opinion was substantially justified.  Defendants have produced more than 500,000 pages of documents in this case to date, with the latest document productions made on November 4 and 15, 2011 (the latest productions, coming only a couple of weeks before Dr. Pietila's deposition, and long after the expert reports were due, consisted of more than one thousand pages).  *See* Andrus *Daubert* Declaration, ¶ 11.  Inevitably, reviewing, organizing, and analyzing such voluminous records (many of which are highly technical) takes time, and Plaintiffs' understanding of the details of the ECB defect has evolved through that process.[17]  Nothing untoward can be gleaned from this fact and Defendants' over-heated protestations can be ignored.  *See Childress v. Darby Lumber, Inc.*, 357 F.3d 1000 (9th Cir. 2004) (finding untimely disclosure of expert opinion substantially justified when caused by the opposing party's failure to provide documents during discovery); *see also San Francisco Baykeeper v. West Bay Sanitary Dist.,* 791 F. Supp. 2d 719, 724 (N.D. Cal. 2011) (finding plaintiff's timing on disclosing witnesses substantially justified due to the fact that investigation into the elements of her case was ongoing).

**III.    CONCLUSION**

Based on the foregoing, Plaintiffs respectfully respect that the Court deny the Motion to Exclude in its entirety.

---

[17] Dr. Pietila's opinions regarding the propensity of the Machines to explode were properly divulged at his deposition because he had only recently formed those opinions, "when [he] became aware of – of these – of the import of all of this."  Pietila Tr., p. 25:16-17, Ex. A to the Andrus *Daubert* Declaration.  Defendants' suggestion that Dr. Pietila withheld his explosion opinions for some strategic litigation purpose is baseless, and simply untrue.

20

1

2  Dated:  February 29, 2012                    Respectfully submitted,

3                                               By: */s/ Lori E. Andrus*
4                                                     Lori E. Andrus

5                                               ANDRUS ANDERSON LLP
6                                               Lori E. Andrus (SBN 205816)
                                                Jennie Lee Anderson (SBN 203586)
7                                               Jessica Moy (SBN 272941)
                                                155 Montgomery St., Suite 900
8                                               San Francisco, CA  94104
                                                Telephone.: (415) 986-1440
9                                               Facsimile:  (415) 986-1474
10                                              lori@andrusanderson.com
                                                jennie@andrusanderson.com
11                                              jessica@andrusanderson.com

12                                              Natalie Finkelman
13                                              James C. Shah
                                                SHEPHERD FINKELMAN MILLER & SHAH, LLP
14                                              35 East State Street
15                                              Media, PA 19063
                                                Telephone: (610) 891-9880
16                                              Facsimile:  (610) 891-9883
17                                              nfinkelman@sfmslaw.com
                                                jshah@sfmslaw.com

18
19                                              *Attorneys for Plaintiffs and Proposed Class*
                                                *Counsel*
20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on February 29, 2012, I electronically filed the foregoing document and exhibits thereto with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Dated: February 29, 2012                    _/s/ Lori E. Andrus_____
                                            Lori E. Andrus

                                            Lori E. Andrus (SBN 205816)
                                            **ANDRUS ANDERSON LLP**
                                            155 Montgomery Street, Suite 900
                                            San Francisco, CA  94104
                                            Telephone:  (415) 986-1400
                                            Facsimile:  (415) 986-1474
                                            lori@andrusanderson.com