1

2                                                          **E-Filed 5/4/2012**

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9              FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                              SAN JOSE DIVISION

11

| | |
|---|---|
| RENEE TIETSWORTH, SUZANNE REBRO, SONDRA SIMPSON, and JOHN CAREY, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SEARS, ROEBUCK AND CO., and WHIRLPOOL CORPORATION,<br><br>Defendants. | Case No. 5:09-cv-00288-JF (HRL)<br><br>ORDER[1] GRANTING IN PART DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY; DENYING PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY; AND DENYING WITHOUT PREJUDICE PLAINTIFFS' MOTION FOR CLASS CERTIFICATION<br><br>[re: dkt. entries 126, 129, 137] |

20          Plaintiffs Renee Tietsworth, Suzanne Rebro, Sondra Simpson, and John Carey ("Plaintiffs")

21  move for class certification pursuant to Fed. R. Civ. P. 23.  Defendants Sears, Roebuck and Co.

22  ("Sears") and Whirlpool Corporation ("Whirlpool") (collectively, "Defendants") oppose the motion.

23  In connection with the motion, Defendants move to exclude certain testimony and opinions of

24  Plaintiffs' expert, Dr. Raymond Pietila ("Pietila"), and Plaintiffs move to exclude certain testimony

25  and opinions of Defendants' expert, Noshirwan K. Medora ("Medora").  The Court has considered

26

27  _____

28  [1] This disposition is not designated for publication in the official reports.

United States District Court
For the Northern District of California

1  the briefing,[2] the admissible evidence in the record, and the oral argument presented at the hearing

2  on March 19, 2012. For the reasons discussed below, Defendants' motion to exclude will be

3  granted in part, Plaintiffs' motion to exclude will be denied, and Plaintiffs' motion for class

4  certification will be denied without prejudice.

5  ## I. BACKGROUND

6  The facts giving rise to this action are well-known to the parties and to the Court and need

7  not be set forth in full here. On April 30, 2010, Plaintiffs filed the operative third amended

8  complaint ("TAC"), asserting a putative class action on behalf of purchasers and owners of top-

9  loading Kenmore Elite Oasis automatic washing machines ("Machines"). According to Plaintiffs,

10  the Machines were manufactured with a defective electronic control board ("ECB") that has caused

11  an unacceptably high percentage of the Machines to malfunction. Plaintiffs assert that these

12  malfunctions occur in three ways: (1) the ECB's defective software and defective pressure sensor

13  together trigger a "F1" error; (2) the ECB's defective software causes a "F51" error; and (3) the

14  ECB's defective software causes a "sudden instability event" that can result in an explosion when

15  certain types of fabric are in the wash load.

16  Plaintiffs assert claims against Whirlpool, which manufactured the Machines, and Sears,

17  which marketed and distributed the Machines, asserting claims under California unfair competition

18  and consumer protection laws, California common law, and the federal Magnuson-Moss Act

19  ("MMWA"), 15 U.S.C. § 2301 et seq. In compliance with the Court's order of March 31, 2010,

20  Plaintiffs limited the proposed classes to consumers who actually have experienced the alleged

21  problems with their Machines. *See* TAC ¶ 86. On July 29, 2011, the Court granted in part

22  Plaintiffs' motion to amend their class definitions to include all purchasers and owners of Machines

23  regardless of whether the alleged defect has manifested; the expanded definitions apply to Plaintiffs'

24  claims for fraudulent concealment and nondisclosure, breach of express warranty, violation of the

25  MMWA, and violation of the CLRA, but not to Plaintiff's claim for violation of the UCL. The

26

27  _____

28  [2] The Court has considered the briefing submitted before the hearing and the supplemental briefing submitted at the Court's request on April 2, 2012. Moreover, as Plaintiffs' supplemental briefing raises new matter, the Court has considered Defendants' proposed response and objections filed on April 11, 2012.

Case No. 5:09-cv-00288-JF
ORDER GRANTING IN PART DEFENDANTS' MOTION TO EXCLUDE ETC.

1  Court did not require Plaintiffs to file an amended pleading, nor did it require Defendants to file

2  amended answers.

3    Plaintiffs now move for certification of the following classes and sub-class:

4    The California Class: All California residents and entities who purchased or own a
toploading Kenmore Elite Oasis automatic washing machine from January 1, 2005 to

5  the present, with model numbers 110.27032600, 110.27032601, 110.27032602,
110.27032603, 110.27042600, 110.27042601, 110.27042602, 110.27042603,

6  110.27052600, 110.27052601, 110.27052602, 110.27062600, 110.27062601,
110.27062602, 110.27062603, 110.27072600, 110.27072601, 110.27072602,

7  110.27072603, 110.27082601, 110.27082603, 110.27082604,
110.27082605, 110.27086601, 110.27086602, 110.27086603, 110.27086604,

8  110.27086605, 110.27087601, 110.27087602, 110.27087603, 110.27087604,
110.27087605, 110.27092600, 110.27092601, 110.27092602, 110.27092603,

9  110.27092604, 110.27152600, 110.27152601, 110.27152602, 110.28032700,
110.28032701, 110.28042700, or 110.28042701.

10

11    The California Sub-Class: All California Class members who are "consumers" as
defined by California Civil Code § 1761(d).

12    The Nationwide Class: All United States residents and entities who purchased or own
a toploading Kenmore Elite Oasis automatic washing machine from January 1, 2005

13  to the present, with model numbers 110.27032600, 110.27032601, 110.27032602,
110.27032603, 110.27042600, 110.27042601, 110.27042602, 110.27042603,

14  110.27052600, 110.27052601, 110.27052602, 110.27062600, 110.27062601,
110.27062602, 110.27062603, 110.27072600, 110.27072601, 110.27072602,

15  110.27072603, 110.27082601, 110.27082602, 110.27082603, 110.27082604,
110.27082605, 110.27086601, 110.27086602, 110.27086603, 110.27086604,

16  110.27086605, 110.27087601, 110.27087602, 110.27087603, 110.27087604,
110.27087605, 110.27092600, 110.27092601, 110.27092602, 110.27092603,

17  110.27092604, 110.27152600, 110.27152601, 110.27152602, 110.28032700,
110.28032701, 110.28042700, or 110.28042701.

18

19     **II. CROSS-MOTIONS TO EXCLUDE EXPERT TESTIMONY**

20    Before addressing the merits of Plaintiffs' motion for class certification, the Court must

21  address the parties' cross-motions to exclude expert testimony and opinion.  Defendants move to

22  exclude certain testimony and opinions of Plaintiffs' expert, Pietila, and Plaintiffs move to exclude

23  certain testimony and opinions of Defendants' expert, Medora.  The experts' opinions may be

24  summarized as follows.

25    Pietila's Initial Report:  The initial report of Plaintiffs' engineering expert, Pietila, was

26  disclosed on May 16, 2011.  In that report, Pietila opines that the Machines suffer from "a uniform

27  design flaw – a defectively programmed Electronic Control Board ("ECB") – and that "[t]he

28  engineering solutions for this design flaw are likewise uniform across all subject Machines – a

3

redesigned ECB that addresses the F-1 and F-51 error codes." Pietila Init. Rpt. at 4. The report addresses only the F1 and F51 errors; it does not address the third type of malfunction allegedly caused by the ECB, that is, the error that leads to the Machine exploding.

With respect to the F1 error code, Pietila states that the ECB's software includes a sophisticated washing algorithm. In order to determine water level with more precision, a pressure sensor converts information regarding water level to digital data that is used by the ECB. *Id*. at 11. However, as originally designed, the test limits used by the ECB software were not compatible with the range of possible data received from the pressure sensor. *Id*. Thus sensor outputs that actually were acceptable were causing the ECB to generate a false F1 error code, which in turn caused operational failure. *Id*. Pietila opined that "[r]esolution of this problem required a software change in the ECB." *Id*.

With respect to the F51 error code, Pietila explains that "one of the major defects in the overall Oasis system design was that the ECB did not reliably control motor speed." *Id*. at 12. "Losing ability to track and control the motor led to problems associated with excessive spin rate and the inability to implement the 'out of balance' algorithm." *Id*. This resulted in a F51 error code and operational failure. *Id*. Whirlpool addressed this problem by redesigning ECB software so that motor rotational status could be determined more reliably. *Id*.

Pietila concludes that "the defective ECB resulted in a product that had an unacceptably high failure rate," citing a service incident rate ("SIR") of 35.51% for the second quarter of 2006, and a SIR of 31.17% for 2006 as a whole. *Id*. at 4-5. The SIR for the first quarter of 2008 had been reduced to 9.87%. *Id*. at 5. Pietila opines that "[t]he remedy selected to resolve the underlying problem was installation of a redesigned ECB." *Id*. at 5.

Medora's Rebuttal Report: the rebuttal report of Defendants' engineering expert, Medora, challenges Pietila's conclusions. Medora describes the F1 and F51 error codes slightly differently than does Pietila. Medora states that "[t]he F1 error code indicates control issues and generally indicates that the ECB has detected an out-of-range pressure signal and can be due to several causes." Medora Reb. Rpt. at 5. He also states that "[t]he F51 error code indicates that the ECB has detected an error in the pattern of signals received from the RPS [rotor position sensor] and can have

4

United States District Court
For the Northern District of California

several causes." *Id*.  Medora points out that although Pietila claims that the allegedly defective ECB caused an unacceptably high failure rate, "Pietila's report does not suggest that any statistical analysis was performed to determine the failure rates due to F1 and F51 error codes." *Id*. at 8. Medora states that the 35.51% rate that Pietila cites includes other brands of Machines that are not part of the present lawsuit, and that it is not restricted to F1 or F51 errors or even to ECB-related errors.  *Id*. at 23.  He provides an alternative statistical calculation, beginning with the data that the total population of the Machines is 756,339 units and that complaint or service repair records are available for a population of 411,385 units ("repair population").  *Id*. at 9-10.  He states that .5% or less of the repair population reported an F1 error code within the first year, and 3.2% or less of the repair population reported an F51 error code within the first year.  *Id*.  He also concludes that Machines utilizing later versions of the ECB have substantially lower rates of F1 and F51 error codes than do Machines utilizing earlier versions.  *Id*. at 13.  He attributes this decrease in error codes to significant changes in software and hardware, not limited to the ECB, that were made at different times from 2006 to 2008.  *Id*. at 15.  For example, he states that the design change that resulted in the largest reduction of  SIRs was the installation of software that improved bandwidth from eighteen loops per second to 900 loops per second.  *Id*. at 21.

Medora examines in detail error rates for Machines that were purchased with Sears extended service plans ("ESPs").  He believes that individuals who had pre-paid Sears to address problems with the Machines could be expected to report errors because they would have no disincentive to seek repair.  *Id*. at 23.  He states that there are significant differences in the rates of F1 and F51 error codes in Machines manufactured at different times during the putative class period.  *Id*. at 23, 37. "Washers sold in 2008 and 2009 show far lower rates than Washers sold in 2006 and 2007, and Washers sold in 2007 shower far lower rates than Washers sold in 2006." *Id*. at 27, 37.  Medora concludes that "[t]he patterns and magnitude of repairs vary so dramatically between different periods of washer production that, to a reasonable degree of engineering certainty, there is a real and significant difference in the performances of these washers that correspond to real and significant differences in software and hardware designs between washers manufactured at different times." *Id*. He states that "Washers sold in 2006 and 2007 show rates of F1 error codes that peak between about

1    1 1/2 and 2 1/2 years , and then the rates drop." *Id*. at 37.  He also states that "[t]he Washers sold in

2    2006 and 2007 show rates of F51 error codes that peak in the first months of service, but then the

3    rates dramatically decrease, strongly suggesting that product owners will experience F51 error

4    codes, if at all, in the first 12 months of life." *Id*. at 27-28.  He concludes that "[s]ince the Washers

5    have not been manufactured since 2009, the vast majority of product owners whose machines might

6    experience" F1 and F51 error codes have already done so. *Id*. at 28, 38.

7         Finally, Medora describes inspections of two Machines, the first owned by Plaintiff Suzanne

8    Clark-Rebro, and the second an exemplar provided by Defendants. *See id*. at 43-47.  He states that

9    diagnostic testing did not reveal any F1 or F51 error codes with either Machine. *Id*. at 51.

10        Pietila's Sur-Rebuttal Report:  Pietila has prepared a lengthy sur-rebuttal report disputing

11   most of Medora's conclusions.  As noted above, Medora concluded that based upon a total Machine

12   population of 756,339 units and a repair population of 411,385 units, the rate of F1 error codes was

13   .5% or less in the first year, and the rate of F51 error codes was 3.2% or less in the first year.  Pietila

14   opines that "Dr. Medora dilutes his statistical figures by improperly including later versions of the

15   Oasis washing machines that do not contain a defective ECB (by 2008, at the introduction of the

16   Phase II software, Whirlpool had corrected the software defects contained in earlier ECBs)."  Pietila

17   Sur-Rebuttal Rpt. at 16.  Pietila also asserts that Medora's analysis is flawed because Medora

18   determined error rates by searching only two fields – technician comments and recorded customer

19   complaints – and only for derivations of "F1" and "F51." *Id*. at 17.  Pietila states that this method is

20   under-inclusive because it does not encompass Machine failures that resulting from a defective ECB

21   but lacking  a specific reference to an error code. *Id*.  He points out that customers may not have

22   communicated the nature of the error to the call center operator, or the call center operator may not

23   have noted the particular F error. *Id*.  Pietila states that "[t]o get an accurate picture of F-1 and F-51

24   hits in the relevant class population, the keyword search term list was expanded to include terms and

25   jargon used by service technicians to describe the ECB." *Id*. at 18.  He claims that "when the

26   broader list of search terms is used to search the data, many more ECB failures are captured." *Id*.

27   When Pietila, with the assistance of a database analyst, conducted his own analysis of the data, he

28   found a failure rate of 21.55% due to defective ECBs. *Id*. at 12-13.  He surmises that "the failure

6

rate in the total customer population is undoubtedly higher because the data provided is limited to those customers who contacted Sears for requests for service." *Id*. at 15. Citing a book on consumer behavior authored in the 1970s,[3] Pietila asserts that reported failures are only the "tip of the iceberg," that is, only a fraction of the actual failures. *Id*.

Pietila also points to other evidence that he believes supports his conclusion of a common defect associated with the ECB, including "six relevant Service Flashes between August 1, 2007 and April 13, 2009" and "a letter to Sears customers . . . [that] advised them that they may be eligible for an ECB 'upgrade,'" *id*. at 4, as well as deposition testimony of Whirlpool engineer Eric Farrington stating that the SIR at the end of 2006 was 28% and that F51 was a large contributor to that figure, *id.* at 21.

In response to Medora's assertion that Pietila inappropriately included other brands in his analysis, Pietila represents that "[t]he basic items that control motor speed and water level (where F-1 and F-51 error codes develop) are the same for all brands that use the Oasis platform," and thus that any inclusion of other brands was appropriate. *Id*. at 22. Moreover, Pietila does not concede that other brands were included in his analysis, stating that "the only other Oasis platform-based product during 2006 was the Whirlpool Cabrio that was released during the 18th week and there is no indication that the 35.51% SIR included the Cabrio or any other models than those in Plaintiffs' class." *Id*.

Pietila goes through Medora's remaining criticisms of his initial report point by point, explaining why he believes that Medora's analysis is flawed. *Id*. at 22-30. He concludes that portion of his sur-rebuttal report with the following:

> Dr. Medora's conclusion that there is no basis to claim that the machines are uniformly flawed because the Machines appear to be non-homogeneous is incorrect because he is overlooking at least two points: a) there have been improvements made by redesigning and installing different versions of software via new versions of ECB (S14 to the Whirlpool models plus S15, S17 to both Whirlpool and Kenmore in 2006, and S18, S19 in 2007), and b) despite the new ECB's [sic] with newer and improved versions of software there still exists a class of Machines that have the older flawed ECB's [sic] that continue to have unacceptably high failure rates (a class of Machines with a common problem – defective ECBs).

*Id*. at 30.

---

[3] *Satisfaction: a Behavioral Perspective on the Consumer*, by Richard L. Oliver.

7

Pietila opines that "there is a relatively large set of customers who now own a machine without the later ECB who have a Machine that is degenerating.  At some point, there is a high probability that their Machine will 'incubate' and malfunction and require a repair." *Id*. at 29.

Medora's Sur-Sur-Rebuttal Report[4]:  Medora's sur-sur-rebuttal report was prepared to address purported new opinions and analysis contained in Pietila's sur-rebuttal report.  Medora points out that although the proposed class includes persons who have purchased Machines through the present, Pietila concedes that ECBs programmed with the S19 or later versions of software are not defective; in fact, Pietila criticizes Medora for including in his analysis ECBs manufactured in 2008 and 2009, which contain updated ECBs.  Medora Sur-Sur-Rebuttal Rpt. at 3-4.  Medora understands Pietila to be saying that only the earlier Machines share the common defect, that is, the defective ECB.  *Id*. at 5.  Medora opines that there are material differences in the rates of reported F1 and F51 error codes even among the Machines manufactured in 2006 and 2007.  *Id*. at 6.  In fact, Medora asserts that based upon Pietila's data, "[t]his difference in the failure rates between the models is so extreme that it cannot be a coincidence, and indicates that there are true and significant differences between these different models and therefore that his revised Proposed Class is not homogenous." *Id*. at 10.

Medora criticizes numerous other aspects of Pietila's sur-rebuttal report and describes in detail further testing he conducted on the Machines.  Medora also supplements his findings with respect to Plaintiff Clark-Rebro's Machine.  After Medora conducted the initial inspection of that Machine, Plaintiff Clark-Rebro discovered her original ECB in her home.  When that ECB was tested, it appeared that it had experienced F51 error codes and other error codes.  *Id*. at 51.

Pietila's Deposition Testimony:  Pietila's written reports are limited to the F1 and F51 errors, and those errors were the focus of defense counsel's questions during Pietila's deposition.  However, when Pietila was asked to identify the  defects in the Machines, he stated that "if a customer decides that he or she wants to wash a raincoat and a waterproof tablecloth and the machine explodes, that's a defect."  Pietila Dep. 24:6-9.  Defense counsel inquired whether Pietila

---

[4] A sur-sur-rebuttal report was neither contemplated nor authorized by the Court's scheduling order.  The Court nonetheless has considered the report to assure a complete record and a thorough analysis of the issues presented by Plaintiffs' motion,

8

had stated this opinion in either of his reports, and Pietila answered that he had not.  *Id*. at 24:13-16.

Pietila indicated that he had formed the opinion about the danger of explosions, also referred to by

the parties as "sudden instability failures," within a few weeks or perhaps a month before his

deposition.  *Id*. at 25:12-17.  At the time of the deposition, Pietila had not been requested to prepare

a further report.  *Id*. at 25:18-26:6.  Defense counsel asked Pietila to expand on his new opinion, and

Pietila responded as follows:

> Okay.  I think there's an inherent defect in – in the software that is part of the control board.  And what happens is that the operating software will start controlling the motor, telling the motor to, okay the drain cycle's complete and now's the time to spin it up, for instance, without properly noting that there's still water in the tub.  And this – when you have an explosion, or whatever you call the sudden event, the reason for that is that water remains in the tub or . . . the control board thinks that the water's actually drained out and it hasn't.  The tub spins up and you have water remaining in the tub, which causes an instability.

*Id*. 31:24-32:11.  Pietila conceded that he had not actually tested the hardware or analyzed the code,

but he represented that he had read documentation and had an understanding of the instability event

and its cause.  *Id*. at 33:2-10.  He stated that "from functionality, it's my opinion that the explosion

event is caused by the – the control board failing to properly determine whether the tub has actually

drained."  *Id*. at 33:10-13.  Pietila admitted that he had not yet done any work to verify whether his

opinion was valid, and that he did not hold the opinion to a reasonable degree of engineering

certainty.  *Id*. at 34:19-24.  Defense counsel then focused the remainder of the deposition on the F1

and F51 errors that were the subject of Pietila's reports.  Pietila attempted to testify about the

explosion issue several more times during the deposition.  *See, e.g.*, Pietila Dep. 102:19-23 ("I

would be dissatisfied with – with that situation if they – ten years plus I decided to wash raincoats

and my machine blew up.  I – I wouldn't be happy.  I don't think that's expected by the customer.");

156:3-6 ("if everybody in the customer community that owns an Oasis washing machine decided to

wash raincoats and tablecloths next Monday morning, the SIR rate would probably be 90 percent");

204:16-17 ("as I mentioned this morning, if you get the right combination of wash load in the Oasis

washer –"); 270:9-13 ("In this case, we have, I consider, serious defects because the customer spent

a lot of money").  However, defense counsel repeatedly steered the questioning back to the F1 and

F51 error codes, for example, telling Pietila "that's certainly not the hypothetical I gave you and

9

United States District Court
For the Northern District of California

1    that's not really the facts in this case." *Id.* 102:24-103:1.

2    **A.      Legal Standards**

3          "A witness who is qualified as an expert by knowledge, skill, experience, training, or

4    education may testify in the form of an opinion or otherwise if:  (a) the expert's scientific, technical,

5    or other specialized knowledge will help the trier of fact to understand the evidence or to determine

6    a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product

7    of reliable principles and methods; and (d) the expert has reliably applied the principles and methods

8    to the facts of the case."  Fed. R. Evid. 702.  Once a witness qualifies as an expert, "the trial judge

9    must ensure that any and all scientific testimony or evidence admitted is not only relevant, but

10   reliable."  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993).  The Supreme

11   Court has indicated that *Daubert* should be applied to expert testimony at the certification stage of

12   class action proceedings.  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. ---, 131 S. Ct. 2541, 2553-

13   54 (2011) ("The District Court concluded that *Daubert* did not apply to expert testimony at the

14   certification stage of class-action proceedings. We doubt that is so . . . .").  "Accordingly, in order to

15   grant class certification, this Court must first determine whether it may rely on the methodology

16   used by [the parties' experts] to decide whether the claims in this case are amenable to common

17   proof."  *In re Aftermarket Automotive Lighting Products Antitrust Litig.*, 276 F.R.D. 364, 370 (C.D.

18   Cal. 2011).[5]  A district court has broad latitude in deciding how to measure reliability and in making

19   the ultimate reliability determination.  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 142

20   (1999). When evaluating expert testimony, courts may consider "(a) whether the theory or technique

21   can and has been tested; (b) whether the theory or technique has been subjected to peer review and

22   publication; (c) the known or potential rate of error for the technique; and (d) the theory or

23   technique's general degree of acceptance in the relevant scientific community."  *Boyd v. City and*

24   *County of San Francisco*, 576 F.3d 938, 945 (9th Cir. 2009) (citing *Daubert*, 509 U.S. at 593–94).

25   _____

26   [5] Plaintiff cite out-of-circuit authority for the proposition that the Court need not engage in a full
     *Daubert* analysis at the class certification stage.  *See In re Zurn Pex Plumbing Prods. Liab. Litig.*,
     644 F.3d 604, 613-14 (8th Cir. 2011).  Such an approach appears to be contrary to Ninth Circuit
27   authority approving application of *Daubert* in the context of class certification.  *See Ellis v. Costco
     Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (holding that the district court correctly applied
28   the evidentiary standard set forth in *Daubert* to a motion to strike an expert opinion submitted in
     support of class certification).

10

United States District Court

For the Northern District of California

1    These factors are not intended to be exclusive.  *See Kumho Tire*, 526 U.S. 137 at 158.  The court's

2    focus must be "on principles and methodology, not on the conclusions that they generate."  *Daubert*,

3    509 U.S. at 595.

4    **B.      Defendants' Motion to Exclude Pietila's Testimony and Opinions**

5           Pietila is an electrical engineer with extensive experience designing, testing, and evaluating

6    electrical and electronic systems.  The Court concludes that in general he is qualified to give expert

7    opinion as to the type of product defects alleged in this case.  Defendants do not dispute Pietila's

8    qualifications in his field.  Rather, they contend that certain of his opinions are inadmissible because

9    they are unsupported by facts in the record.  Ordinarily, the factual basis of an expert's opinion goes

10   to the credibility of the testimony, not to its admissibility.  *See Hangarter v. Provident Life and Acc.*

11   *Ins. Co.*, 373 F.3d 998, 1017 n.14 (9th Cir. 2004) (citing *Children's Broad. Corp. v. Walt Disney*

12   *Co.*, 357 F.3d 860, 865 (8th Cir. 2004)).  "Only if the expert's opinion is so fundamentally

13   unsupported that it can offer no assistance to the jury must such testimony be excluded."  *Children's*

14   *Broad. Corp.*, 357 F.3d at 865.

15          Defendants assert that there is absolutely no factual support for Pietila's conclusion that

16   "there is a high probability" that class members' Machines will fail in the future.  *See* Pietila Sur-

17   Rebuttal Rpt. at 29.  In his deposition, Pietila recast this opinion somewhat, stating that all of the

18   ECBs "have a propensity to fail."  Pietila Dep., 154:10-11.  He followed up by stating that "these

19   machines have inherent design defects that are sitting there like a bomb armed, ready to go, and . . .

20   there's a high probability that this will happen during the operational life."  *Id.* 154:17-22.

21   Defendants contend that Pietila did not consider any quantitative data in reaching this opinion, citing

22   as an example Pietila's deposition statement that he does not know what the failure rate in 2009 is

23   for Machines manufactured in 2006.  Pietila Dep. 265:10-21.  Defendants also assert that Pietila

24   failed to address facts that undercut his opinion, such as a downward trend of F1 and F51 errors over

25   time.  To the extent that Pietila relies upon subsequent remedial measures to prove the propensity of

26   the original ECBs to fail, Defendants contend that such reliance is inappropriate under Federal Rule

27   of Evidence 407.  That rule provides that "[w]hen measures are taken that would have made an

28   earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to

                                                    11

United States District Court

For the Northern District of California

1    prove . . . a defect in a product or its design." Fed. R. Evid. 407.

2           Considering both of his reports and his deposition testimony, it appears that Pietila applied

3    his experience as an electrical engineer in concluding that the ECBs in the earlier-manufactured

4    Machines were defective as designed; that the defects caused a significant percentage of the

5    Machines to fail; that the only reason the failure rate has trended downward is that Defendants have

6    fixed the design defects in later-manufactured machines; and that earlier-manufactured Machines

7    that are still in use have a propensity to fail given the magnitude of the design defects in question.

8    In forming his opinion, Pietila considered the ECB design; statistical analysis with respect to failure

9    rates at various points in time; the Service Flashes; the customer letter sent out by Sears advising of

10   eligibility for an "upgrade"; and the testimony of Mr. Farrington.  While Defendants' expert draws

11   contrary conclusions from the same evidence based upon different statistical analysis and

12   methodology, the Court cannot conclude as a matter of law that Pietila's analysis and methodology

13   are so flawed as to render his opinions inadmissible.  To the extent that Pietila refutes Defendants'

14   reliance on a downward trend in the reporting of defects by arguing that this trend is the result of

15   fixes applied by Defendants rather than an absence of a defect, the Court concludes that Rule 407

16   does not apply.

17          Defendants also argue that Pietila is unqualified to opine on whether the Machines' failure

18   rate was underreported.  As noted above, Pietila relied on a 1970s study of consumer behavior in

19   surmising that the errors that were reported were only the "tip of the iceberg."  Defendants correctly

20   point out that Pietila is not an expert in consumer behavior, and that the source upon which he relied

21   is quite outdated.  *See* Pietila Dep. 225:18 – 231:14.  Under these circumstances the Court will

22   exclude Pietila's opinion that the failure rates were underreported.

23          Finally, Defendants seek to exclude Pietila's opinion concerning "sudden instability failures"

24   that may cause the Machines to explode when waterproof fabrics are in the load.  Pietila first

25   mentioned this opinion during his deposition, which occurred nearly seven months after he

26   submitted his initial report, only two weeks before Plaintiffs filed their motion for class certification,

27   and the day after Medora's deposition.  Defendants contend that under these circumstances Pietila's

28   opinion on sudden instability failures should be excluded as untimely and prejudicial.  The Court

United States District Court
For the Northern District of California

1   agrees that Pietila's opinion on this topic fails to comport with the requirements of Federal Rule of

2   Civil Procedure 26(a).  Moreover, the opinion is so fundamentally unsupported that it could not

3   properly be considered by a jury.  Pietila conceded that he had not actually tested the hardware or

4   analyzed the code relating to the sudden instability failures, had not yet done any work to verify

5   whether his opinion was valid, and did not hold the opinion to a reasonable degree of engineering

6   certainty.  *Id.* at 33-2-34:24.  Based upon this record, the Court will exclude Pietila's opinion with

7   respect to sudden instability events for purposes of the present motion.

8          Accordingly, Defendants' motion to exclude will be granted in part.  Pietila's opinions with

9   respect to the asserted underreporting of errors and with respect to the sudden instability defect will

10  not be considered in connection with the present motion for class certification.  The motion

11  otherwise will be denied.

12  **C.     Plaintiffs' Motion to Exclude Medora's Testimony and Opinions**

13         Medora is a Senior Managing Engineer with Exponent, an engineering and scientific

14  consulting firm.  He has more than thirty years of experience in failure analysis of electronic

15  components and systems.    The Court concludes that in general he is qualified to give expert

16  opinion as to the type of product defects alleged in this case.

17         As discussed above, much of Medora's testimony depends upon statistical analysis of the

18  subject  failures.  Medora admittedly is not a statistician; rather, he directed database analysts at

19  Exponent to examine the customer and service data collected by Sears in the ordinary course of

20  Sears' business operations.  Rebuttal Rpt. at 5, 8-9.  Medora explains in his rebuttal report the

21  methodology used by Exponent's database analysts.  *Id*. at  5-6.  He appends to his rebuttal report a

22  description of the database program used to conduct the queries, a list of search terms used, and the

23  specific part numbers for which the analysts searched.  Medora also explained his methodology in

24  detail during his deposition.  Medora Dep. 55:18-59:11.  He stated expressly that the data was

25  analyzed at his request, and that the data was reviewed and approved by a PhD-level statistician as

26  part of Exponent's quality control process.  *Id*. at 69:15-70:22.

27         Plaintiffs assert that because Medora himself did not perform the statistical analysis and

28  cannot explain precisely how it was performed, he is not qualified to render any opinions based

13

1    upon the analysis.  However, Federal Rule of Evidence 703 provides as follows:

2        An expert may base an opinion on facts or data in the case that the expert has been
         made aware of or personally observed.  If experts in the particular field would
3        reasonably rely on those kinds of facts or data in forming an opinion on the subject,
         they need not be admissible for the opinion to be admitted.  But if the facts or data
4        would otherwise be inadmissible, the proponent of the opinion may disclose them to
         the jury only if their probative value in helping the jury evaluate the opinion
5        substantially outweighs their prejudicial effect.

6    Fed. R. Evid. 703.  Defendants present deposition testimony and declarations of in-house engineers

7    demonstrating that engineers routinely rely upon others' analysis of service data to evaluate and

8    address field issues.  *See, e.g.*, Chowanec Dep. 51:21-57:21; Farrington Dep. 77:8-20.

9        The Court concludes that Medora's reliance upon the statistical analysis prepared by his

10   team is appropriate under Rule 703.  In *Monsanto Co. v. David*, 516 F.3d 1009 (Fed. Cir. 2008),

11   Plaintiff's employees performed scientific field tests to determine whether the defendant's soybean

12   fields had been planted with a particular brand of soybeans.  Plaintiff's expert relied upon those field

13   tests in rendering his opinions.  The court rejected the defendant's argument that the expert's

14   opinions based upon the field tests should have been excluded, noting that "an expert need not have

15   obtained the basis for his opinion from personal perception."  *Id*. at 1015.  The court observed that

16   "numerous courts have held that reliance on scientific test results prepared by others may constitute

17   the type of evidence that is reasonably relied upon by experts for purposes of Rule of Evidence

18   703."  *Id*.  The court concluded that "[the expert's] reliance on the scientific reports prepared by his

19   team is therefore the type of reliance that is reasonable for expert witnesses."  *Id*.

20       Plaintiffs cite this Court's decision in *Heisler v. Maxtor Corp.*, No. 5:06-cv-06634-JF (PSG),

21   2011 WL 1496114 (N.D. Cal. April 20, 2011) in support of their argument that Medora's reliance

22   on the statistical analysis of his team is inappropriate under Rule 703.  However, the cited portion of

23   *Heisler* addresses not the applicability of Rule 703 but the requirement that an expert's opinions be

24   based upon reliable methodology.  The Court was troubled by the fact that the expert had *no*

25   familiarity with the software program that was used for testing a computer drive and by the expert's

26   own acknowledgement that he had learned about the program from a "local computer guy" on the

27   day of the testing.  *Id*. at *7.

28       Plaintiffs also cite Judge Illston's decision in *Stein v. Pac. Bell*, No. C 00-2915 SI, 2007 WL

                                              14

**United States District Court**
For the Northern District of California

1   831750 (N.D. Cal. Mar. 19, 2007), for the proposition that "Rule 703 does not sanction the simple

2   transmission of hearsay." *See id*. at *11 (quoting *United States v. Tomasian*, 784 F.2d 782, 785-86

3   (7th Cir. 1986)). In *Stein*, the expert reviewed documents and then restated as his opinions the

4   findings or allegations in those materials. *See id*. at 11. While this case offers Plaintiffs more

5   support than does *Heisler*, it is factually distinguishable in that Medora did not merely parrot the

6   statistical analysis of his team but rather explained the methodology of the analysis and incorporated

7   the analysis into his report regarding the alleged product defects.

8       The Court notes that if it were to exclude Medora's opinions on this ground, it likewise

9   would have to exclude Pietila's opinions to the extent that they are based upon statistical analyses

10  that he did not perform personally. Plaintiffs argue that exclusion of Pietila's opinions on this

11  ground would be inappropriate because Defendants' motion to exclude does not raise it. However,

12  in its capacity as a gatekeeper, the Court seeks to apply evidentiary rules uniformly.

13      Accordingly, Plaintiffs' motion to exclude will be denied.

### III. MOTION FOR CLASS CERTIFICATION

15  **A.    Legal Standards**

16      "The class action is an exception to the usual rule that litigation is conducted by and on

17  behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2550

18  (2011) (internal quotation marks and citation omitted). "In order to justify a departure from that

19  rule, a class representative must be part of the class and possess the same interest and suffer the

20  same injury as the class members." *Id*. (internal quotation marks and citation omitted). "Before

21  certifying a class, the trial court must conduct a 'rigorous analysis' to determine whether the party

22  seeking certification has met the prerequisites of Rule 23." *Mazza v. American Honda Motor Co.,*

23  *Inc.*, 666 F.3d 581, 588 (9th Cir. 2012) (quoting *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d

24  1180, 1186, as amended by 273 F.3d 1266 (9th Cir. 2001)).

25      Under Rule 23(a), four prerequisites must be satisfied for class certification:

26      (1) the class is so numerous that joinder of all members is impracticable;

27      (2) there are questions of law or fact common to the class;

28      (3) the claims or defenses of the representative parties are typical of the claims or
    defenses of the class; and

15

1    (4) the representative parties will fairly and adequately protect the interests of the
2    class.

3    Fed. R. Civ. P. 23(a).

4        A plaintiff also must satisfy one or more of the separate prerequisites set forth in Rule 23(b):

5    (1) there is a risk of substantial prejudice from separate actions; (2) declaratory or injunctive relief

6    benefiting the class as a whole would be appropriate; or (3) common questions of law or fact

7    predominate and the class action is superior to other available methods of adjudication.  *See* Fed. R.

8    Civ. P. 23(b).

9        "Rule 23 does not set forth a mere pleading standard.  A party seeking class certification

10   must affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to prove

11   that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Dukes*,

12   131 S.Ct. at 2551.  Analysis of these factors "generally involves considerations that are enmeshed in

13   the factual and legal issues comprising the plaintiff's cause of action." *Id*. at 2552 (internal

14   quotation marks and citation omitted).  "Nor is there anything unusual about that consequence:  The

15   necessity of touching aspects of the merits in order to resolve preliminary matters, e.g., jurisdiction

16   and venue, is a familiar feature of litigation." *Id*.

17   **B.**      **Statements of Recent Decision**

18       Both parties have filed statements of recent decision.  The Court has considered all of the

19   decisions cited by the parties to the extent that they are relevant to its analysis.

20   **C.**      **Claims at Issue**

21       The operative pleading asserts claims for:  (1) violation of California's Unfair Competition

22   Law ("UCL"), Cal. Bus. & Prof. Code § 17200 et seq.; (2) fraudulent concealment and

23   nondisclosure; (3) breach of express warranty; (4) violation of the Magnuson-Moss Act

24   ("MMWA"), 15 U.S.C. § 2301 et seq.; (5) violation of California's Consumer Legal Remedies Act

25   ("CLRA"), Cal. Civ. Code § 1750; and (6) unjust enrichment.  Defendants assert that the Court

26   already has stricken class claims based upon sudden instability events and based upon the MMWA

27   and that as a result these claims are not at issue for purposes of class certification.  Plaintiffs argue

28   that Defendants are misreading this Court's prior orders, and that both sudden instability claims and

16

1   MMWA claims are at issue in their motion for class certification.

2        On March 31, 2010, the Court struck Plaintiffs' previously proposed class definitions, with

3   leave to amend, after concluding that only class members who actually had experienced problems

4   with their Machines' ECBs had standing to sue and that the putative classes included members who

5   had not experienced such problems.  *See* March 2010 Order at 30.  In the same order, the Court

6   concluded that Plaintiffs could not pursue warranty claims on a classwide basis because individual

7   questions would predominate.  *See id.* at 32.  Plaintiffs subsequently moved to amend their class

8   definitions based upon authority supporting maintenance of a class on behalf of all purchasers of the

9   Machines regardless of whether the alleged defect has manifested.  On July 29, 2011, the Court

10  granted the motion to amend with respect to Plaintiffs' "claims for violation of the CLRA,

11  fraudulent concealment and nondisclosure, breach of express warranty, and violation of the

12  MMWA." July 2011 Order at 6.  The motion was denied as to Plaintiffs' claims for violation of the

13  UCL.  *Id.* at 6-7.

14       The Court acknowledges that its July 2011 order may have created confusion, because it

15  permitted Plaintiffs to add class allegations with respect to their MMWA claim notwithstanding its

16  earlier determination that class claims based upon warranty theories were inappropriate.  Because

17  the  March 2010 Order was interlocutory in nature, and because the July 2011 order clearly granted

18  Plaintiffs leave to allege a classwide MMWA claim, the Court concludes that as a procedural matter

19  such a claim is not precluded.

20       Defendants assert without elaboration that Plaintiffs are asking the Court to "second guess

21  the reasoned decision of the U.S. Consumer Product Safety Commission."  Defs' Opp. at 12.

22  Defendants do not make clear how the Commission's decision precludes class certification here.

23  Defendants also claim that permitting Plaintiffs to go forward with sudden instability claims would

24  "sandbag" Defendants.  *Id.*  As discussed above, the Court's July 2011 decision granted Plaintiffs'

25  motion for leave to assert class claims even where the alleged defect has not manifested.[6]

26

27  _____

[6] Plaintiff have attached to their motion for class certification the declarations of two non-California
28  residents who claim to have experienced sudden instability events and who have offered to serve as
    class representatives.  However Plaintiffs apparently have withdrawn this offer based upon their
    contention that "proof of actual explosions is unnecessary."  Plaintiffs' Reply at 7, n. 8.

Case No. 5:09-cv-00288-JF
ORDER GRANTING IN PART DEFENDANTS' MOTION TO EXCLUDE ETC.

1    Obviously, nothing in this procedural determination bears upon the question whether these

2    particular claims are appropriate for class certification.

3    **D.    Certification**

4        **1.    Identifiable and Ascertainable Class**

5        "As a threshold matter, and apart from the explicit requirements of Rule 23(a), the party

6    seeking class certification must demonstrate that an identifiable and ascertainable class exists."

7    *Mazur v. eBay, Inc.*, 257 F.R.D. 563, 567 (N.D. Cal. 2009).  The proposed Nationwide Class

8    includes "All United States residents and entities who purchased or own" Machines with specified

9    model numbers "from January 1, 2005 to the present."  Similarly, the proposed California Class

10   includes "All California residents and entities who purchased or own" Machines with specified

11   model numbers "from January 1, 2005 to the present."

12       At the hearing on the present motion, the Court questioned the January 1, 2005 start date,

13   observing that it appears that the subject Machines were manufactured from 2006 through 2009.

14   *See* Medora Rebuttal Rpt. at 12-13.  In their supplemental brief filed on April 2, 2012, Plaintiffs

15   suggest that the class definitions should be revised to reflect a start date of December 2005.  *See*

16   Pltffs' Supp. Opp. at 7 n.6.  Plaintiffs represent that a limited number of test Machines were sold

17   prior to December 2005, and that complaints and product returns began occurring in December

18   2005.  The Court agrees that under these circumstances, December 2005 is an appropriate start date

19   for the class period.[7]

20       Other  aspects of Plaintiffs' class definitions are more troubling.  Plaintiffs' expert, Pietila,

21   opines that by 2008 Defendants had corrected the ECB defect.  In fact, Pietila chastises Defendants'

22   expert for including later versions of the Machine in his statistical analysis:  "Dr. Medora dilutes his

23   statistical figures by improperly including later versions of the Oasis washing machines that do not

24   contain a defective ECB (by 2008, at the introduction of the Phase II software, Whirlpool had

25

26   ─────────────────────────────

27   [7] Defendants argue that the Court should reject the proposed December 2005 start date because
     Plaintiffs have not submitted evidence sufficient to show that Defendants knew of the alleged F1
     and F51 failures as early as December 2005.  *See* Defs' Response and Objs., at 10.  Whether

28   Plaintiffs ultimately can prove their allegations is a separate inquiry from the question of whether
     Plaintiffs have identified an ascertainable class.

                                                      18

United States District Court
For the Northern District of California

corrected the software defects contained in earlier ECBs)."  Pietila Sur-Rebuttal Rpt. at 16.  Medora observes in his sur-sur-rebuttal report that although the proposed class includes persons who have purchased Machines through the present, Pietila appears to concede that ECBs programmed with the S19 or later versions of software are not defective.  *See* Medora Sur-Sur-Rebuttal Rpt. at 3-4.  When the Court raised this issue at the hearing, Plaintiffs' counsel represented that all of the model numbers listed in the proposed class definition contain defective ECBs, and that the class period properly is defined to run from 2005 to "the present" because the subject machines still run the risk of failing.  Defendants contend that the model numbers identified in the proposed class definition were used both on Machines containing the allegedly defective ECB and on Machines containing new ECBs that corrected the earlier software defect.  Thus, Defendants argue, the proposed definition is over-inclusive.  While conceding that the subject model numbers might have been used on "some unidentified (and likely small number of) Machines within those model ranges that do not have a defective ECB," Plaintiffs assert that they have provided the Court with a chart identifying every defective ECB by part number, software version, and pressure sensor manufacturer.  *See* Pltffs' Supp. Br. at 7 n.6.  Plaintiffs argue that this identifying information may be checked on each Machine during a claims procedure if and when appropriate.  This approach seems somewhat unwieldy given that approximately 190,000 Machines were in the field through the end of 2006.  *See* Defs' Response and Objs., at 6.

After considering the parties' arguments, the Court concludes that the proposed classes are overbroad.  "[N]o class may be certified that contains members lacking Article III standing."  *Mazza*, 666 F.3d at 594 (internal quotation marks and citation omitted).  "[S]tanding requires that (1) the plaintiff suffered an injury in fact . . . (2) the injury is fairly traceable to the challenged conduct, and (3) the injury is likely to be redressed by a favorable decision."  *Id.* (internal quotation marks and citation omitted).  If the allegedly defective ECB was not included in some Machines that carry the model numbers identified in the class definitions, then the classes necessarily contain members who lack Article III standing.  Moreover, it is unclear how an individual who purchased a Machine within the class period but then returned, sold, or otherwise disposed of the Machine without experiencing any error codes could be deemed to have suffered a compensable injury.  *See*

19

**United States District Court**
For the Northern District of California

Defs' Response and Objs. at 6 (discussing evidence that some Machines were returned to Sears and resold to a second purchaser, and some were sold by the original owner to a second owner). Because of the way that the classes are defined, it appears that "ascertaining class membership would require unmanageable individualized inquiry." *Xavier v. Philip Morris USA Inc.*, 787 F. Supp. 2d 1075, 1089 (N.D. Cal. 2011).

Finally, in light of the recent decision *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136 (9th Cir. 2012), it appears that Plaintiffs' claims based upon Defendants' alleged concealment of the ECB defect are viable only to the extent that the defect causes an unreasonable safety hazard. In *Wilson*, purchasers of a notebook computer claimed that the manufacturer concealed a design defect that rendered the laptops "substantially likely to cease working and require expensive repair during their useful life and with normal use and after the expiration of the warranty." *Id.* at 1139. The plaintiffs alleged that the defendant's conduct violated the California's UCL, CLRA, and common law fraud and deceit statutes. *See id.* at 1140. The district court concluded that for a manufacturer's omission and/or concealment of a design defect to be legally "material" for purposes of these claims, the defect must cause "an unreasonable safety hazard." *See id.* at 1143. The district court also concluded that the plaintiffs had not sufficiently alleged a causal connection between the design defect and a safety hazard. *See id.* The appellate court affirmed the district court on both of these points. *See id.* Plaintiffs argue that the *Wilson* court misinterpreted California law. However, a decision of the Ninth Circuit is binding upon this Court, and *Wilson* does not appear to be distinguishable from the present case in any meaningful way. Plaintiffs point out that *Wilson* itself distinguished the present case on the ground that here Plaintiffs allege that they began experiencing problems with the Machines within the express warranty period while in *Wilson* the plaintiffs alleged that the problems manifested after expiration of the warranty period. *See id.* at 1142 n.1. It is not apparent how this distinction is relevant to whether a particular fact is "material" for purposes of UCL, CLRA, and fraud claims. Moreover, the proposed classes capture not only individuals who experienced an error code during the one-year warranty period but also those who experienced an error code outside the warranty period or who have not experienced an error code at all. Even if *Wilson* could be read to hold that concealment of a non-safety defect is material *if* the defect

manifests during the warranty period, the proposed class definitions still would be far too broad.

The Court recognizes that a motion for class certification is not the appropriate means for determining whether Plaintiffs' claims under the UCL, CLRA, and common law are subject to dismissal wholly or in part, but in light of *Wilson*, it appears that these claims no longer are viable with respect to non-safety defects such as the manifestation of error codes.  To the extent that the Court would be inclined to certify the claims, certification necessarily would be limited to the claim that the ECB defect posed an unreasonable risk that the Machines would explode.  However, as is discussed above, the Court concludes that Plaintiffs' expert evidence on that point must be excluded.  It would be inappropriate to certify the UCL, CLRA, or common law claims for class treatment absent record evidence that individuals were subjected to a common defect that posed an unreasonable risk of harm.  *See Bruce v. Harley-Davidson Motor Co., Inc.*, Case No. CV 09-6588 CAS (RZx), 2012 WL 769604, at *6 (C.D. Cal. Jan. 23, 2012) (denying class certification based upon the plaintiffs' "failure to show that common evidence will ultimately be admissible to prove that the Class Vehicles share a common defect"); *Stevens v. Harper*, 213 F.R.D. 358, 383 (E.D. Cal. 2002) ("Because there is no evidence of a systemwide CYA policy or practice of denying wards outdoor exercise, certification of a systemwide class is inappropriate.").

In summary, the Court concludes that the proposed classes are overbroad and unmanageable as defined.  In addition, the Court concludes that Plaintiffs' UCL, CLRA, and common law fraud claims are not appropriate for certification for the reasons discussed above.  Although this determination is sufficient to dispose of the present motion, the Court will address the remaining Rule 23 factors in order to provide a complete record.

**2.**       **Rule 23(a)**

a.       **Numerosity**

Plaintiffs present evidence that the nationwide class consists of more than 200,000 consumers who purchased or own a defective Machine.  Defendants do not argue that Plaintiffs have failed to satisfy the numerosity requirement.

b.       **Commonality**

Class members' claims must depend upon a common contention that is "of such a nature that

21

1   it is capable of classwide resolution – which means that determination of its truth or falsity will

2   resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 131

3   S.Ct. at 2551. "What matters to class certification . . . is not the raising of common questions – even

4   in droves – but, rather the capacity of a classwide proceeding to generate common answers apt to

5   drive the resolution of the litigation. Dissimilarities within the proposed class are what have the

6   potential to impede the generation of common answers." *Id.* (internal quotation marks and citation

7   omitted).

8          Plaintiffs' claims turn upon the theory that all of the Machines in question were

9   manufactured with a defective ECB. Plaintiffs assert that the defect manifested in three ways: (1)

10  the ECB's defective software and defective pressure sensor together trigger a "F1" error; (2) the

11  ECB's defective software causes a "F51" error; and (3) the ECB's defective software causes a

12  "sudden instability event" that can cause an explosion when certain types of fabric are in the wash

13  load. These claims appear to be susceptible to common resolution – either the Machines in question

14  contained a common defect in the ECB or they did not, and either the defect rendered the machines

15  substantially certain to fail or it did not. Other common issues include whether Defendants were

16  aware of the defect and concealed it.

17         Defendants argue that there is no common defect. Setting aside the alleged sudden

18  instability defect, as to which there is no record evidence as discussed above, the parties have

19  submitted competing expert testimony and other evidence as to whether there is a common defect in

20  the ECB. The Court need not resolve this merits issue at this stage of the proceedings. *See Wolph v.*

21  *Acer Am. Corp.*, 272 F.R.D. 477, 482 (N.D. Cal. 2011). The question is whether resolution of this

22  issue "will resolve an issue that is central to the validity of each one of the claims in one stroke."

23  *See Dukes*, 131 S.Ct. at 2551. The answer is yes.

24         Defendants also argue that a number of individual issues will predominate. That argument

25  presents a separate inquiry that is addressed below in the discussion of Rule 23(b).

26             **c.    Typicality**

27         The Court must determine whether "the claims or defenses of the representative parties are

28  typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "[R]epresentative claims

22

are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). "[T]he commonality and typicality requirements of Rule 23(a) tend to merge.  Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Dukes*, 131 S.Ct. at 2551 n.5.  A proposed class representative is not typical if his or her claims are subject to time-consuming specific defenses that would not apply to absent class members.  *See State of Alaska v. Suburban Propane Gas Corp.*, 123 F.3d 1317, 1321 (9th Cir. 1997) ("A named plaintiff's motion for certification should not be granted if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.") (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)).

Defendants assert that the claims of the named Plaintiffs are not typical of the claims of the proposed classes.  This assertion is based upon Defendants' assumption that recovery may not be had by individuals who did not actually experience an F1 or F51 error code.  Defendants argue that there is no evidence that any of the named Plaintiffs experienced a false error code, and thus that the named Plaintiffs cannot represent the claims of those individuals who did experience a false error code.  In its order of July 2011, the Court concluded that class claims may be certified with respect to claims based on an inherent defect theory even if class members have not experienced a manifestation of the alleged defect.  July 2011 Order at 6.  It held that "when a latent defect is substantially certain to result in malfunction of the product, the product is not worth the price for which it was sold, regardless of whether or not the alleged defect has manifested." *Id.*  The Court is not inclined to revisit this determination.

### d.    Adequacy

Plaintiffs must demonstrate that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  When considering the adequacy of a class representative, courts generally consider only two questions:  "(1) [d]o the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the

23

representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"

*Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003).  There is no evidence of any conflict of

interest, and Plaintiffs have been zealous in prosecuting the action.

### 3.   Rule 23(b)

In addition to demonstrating that this case meets the four requirements of Rule 23(a),

Plaintiffs must demonstrate that it meets one of the requirements of Rule 23(b).  They assert that the

requirements of Rule 23(b)(3) are met because common questions of law or fact predominate and

the class action is superior to other available methods of adjudication.  When considering

application of Rule 23(b)(3), the Court must go beyond asking whether any common questions exist

and ask whether these common questions "predominate over any questions affecting only individual

members" of the putative class.  *See* Fed. R. Civ. P. 23(b)(3).  This analysis focuses on "the

relationship between the common and individual issues. When common questions present a

significant aspect of the case and they can be resolved for all members of the class in a single

adjudication, there is clear justification for handling the dispute on a representative rather than on an

individual basis."  *Hanlon*, 150 F.3d at 1022 (internal quotation marks and citation omitted).  The

Rule 23(b)(3) inquiry "tests whether proposed classes are sufficiently cohesive to warrant

adjudication by representation."  *Id*. (citation omitted).  If common questions do predominate, the

plaintiff must demonstrate that the class action is superior to other available methods of

adjudication.  *See* Fed. R. Civ. P. 23(b).

For the reasons discussed above, the Court declines to certify the UCL, CLRA, and common

law concealment claims.  As noted in the March 2010 Order, "Plaintiffs' express warranty claims

involve elements that are individual to each purported class member, such as the provision of notice,

an opportunity to cure, and reliance."  March 2010 Order at 32.  Although it has reconsidered this

determination in light of the confusion inadvertently created by the July 2011 order, the Court

remains persuaded that individual questions would predominate with respect to the warranty claims.

With respect to the MMWA claim, Plaintiffs' counsel clarified at the hearing that the claim is based

solely upon the federal statute and does not depend upon the laws of individual states.  In light of

that clarification, the Court conceivably could certify a properly-defined class with respect to the

24

MMWA claim.  However, because the proposed classes are overbroad and unmanageable as currently defined, the present motion for class certification will be denied in its entirety.

Because there appears to be a reasonable possibility that Plaintiffs could define an appropriate class with respect to their MMWA claim, this determination is without prejudice, but only to that extent.  Because of the length of time this case has been pending and in the interest of finality, any renewed motion for class certification must be filed within forty-five (45) days of the date this order is filed.  Such a renewed motion shall not contain any new or amended claims or additional supporting evidence.

## IV. ORDER

Good cause therefor appearing:

(1)  Defendants' motion to exclude certain testimony and opinions of Plaintiffs' expert is GRANTED IN PART;

(2)  Plaintiffs' motion to exclude certain testimony and opinions of Defendants' expert is DENIED; and

(3)  Plaintiffs' motion for class certification is DENIED WITHOUT PREJUDICE on the conditions set forth above.

DATED:  May 4, 2012

_____
JEREMY FOGEL
United States District Judge

United States District Court
For the Northern District of California